# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| In re:<br><br>INSIGHT TERMINAL SOLUTIONS, LLC, *et al*.,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 19-32231<br><br>(Jointly Administered)<br><br>Adv. Proc. No. 24-03007-jal |
| INSIGHT TERMINAL SOLUTIONS, LLC, as the Reorganized Debtor,<br><br>                    Plaintiff,<br><br>      v.<br><br>CITY OF OAKLAND,<br><br>                    Defendant. | Judge Joan A. Lloyd |

<u>**DEFENDANT CITY OF OAKLAND'S MEMORANDUM OF LAW**</u>
<u>**IN SUPPORT OF MOTION TO DISMISS**</u>

## I.      PRELIMINARY STATEMENT

1.     On November 3, 2020, this Court entered its order confirming prepetition lender Autumn Wind Lending, LLC ("<u>AWL</u>")'s plan of reorganization for the bankruptcy estate of chapter 11 debtor Insight Terminal Solutions, LLC ("<u>ITS</u>" or "<u>Reorganized Debtor</u>").  (Dkt. 378) ("<u>Plan</u>"). Three and a half years later, Plaintiff Reorganized Debtor ITS, now controlled by California-based AWL, files this adversary complaint (the "<u>Complaint</u>") asserting two business interference tort claims under California law against the City of Oakland ("<u>Defendant</u>" or the "<u>City</u>"), a California city with regard to actions that allegedly began a decade ago in California.  This alone should raise the Court's brow on whether this Court has jurisdiction.  But the death knell for jurisdiction here is

- 1 -

that this alleged business torts were never listed on ITS's schedules, never addressed in the Plan (and do not pertain to the Plan or the Estate), and certainly do not arise in or under the Bankruptcy Code.  Simply, this Court does not have core or non-core jurisdiction to adjudicate this adversary.

2.    The Complaint claims the City had a contract with Oakland Bulk and Oversized Terminal ("OBOT"), a primary leaseholder of City-owned land in the former Oakland Army Base that ITS wished to sublease from OBOT.  The Complaint further alleges that, *over a decade ago*, the City took actions regarding that OBOT Ground Lease that constitute tortious interference with its own partnership with OBOT that resulted in this 2019 bankruptcy.  Indeed, OBOT and the City have been litigating the validity of this Ground Lease in state and federal court for years, and that litigation remains ongoing in the appellate courts in California.  Notably, that litigation has not been favorable to OBOT's business torts claims or damages claims (the same "over $1 billion" in future lost profits which ITS now tries to claim here). ITS now wants a court outside of California to look at overlapping claims under California law.

3.    However, even if this Court were to find jurisdiction in this bankruptcy proceeding, these tort claims fail under California law and must be dismissed for independent dispositive reasons: 1) there is no common law right to sue a city directly in tort in California; 2) any claims based on City action from 2014-2019 are plainly time-barred; 3) with respect to the more recent allegations, the claims fail because the City has a right to enforce the status quo with regard to the Ground Lease pending appeal under well-established California law, *see Daly v. San Bernardino Cnty. Bd. of Supervisors*, 11 Cal.5th 1030, 1041 (2021); and 4) California law does not permit a breach of contract as the sole predicate for interference with prospective advantage.

4.    The Complaint is facially deficient for which there can be no reasonable dispute. ITS's claims that this Court has jurisdiction, and that the City is liable to ITS under California law

are not just frivolous, they were made in bad faith to avoid California law.  The case should be dismissed in its entirety with costs to the City.

## II.      FACTUAL BACKGROUND

5.      Plaintiff ITS purports to sue Defendant City for business interference torts arising from a proposed development project on City-owned land at the former Oakland Army Base in Oakland, California, which was intended to be developed as a bulk commodity terminal by ITS's business partner and proposed landlord, OBOT.

6.      The City and OBOT entered into a series of development-related contracts, beginning in 2012, including a Ground Lease for the West Gateway property.  OBOT in turn entered into a proposed sublease for that property with ITS in 2018.  ITS now claims that the City's actions beginning in 2014 through the present interfered with its sublease of the land from OBOT and other unnamed future contracts and profits from the development.  But the validity of contracts in question (the 2016 Ground Lease between OBOT and the City, and, accordingly, the 2018 proposed sublease between OBOT and ITS) is the exact subject of currently pending and ongoing California state court litigation.  *See OBOT v. City of Oakland*, Alameda County Superior Court Case No. RG18930929; First District Court of Appeal Case No. A169585.  The City briefly explains the parties, the contracts, and the litigation background, before addressing the relevant aspects of the ITS bankruptcy proceedings, and this new 2024 adversary proceeding, identifying in particular information that ITS neglected to tell the Court regarding the prior and pending proceedings.

### A.      The Developers, the City, and the Development Contracts

7.      Defendant City of Oakland is a municipal corporation formed under the laws of California and owns the West Gateway land.  (Adv. Dkt. 1, ¶ 17.)  The California Capital Investment Group ("CCIG") is an Oakland-based real estate development firm chosen by the City

- 3 -

to help develop the former Army Base.  (*Id.*, ¶ 2.)  OBOT was created and is owned by CCIG for purposes of the West Gateway bulk commodity terminal project.  (Adv. Dkt. 1, Ex. B at 1 & n.3.)

8.     Plaintiff ITS is an entity originally created by an executive with Kentucky-based Bowie Resource Partners, for purposes of partnering with OBOT in the bulk terminal project.  *See Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 321 F.Supp.3d 986, 989 (N.D. Cal. 2018) (*OBOT I*), *aff'd,* 960 F.3d 603 (9th Cir. 2020).  As this Court is aware, ITS filed its petition for relief under chapter 11 in this Court in 2019, and subsequent to plan confirmation, has been owned and controlled by Los Angeles-based AWL.  (Dkt. 378).

9.     The 2013 Development Agreement ("DA") between CCIG and the City governed the regulatory framework that would apply to the development projects on the old Army Base property.  *OBOT I*, 321 F. Supp. 3d at 989.  That DA, as is typical, set forth parameters for freezing existing laws and conditions under which the City could enact and apply new legislation.  *Id.* at 992.  Also typical, the DA reserved the City's rights to apply all existing regulatory requirements, including permitting, and state and local environmental compliance requirements.  *Id.*

10.    The 2016 West Gateway Ground Lease ("Ground Lease") was the real estate transaction by which the City transferred possession of the land and set forth the permitted and required uses, in exchange for the payment of rent to the City.  (Adv. Dkt. 1, Ex. B at 42–48, 69.)  The Ground Lease required OBOT to commence construction of the terminal and related rail by specific deadlines.  (*Id.*, Ex. B at 48.)  The Ground Lease expressly did not restrict the City's regulatory authority.  (*Id.*, Ex. B at 40-41.)

11.    In June 2016, the City invoked the DA provisions for new health and safety regulations to pass an Ordinance and Resolution regulating the storage and handling of coal in

Oakland, including at the proposed West Gateway project. *OBOT I* at 991. As discussed below, this resulted in the first litigation between OBOT and the City.

12.     The deadline set forth in the Ground Lease to commence construction of the terminal and related rail was August 14, 2018 at the latest. (Adv. Dkt. 1, Ex. B at 34, 48–49.) OBOT failed to meet that deadline, claiming *force majeure* extension based on actions including the 2016 Ordinance that were known or foreseeable at the time of the Ground Lease. (*Id*. at 34.) The City rejected those claims, called default and terminated pursuant to the contract terms on November 22, 2018. (*Id*. at 85-86.)

13.     After OBOT's default under the Ground Lease, OBOT and ITS entered into the ITS sublease ("Sublease") on September 24, 2018, assuming OBOT's responsibilities to develop the terminal in exchange for significant upfront and continuing monetary payments by ITS to OBOT. (Adv. Dkt. 1, ¶ 4; Request for Judicial Notice ("RJN"[1]), Ex. B at 19-20.) The City is not a party. (*Id*.) Because OBOT and ITS entered into the Sublease after OBOT defaulted, and in light of the express WGW Lease terms barring all subleases during a default, the City never approved or recognized the sublease under the WGW Lease. (*Id.*, ¶ 9 & Ex. B at 81.)

### B.     Prior and Pending Federal and State Litigation

14.     In December 2016, OBOT sued the City in federal court in California, challenging the City's authority to enact and apply the coal Ordinance and Resolution to the project, including as a breach of the DA. *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* ("*OBOT I*"), Case No. 16-cv-07014-VC (N.D. Cal.). In May 2018, the Court concluded the City had not met

---

[1]  Attached hereto as **Exhibit A**, the Request for Judicial Notice. "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir.2001).

the requisite standard for imposing new health and safety legislation, and concluded the City thereby breached the DA.  (*OBOT I*, 321 F. Supp. 3d at 988-89.) The City appealed, and the Ninth Circuit eventually affirmed.  *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland (*"*OBOT II*"*),* 960 F.3d 603, 607 (9th Cir. 2020).

15.    Significantly, in that federal litigation, OBOT expressly waived damages.  (Adv. Dkt. 1, Ex. B at 90 n.38.)  OBOT also pled relief from the Ground Lease deadlines but also abandoned that equitable relief.  (*See* Adv. Dkt 1, Ex. B at 3-4; 90 n.38.)

16.    In December 2018, after the City terminated the Ground Lease, OBOT sued the City again in state court, the Alameda County Superior Court (the "Superior Court"), this time for hundreds of millions of dollars.  (RJN, Ex. B at 3-4.)  OBOT initially pled both contract and tort claims, including tortious interference with the ITS (then TLS) sublease.  (*Id.*, Ex. A.)  On May 16, 2019, the Superior Court dismissed the tort claims on the ground that OBOT had failed to identify a statutory predicate for suing the City in tort and otherwise failed to state a claim.  (*Id.*, Ex. A at 6.)  OBOT did not attempt to reallege those torts in its operative amended complaint. (Adv. Dkt. 1, Ex. B at 4).

17.    After a bench trial, the Superior Court agreed with the City that *res judicata* partially barred OBOT's claims in light of the federal litigation.  (Adv. Dkt. 1, Ex. B at 90 n.38.)  That court also concluded that OBOT had failed to meet the contract construction deadlines, but concluded that events of *force majeure* after May 15, 2018 warranted granting an extension, and therefore concluded the City's termination of the Ground Lease was a breach.  (*Id*., Ex. B at 89-91.)

18.    The trial court then conducted a further bench trial on remedies.  (RJN, Ex. B at 2-3.)  OBOT asserted its right to elect either an specific performance remedy of a contract deadline extension plus $20 million in equitable damages, or $160 million in present-day value of its claimed

- 6 -

approximately $1 billion in lost future profits from the ITS Sublease over the life of the Ground Lease as contract damages.  (*Id*.)  *The Court rejected OBOT's lost profits claims as entirely speculative and granted zero dollars in lost future profits* (including both the $20 million in incidental damages, and reducing the $160 million in contract damages to $300,000 in actual costs). (*Id*., Ex. B at 14, 19-29.)  OBOT elected specific performance remedy of a contract extension and the trial court entered judgment on January 23, 2024.  (*See* Adv. Dkt. 1, Ex. A.)

19.     Immediately upon entry of judgment, the City filed its notice of appeal,  (RJN, Ex. C.), which triggers the automatic stay pending appeal doctrine under California law set forth in *Daly v. San Bernardino Cnty. Bd. of Supervisors*, 11 Cal.5th 1030, 1041 (2021).  That appeal remains pending, *see* California Court of Appeal, First District, Case No. A169585.

### C.     ITS Bankruptcy Proceedings and 2020 Plan Confirmation

20.     Following defaults on money owed to OBOT, AWL, and others, ITS filed a voluntary chapter 11 petition in this Court on July 17, 2019 (the "Petition Date"), commencing Case No. 19-32231 (the "ITS Bankruptcy")  (Dkt. 1.)  ITS disclosed estimated assets of $1,000,001 to $10 million and estimated liabilities of $10,000,001 to $50 million in its petition.  (*Id.* at 3.)

21.     ITS did not list the City as a notice party in its petition.  (Dkt. 1.)  Nor did ITS schedule the City as a creditor.  (Dkt. 63 at 13-18 of 31.)

22.     ITS' Schedule A/B filed on August 22, 2019 disclosed its proposed Sublease of 19 acres at the former Oakland Army Base.  Although now claiming that the City's actions purportedly drove ITS into bankruptcy, neither its original nor amended Schedule A/B disclose any cause of action held against the City as of the Petition Date. (*Id.* at 8-12 of 31; *see also* Dkt. 105-1 at 1-5.)

23.     AWL filed a motion to dismiss the ITS Bankruptcy on July 25, 2019. (Dkt. 13). Therein, AWL asserted that the ITS Bankruptcy was "commenced as a stalling tactic to allow [Mr. John] Siegel [the former non-member Manager of ITS from formation until November 5, 2020] …

- 7 -

to retain the Sublease in what is essentially a two-party dispute involving quintessential state law issues." (*Id.* at 5.)  The two parties referenced there were AWL and ITS, not the City.

24.     On August 20, 2019, ITS stated in its objection to AWL's motion to dismiss that the ITS Bankruptcy was filed to protect its commercial development Project that had been disrupted due to *three* distinct factors:  (1) litigation stemming from the alleged actions of the City (the "Oakland Overburden"); (2) the Sublease, which had been declared in default by OBOT for failure to pay rent and faced the threat of termination; and (3) AWL had sought to foreclose on its security interest in ITS' membership interests upon ITS' uncured defaults under the terms of the parties' loan documents. (Dkt. 61, ¶ 1.)  Per its objection, ITS filed its case with the intent "to utilize the benefits and protections of chapter 11 to identify a takeout lender or investor that will allow [ITS] to move forward with the Project or locate a buyer of the Sublease." (*Id.,* ¶ 2.)

25.     On April 27, 2020, AWL filed its Disclosure Statement and plan of reorganization ("Plan"). (Dkts. 245, 245-1.)  According to the Disclosure Statement, the Sublease is ITS's "sole *potential* asset of substantial value".  (Dkt. 245, Art. III, ¶ A.) ITS did *not* identify any potential claims against the City, as of that time, as assets (let alone claims worth a purported $1 billion).

26.     AWL's Plan contains several other provisions, in pertinent part:

(a)     *On the Effective Date, all existing Interests in ITS shall be cancelled* and rendered null and void.  (Dkt. 245, Art. V, ¶ A.)

(b)     *AWL shall be the sole member of the Reorganized Debtor* as of the Effective Date of the Plan.  (*Id.*, Art. VI, ¶ D.)

(c)     *All Allowed General Unsecured Claims are unimpaired under the Plan and to be paid in full*.  (*Id.*, Art. III, ¶ B.)

(d)     *The Plan will be funded by* ITS' cash reserves as of the Petition Date, and *AWL's Cash Contribution of $5 million* for the benefit of Allowed Class 3 (General Unsecured Claims), *with any remaining funds to revert to AWL*. (*Id.*, Art. V, ¶ E.)

(e)     Per the affidavit of Vikas Tandon, Chief Investment Officer of Ridgedale Partners, LLC, the ultimate parent of AWL and JMB Capital Partners Master Fund, L.P.

- 8 -

("Fund"), *the Fund has "unencumbered liquid assets in excess of $150 million" and will guarantee all Allowed Claims* (except certain "Subordinated Claims") *in excess of the Cash Contribution by AWL*. (*Id.*, Ex. B attached thereto, ¶¶ 1-2.)

(f)    Except as otherwise explicitly provided in the Plan, *on the Effective Date, all property comprising the Estate (including Litigation Claims…) shall vest in the Reorganized Debtor* free and clear of all Claims, Liens, charges, interests, and encumbrances.  Furthermore, as of and following the Effective Date, *the Reorganized Debtor may operate its business* and use, acquire, and dispose of property *and settle and compromise Claims, Interests, or Litigation Claims without supervision of the Bankruptcy Court*, free any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  (*Id.*, Art. VI, ¶ B.)

(g)    Except as otherwise provided in the Plan, *all Litigation Claims other than Avoidance Actions are retained and reserved for the Reorganized Debtor*… [who] shall have the sole authority to prosecute, compromise, settle, and otherwise deal with any Litigation Claims other than Avoidance Actions, and does so in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B).  (*Id.*, Art. VII, ¶ K.)

(h)    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising out of, and relating to, the Chapter 11 Cases and the Plan, including the jurisdiction to (i) adjudicate *any and all adversary proceedings … that may be commenced or maintained pursuant to the Chapter 11 Case, the Plan*, *or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date*, and all controversies and issues arising from or relating to any of the foregoing (*see id.*, Art. IX, ¶ A.2.); and (ii) hear and determine *disputes arising in connection with the "interpretation, implementation, or enforcement of the Plan or the Confirmation Order"* (*Id.*, Art. IX, ¶ A.8.)

27.    ITS filed a competing plan of reorganization on May 26, 2020 (Dkt. 217), followed a June 19, 2020 amended plan of reorganization. (Dkt. 247.)  While ITS' plans contained several pertinent provisions similar to those in AWL's Plan, ITS proposed to fund its plan through a future contribution of approximately $50 million by the State of Utah.  Neither AWL nor ITS proposed to fund their plans with the litigation proceeds which the ITS now seeks to recover in this case.

28.    On November 3, 2020, the Court entered its order confirming AWL's Plan (the "Confirmation Order") (Dkt. 379.)  On November 5, 2020, AWL filed its notice confirming that the Effective Date of the Plan occurred on the same date. (Dkt. 381.)

**D.**     **Current Billion-Dollar Adversary Proceeding**

29.     On March 11, 2024, ITS filed its Complaint against the City, alleging two California state law business interference torts. (Adv. Dkt. 1.)   ITS largely reaches back in time to allege that City action and events prior to bankruptcy, leading up to the City's November 2018 termination of the Ground Lease, as the cause of the ITS bankruptcy (notwithstanding its contradictory statements in its objection to AWL's motion to dismiss).  ITS also references recent action by the City respecting the California mandatory stay pending appeal doctrine.

30.     Although ITS alleges that the City's actions on which it now bases these claims were "proven at trial twice before, in both federal and state courts" (and therefore known to ITS for *years*), it nonetheless now asserts that it is only the knowledge of the January 23, 2024 state court judgment that triggered its ability to (finally) file suit against the City.  (Adv. Dkt. 1, ¶¶ 1, 9.)

31.     ITS also selectively describes and attaches exhibits from the Superior Court record, omitting that court's ruling on demurrer dismissing OBOT's identical tort claims (RJN, Ex. A), the court's decision on remedy, rejecting all of OBOT's claimed lost profits (valued at approximately $1 billion, reduced to present value of $160 million) as entirely speculative (*id.*, Ex. B), and the City's appeal (*id.*, Ex. C.)  On the heels of OBOT losing those claims, ITS now also seeks over $1 billion in lost future profits, arising from the very same alleged City behavior (Adv. Dkt. 1, ¶ 62.)

### III.     LEGAL STANDARD

32.     The City seeks relief pursuant to Rule 12(b)(1).  Where, as here, "subject matter jurisdiction is challenged pursuant to Federal Rule of Civil Procedure 12(b)(1), "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

33.     As recently and succinctly summarized by the United States Bankruptcy Court for the Eastern District of Kentucky:

4879-9304-4152.6

> There are multiple federal statutes that define the scope of the bankruptcy court's subject-matter jurisdiction. First, under 28 U.S.C. § 1334(b), "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Second, 28 U.S.C. § 157(a) authorizes the district courts to refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 ... to the bankruptcy judges for the district."

*Elam v. Nationstar Mortg., LLC*, Adv. Pro. No. 21-00098, 2022 Bankr. LEXIS 1340, at *8-9 (Bankr. W.D. Tenn. May 4, 2022), *aff'd*, *Elam v. Nationstar Mortg., LLC)*, No. 22-8012, 2023 Bankr. LEXIS 2135 (B.A.P. 6th Cir. Aug. 29, 2023).  Crucially, "[w]ithout jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Tew v. ED&F Man Cap. Mkts., Ltd.*, No. 23-05042, 2023 Bankr. LEXIS 2766, at *3 (Bankr. E.D. Ky. Nov. 16, 2023) (citations omitted) (dismissing post-confirmation adversary proceeding for lack of subject matter jurisdiction).

34.    The City does also seek, in the alternative, relief pursuant to Rule 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

35.    On a motion to dismiss, the Court may consider any document attached to or incorporated in the pleading, or other documents properly subject to judicial notice such as filings and decisions in this or other court proceedings. *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991) ("Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure.)

## IV.    ARGUMENT

### A.    The Court Lacks Subject Matter Jurisdiction.

36.    ITS broadly alleges, without any specificity, that "[j]urisdiction is proper under 28 U.S.C. § 1334(b)."  (Adv. Dkt. 1, ¶ 13.)   ITS adds, in similarly conclusory fashion, that the adversary proceeding is "core."  (*Id.* ¶ 12.)  ITS is wrong:  This proceeding is not in any sense "core," and it neither "arises under" the Bankruptcy Code, "arises in" nor is "related to" the ITS Bankruptcy.  There is no basis for this Court to assert jurisdiction over these California state law tort claims brought against a non-creditor entity, more than four years post-plan confirmation.

### 1.    This is Not a Core Proceeding.

37.    A "core" proceeding is one that "could not exist outside of the bankruptcy" or that "invokes a substantive right created by federal bankruptcy law." *Lowenbraun v. Canary*, 453 F.3d 314, 320 (6th Cir. 2006).  Because ITS's tort claims do not involve any "substantive rights granted by the Bankruptcy Code" and are not the "type of controversy unique to bankruptcy," there is no even remotely plausible argument that this is a core proceeding.  *See E. Ky. Power Coop., Inc. v. Greenwich Ins. Co.*, No. 05-137, 2006 WL 6351092, at *1 (E.D. Ky. Jan. 24, 2006).

### 2.    This Proceeding Does Not "Arise under" under the Bankruptcy Code.

38.    "The phrase 'arising under title 11' describes those proceedings that involve a cause of action created or determined by a statutory provision of title 11 . . . ." *In re Trans-Industries, Inc.*, 419 B.R. 21, 26-27 (Bankr. E.D. Mich. 2009) (citations omitted); *Mich. Employment Sec. Comm'n (In re Wolverine Radio Co.),* 930 F.2d 1132, 1144 (6th Cir. 1991) (stating civil proceedings "arising under" title 11 "involve causes of action created or determined by a statutory provision of title 11", e.g., an action to avoid a preferential transfer under § 547 of the Bankruptcy Code). *Moyer v. Bank of America*, 400 B.R. 569, 572-73 (Bankr. W.D. Mich. 2008).  The only claims alleged by ITS here are torts that plainly arise under state law, not the Bankruptcy Code.

### 3.    This Proceeding Does Not "Arise in" a Bankruptcy Case.

39.    Likewise, these torts are not claims that "by their very nature, could arise only in bankruptcy cases," and therefore do not "arise in" this bankruptcy case either.  *In re Wolverine Radio*, 930 F.2d at 1144.   Proceedings arising in a case under Title 11 "are not based on any right expressly created by Title 11, but nevertheless, would have no existence outside of the bankruptcy," such as "administrative matters; counterclaims by the estate against persons filing claims against the estate; orders to turn over property of the estate and determinations of the validity, extent or priority of liens." *McDaniel v. ABN AMRO Mortgage Group,* 364 B.R. 644, 647 (Bankr. S.D. Ohio 2007).  Here, the Complaint seeks relief solely based on state law tort claims that are commonly asserted in civil litigation between business parties outside of the bankruptcy context, and therefore do not qualify for this jurisdiction.  *Tew*, 2023 Bankr. LEXIS 2766, at *16-17.

### 4.    This Post-Confirmation Proceeding Is Insufficiently "Related To" a Case under the Bankruptcy Code.

40.    This Court also lacks "related to" jurisdiction over this proceeding.  A bankruptcy court's jurisdiction over a civil proceeding as "related to" a bankruptcy case constitutes the "outer limits of the district court's referral to its bankruptcy judges[.]" *Evans & Assoc. v. Macnichol*, 240 B.R. 731, 732 (Bankr. S.D. Ohio 1999).  Thus, the Supreme Court has made clear that "a bankruptcy court's 'related to' jurisdiction cannot be limitless" and "bankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, n.6 (1995).

41.    For cases brought post-confirmation, "[a]t the most literal level, it is impossible for the bankrupt debtor's estate to be affected by a post-confirmation dispute because the debtor's estate ceases to exist once confirmation has occurred."  *Papas v. Buchwald Capital Advisors, LLC, et al.*, 728 F.3d 567, 577 (6th Cir. 2013) (quoting, *inter alia, Resorts Int'l Financing, Inc. v. Binder*, 372

- 13 -

F.3d 154, 165 (3d Cir. 2004)).  The Sixth Circuit courts therefore confirm that jurisdiction over a related proceeding diminishes after chapter 11 plan confirmation.  *See, e.g.,* 2023 Bankr. LEXIS 2766, *20-21; *In re St. James Nursing & Physical Rehab. Ctr., Inc.*, 645 B.R. 220, 249-50 (Bankr. E.D. Mich. 2022); *In re CS DIP, LLC*, Case No. 12-01573, 2015 Bankr. LEXIS 3435, at *27 (Bankr. M.D. Tenn. Oct. 9, 2015).  In addition, courts refer to post-confirmation jurisdiction as "sharply" reduced, "somewhat" reduced, "fairly narrow," and "pared down."  *See In re Ventilex USA, Inc.*, 509 B.R. 140, 143 (Bankr. S.D. Ohio 2014); *CS DIP, LLC*, 2015 Bankr. LEXIS 3435, at *33; *In re Wisper, LLC*, Case No. 13-10770, 2015 Bankr. LEXIS 2505, at *14-16 (Bankr. W.D. Tenn. Feb. 13, 2015); *Eastland Partners, Ltd. P'ship v. Brown*, 199 B.R. 917, 919-20 (Bankr. E.D. Mich. 1996).

42.    The post-confirmation test for "related to" jurisdiction is exacting, requiring a "*close nexus* to the bankruptcy plan or proceeding.*"  See Thickstun Bros. Equip. Co. v. Encompass Servs. Corp.*, 344 B.R. 515, 521 (B.A.P. 6th Cir. 2006) (emphasis added); *see also, e.g., E. Ky. Power Coop.*, 2006 WL 6351092, at *2 ("Where there is a dispute about a non-core matter after confirmation of the Plan, there must be a close nexus between the dispute and the Plan to vest subject matter jurisdiction…").  To satisfy this standard, a dispute must affect an "integral part of the bankruptcy proceeding." *See E. Ky. Power Coop.*, 2006 WL 6351092, at *2; *see also Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 837 (4th Cir. 2007).

43.    In the seminal case adopting the "close nexus" standard, the Third Circuit explained: "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Resorts Int'l*, 372 F.3d at 167. Stated another way, a civil proceeding is "related to" a case under title 11 "*if the outcome could*

*conceivably have an effect on the estate being administered in bankruptcy*." *Greektown Holdings,* 728 F.3d at 577 (citations omitted) (emphasis added).

44.      As Judge Wise recently examined in the *Tew* case, courts also assess whether "related to" jurisdiction exists using a variety of factors. *See, e.g., Tew,* 2023 Bankr. LEXIS 2766, \*17; *BWI Liquidating Corp. v. Rialto,* 437 B.R. 160 (Bankr. D. Del. 2010); *Equip. Finders, Inc. v. Fireman's Fund Ins. Co.*, 473 B.R. 720, 733-34 (Bankr. M.D. Tenn. 2012) (collecting cases).  And significantly, potential contribution of a litigation damages award to a debtor's assets does not qualify as "related to" jurisdiction.  *Id*. at \*22-23 (citing *Equip. Finders, Inc.*, 473 B.R. 720.)

45.      ITS attempts to manufacture a connection between its current tort claims and this bankruptcy proceeding by claiming that the City's actions in 2018 *caused* the 2019 ITS bankruptcy. Indeed, in the *Tew* case, the Eastern District recently rejected a claim that an allegation that the defendant's actions caused the bankruptcy was sufficient to invoke related to jurisdiction. *Id.*, 2023 Bankr. LEXIS 2766, \*35-37. This case presents an even stronger basis for rejecting jurisdiction, based on the following factors, which *all* weigh against jurisdiction:

### a.      The City did not actively participate in the ITS Bankruptcy.

46.      The City has never had any contractual or business relationship with ITS, and ITS conspicuously does not (and cannot) allege that it has.  The City appeared in the ITS Bankruptcy solely to alert the Court to the existing state court litigation challenging the validity of the OBOT Ground Lease (the termination of which would invalidate any sublease with ITS).  (Dkt. 276.)  As is clear from the docket, the City did not file a proof of claim; ITS did not schedule the City as holding a file a prepetition claim; and ITS did not even include the City as a notice party.  Nor did ITS (or AWL) ever schedule any contingent or unliquidated claims against the City.  As the City's connection to this case is minimal at best, this factor plainly militates against jurisdiction.

- 15 -

**b.    ITS reorganized in bankruptcy.**

47.    The rationale for the narrowing of "related to" jurisdiction post-confirmation starts with the premise that a reorganized debtor is emancipated by the confirmation of a reorganization plan.  Upon confirmation, the reorganized debtor emerges and enters the marketplace in its reincarnated form.  "From that point forward, it is just like any other corporation; 'it must protect its interests in the way provided by the applicable non-bankruptcy law,' without any special swaddling."  *See Tew*, 2023 Bankr. LEXIS at *26-27 (quoting *Boston Reg'l Med. Ctr., Inc. v. Reynolds*, 410 F.3d 106-07).  To permit otherwise would risk an unwarranted expansion of federal court jurisdiction but also "would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litigation affecting them into a single federal forum."  *Boston Reg'l Med. Ctr.*, 410 F.3d at 106.  This case is a prime example of exactly that:  the Reorganized Debtor (now based in California) engaging in forum shopping rather than properly adjudicating California state law claims against a California city in California courts.

48.    AWL confirmed its Plan for ITS's bankruptcy estate in November 2020, to take ownership and control of ITS through the cancellation of its interests as of the Effective Date and the issuance of New Membership Interests under the terms of the Plan to develop or actively market and sell the Sublease.  (Dkt. 245, Art. II, at 4-5.)  As ITS undisputedly has opted to "reenter the marketplace," as compared to a debtor that liquidated its assets and stopped operating, this second factor weighs heavily against finding "related to" jurisdiction over this proceeding.

**c.    The causes of action are not "rooted in" bankruptcy.**

49.    "Pertinent to whether 'related to' jurisdiction exists is whether a complaint's allegations concern activity in or leading to the bankruptcy case.   If the claims in a proceeding are rooted in bankruptcy, a stronger argument exists to find 'related to' jurisdiction…. ¶ Conversely, when causes of action are not rooted in bankruptcy and could be pursued outside of bankruptcy, a

- 16 -

connection between the proceeding and the bankruptcy case or plan is more tenuous." *Tew*, 2023 Bankr. LEXIS 2766, at \*29-31 (dismissing for lack of subject matter jurisdiction where civil RICO and state law claims asserted against defendant did not pertain to activity in debtors' bankruptcy case). Examples of cases "rooted in" bankruptcy include a scheme to defraud debtors involving a sham chapter 11 case, *id*. (citing *Tang v. Citic Capital Holdings Ltd*., Case No. 21-17008-JXN-AME, 2022 U.S. Dist. LEXIS 184505, at \*18 (D.N.J. Oct. 7, 2022)), and the transfer of a plan asset without notice in a chapter 11 sale and confirmation process. *Id.*

50.     In contrast, exactly as in *Tew*, the tort claims at issue here "do not pertain to activity in Debtors' bankruptcy case" at all, but rather alleged conduct well before (the alleged Oakland Overburden) and well after the bankruptcy proceedings (the 2024 City inaction post-judgment in light of the stay). *Id*., 2023 Bankr. LEXIS 2766, \*30-31. As in *Tew*, an allegation that the actions of the City somehow led to the bankruptcy does not suffice. *Id.* at \*31 (concluding claims were not "rooted in" the bankruptcy where "Plaintiffs allege Defendant's conduct in 2012-2015 subjected Debtors to litigation initiated in 2018, which, due to mounting legal fees, ultimately forced Debtors to seek bankruptcy protection in 2020."). Thus, this factor also strongly supports dismissal.

> **d.      These claims do not have a close nexus with the bankruptcy.**

51.     Ancillary litigation arising out of post-confirmation conduct does not provide a sufficient nexus to warrant "related to" jurisdiction over a resulting adversary proceeding. *See, e.g., Resorts Int'l*, 372 F.3d at 163, 169-71 (rejecting argument that malpractice claims by liquidating trustee against accounting firm providing audit reports post-confirmation were related to the underlying bankruptcy case). Similarly, "claims based on pre-petition conduct that were asserted post-confirmation, but could have been brought prior to confirmation[,] lack a nexus sufficient to confer jurisdiction upon the bankruptcy court." *Fairchild Liquidating Trust v. New York,* 452 B.R. 525, 531-32 (Bankr. D. Del. 2011) (concluding "a breach of contract claim based on pre-petition

- 17 -

conduct filed post-confirmation belongs to the reorganized debtor, without regard to when and how the claim arose." (footnotes omitted)).

52.     Here, ITS asserts claims, for the first time, post-plan confirmation, that largely challenge pre-confirmation actions.  And, ITS never asserted prior to plan confirmation that the City caused its bankruptcy, and it cannot invent that belated (and implausible) allegation now, post-confirmation, in a transparent effort to manufacture bankruptcy jurisdiction.  And, ITS's only claims that are not facially time-barred are based on alleged City conduct in late 2023 and 2024, which cannot possibly have played any role in ITS's 2019 bankruptcy.

53.     In addition, as in *Tew*, "One aspect of the analysis is simple here; none of the claims in the complaint would require a reviewing court to interpret Debtors' Plan or to enforce any of its provisions."  (*Id.,* 2023 Bankr. LEXIS 2766, at *29-31.)  This action does not involve the enforcement of any orders issued by this Court in the ITS Bankruptcy, nor will resolution of the plaintiffs' claims require this Court to address the "interpretation, implementation, consummation, execution, or administration" of the Plan.  (*See* Dkt. 245, Art. IX, ¶¶ A.1., A.8.)

54.     Moreover, even if ITS could pursue a recoverable claim against the City, the Plan does not provide for ITS to use any such proceeds to increase creditor recoveries thereunder.  In fact, the outcome of this adversary proceeding would have <u>zero</u> impact to the estate. Under the terms of the Plan confirmed over three and a half years ago, AWL agreed to fund distributions under the plan through a Cash Contribution and JMB Capital Partners Master Fund, LP ("<u>JMB Capital</u>") to provide a guarantee of payment of all Allowed Claims that exceed the Cash Contribution.  (Dkt. 245-1, Art. VI, ¶¶ D., E.)  As the Class 3 General Unsecured Claims under the Plan are unimpaired (*see id.*, Art. III, ¶ B.), any litigation proceeds which ITS hopes to recover from the City would not be used to pay creditors under the Plan—they would go to Reorganized Debtor

alone.  The outcome of this litigation therefore has no nexus (let alone a "close nexus") to the Plan or the ITS Bankruptcy.

>    **e.     ITS's Plan does not preserve jurisdiction over these claims.**

55.     In tandem with the "close nexus" requirement, some courts examine whether a plan "preserves" subject matter jurisdiction over the claims at issue. *See, e.g., Tew,* 2023 Bankr. LEXIS 2766 at *35-36 (collecting cases); *see also Ventilex*, 509 B.R. at 143; *Shandler v. DLJ Merch. Banking, Inc.*, 330 B.R. 512, 525 (Bankr. D. Del. 2005).    Here, the retention of jurisdiction provision in the Plan does not specifically identify or describe, any claim ITS may have or bring against any party, let alone identify these claims against the City.  (Dkt. 245-1, Art. VII, ¶ K.) Generic language regarding ITS's right to pursue claims against unidentified third parties is wholly insufficient to preserve ITS's non-bankruptcy claims against the City in this forum.  *See, e.g., BWI Liquidating Corp.*, 437 B.R. at 165-66 ("a Plan must specifically describe a cause of action in order to retain 'related to' jurisdiction.").

56.     In sum, *all* of the factors identified in the Sixth Circuit doctrine as pertaining to "related to" jurisdiction weigh against jurisdiction here.  Again, there is no plausible argument in favor of jurisdiction over these California tort claims.

>    **B.     Debtor Fails to State Any Valid Claim Against the City**

57.     Again, even if this Court were to accept jurisdiction post-confirmation on the facts of this case (which it should not), ITS's claims are so lacking in merit as to be frivolous under California law, and must be dismissed.[2]

---

[2] This list is not exhaustive of the substantive problems with ITS's claims here, including the fact that they are barred again by *res judicata* as a result of its privity with OBOT in funding the state court litigation, and California doctrine that requires entities to be "strangers" to claim such business interference.  The arguments addressed here are more than sufficient to dismiss the case.

### 1.    There Is No Common Law Tort Liability in California for Cities.

58.    ITS's Complaint asserts two California tort claims directly against the City but "there is no common law tort liability for public entities in California." *In re Groundwater Cases,* 154 Cal. App. 4th 659, 688 (2007); *see also Freeny v. City of San Buenaventura*, 216 Cal. App. 4th 1333, 1346 (2013) (cities are "presumptively immune from tort liability").  The only tort liability for public entities in California is that created specifically by statute: "direct tort liability of public entities must be based on a specific statute declaring them to be liable." *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1183 (2003); *see* Cal. Gov. Code §815(a).

59.    Long-standing California case law makes clear that a complaint <u>must</u> specifically plead the statutory basis for any tort claim against a city to state a claim:  to "state a cause of action, every fact essential to the existence of statutory liability must be pleaded with particularity, including the existence of a statutory duty." *Herd v. Cnty. of San Bernardino*, 311 F. Supp. 3d 1157, 1171 (C.D. Cal. 2018) (applying California law); *Lopez v. S. Cal. Rapid Transit Dist.*, 40 Cal. 3d 780, 795 (1985).  Because ITS's Complaint fails to assert <u>any</u> statutory basis for the City's liability for these business torts (Adv. Dkt. 1, ¶¶ 65-88), its claims therefore must be dismissed.  *See Nahas v. City of Mountain View*, 2005 WL 2739303, at *7, 9 (N.D. Cal. Oct. 24, 2005) (dismissing tortious interference claims against a public entity for failure to identify any statutory basis for liability, and reminding plaintiffs of their Rule 11 obligations).

60.    Moreover, counsel for ITS (Messrs. Lee and Sanders), who also represented OBOT in the state court litigation, are well-aware of this requirement of California law, because OBOT's business torts alleging the same interference with the same contracts were dismissed in 2019 on exactly these grounds.  (*See* RJN, Ex. A at 6.)  Despite this ruling, ITS now (frivolously) pleads the same claims with the exactly the same fatal flaw. *Cf. Nahas,* 2005 WL 2739303, at *9 (warning of Rule 11 sanctions for this type of pleading).

- 20 -

## 2. The Business Torts Are Facially Time-Barred

61.     The ITS claims based on alleged City action from 2014 through 2018 are plainly facially time-barred.  *See Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) ("[D]ismissal is warranted if 'the allegations in the complaint affirmatively show that the claim is time-barred'").  The default statute of limitations for government tort claims in California (even assuming ITS properly stated one) is "within two years from the accrual of the cause of action." Cal. Gov. Code § 945.6(a)(2); *Lundeen Coatings Corp. v. Dep't of Water & Power*, 232 Cal. App. 3d 816, 827 (1991); *DC Comics v. Pac. Pictures Corp.*, 938 F. Supp. 2d 941, 948 (C.D. Cal. 2013) ("A tortious-interference claim typically accrues 'at the date of the wrongful act.'").[3]   ITS's allegations based on the City's conduct culminating in the termination of the Ground Lease in 2018 and ITS's bankruptcy proceedings in 2019 and 2020 are *far* outside the statute of limitations.

62.     ITS's Complaint brazenly attempts to plead around the statute of limitations by alleging for each of its claims that "Plaintiff did not ascertain that Defendant's conduct was without basis and unjustified until January 23, 2024, when the State Court entered Judgment, finding that the City's purported termination of the Ground Lease was unlawful." (Adv. Dkt. 1, ¶¶ 70, 82.) There is no basis for dispute that, under California law, the discovery rule is based on awareness of *facts*, not a party's understanding of the law.  *Quarry v. Doe I*, 53 Cal. 4th 945, 960 (2012); *Rosas v. BASF Corp.*, 236 Cal. App. 4th 1378, 1389 (2015).   As the California Supreme Court has explained, a plaintiff "discovers the cause of action when he at least suspects *a factual basis, as opposed to a legal theory, for its elements*, even if he lacks knowledge thereof—when, simply put,

---

[3] The two-year statute of limitations for suits against public entities under the Government Claims Act controls, *see Moore v. Twomey*, 120 Cal. App. 4th 910, 913 (Cal. App. 3d Dist. 2004), but regardless, the ordinary statute of limitations for claims of tortious interference with contract or prospective economic advantage is also two years.  Cal. Code Civ. Proc. § 339(1); *Knoell v. Petrovich*, 76 Cal. App. 4th 164, 168 (Cal. App. 2d Dist. 1999).

he at least suspects that someone has done something wrong to him." *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397-98 (1999) (emphasis added) (citations omitted).

63.     Here, ITS has pled that it was actually aware of the factual basis for its current claims by no later than November 2018, when the City terminated the Ground Lease, and by July 2019, when ITS claims that the City's conduct allegedly caused it to file for bankruptcy. (Adv. Dkt. ¶ 1, 58.)[4] There is simply no legal authority that supports tolling ITS's claims until it understood the state court judgment. *All authority is to the contrary. See, e.g.*, *Shropshire v. Fred Rappoport Co*., 294 F. Supp. 2d 1085, 1101 (N.D. Cal. 2003) (finding "no authority" under California law to support the argument that "under the discovery rule, the interference claims did not accrue … even though the plaintiff is aware of the facts giving rise to injury—until a legal determination has been made in a separate action as to the wrongfulness of a defendant's conduct"); *Cypress Semiconductor Corp. v. Superior Ct.*, 163 Cal. App. 4th 575, 585 (2008) ("It is not the law that accrual of a cause of action depends upon the existence, as a matter of fact, of a winning claim.").  ITS's claims that the City *caused* the ITS bankruptcy are time-barred and must be dismissed.

### 3.     Interference with Contract Claims Based on the Recent 2024 Post-Judgment City Inaction Ignore the California Stay Doctrine

64.     What remains after removing the time-barred claims is ITS's contention that the City recently, post-state court judgment, refused to alter the status quo to move the project forward by recognizing the Sublease.  (Adv. Dkt. 1 at ¶¶ 9, 40).  But *the termination of these contracts is exactly the legal issue pending on appeal*. To state a claim for tortious interference with contract under California law, a plaintiff must plead "a *valid* contract between plaintiff and a third party." *Pac.*

---

[4] The City does not remotely concede as a factual matter that the City's actions, as opposed to ITS's then-owners' own financial missteps, caused the ITS Bankruptcy.  Regardless, for purposes of this Motion only, the City assumes all inferences in ITS's favor, and ITS's claims are defeated by ITS's own allegations.

- 22 -

*Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (emphasis added); *see also Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners*, 52 Cal. App. 4th 867, 879-80 (Cal. App. 4th Dist. 1997) "[A] cause of action for intentional interference with contractual relations requires an underlying *enforceable* contract.") (emphasis added).  Courts strictly enforce this pleading requirement to avoid "blur[ring] the analytical line between the two interference torts" and in "recognition that the 'formally cemented economic relationship' created by an 'existing contract' is entitled to greater solicitude than a relationship falling short of that." *Bed, Bath & Beyond of La Jolla, Inc.*, 52 Cal. App. 4th at 879 (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392 (1995)).  Therefore, "[i]f there is no enforceable contract, *for whatever reason*," there is no intentional interference with contract claim.  *PMC, Inc. v. Saban Ent., Inc.*, 45 Cal. App. 4th 579, 602 (Cal. App. 2d Dist. 1996), *disapproved of on other grounds by Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) (emphasis in original); *see also* Rest. 2d, Torts § 766, Comment f. ("The particular agreement must be in force and effect at the time of the breach that the actor has caused.").

65.    The Complaint deceptively ends its account of the state court proceedings with the Superior Court's order resolving liability and judgment.  However, as counsel for ITS are well aware, the City has appealed (*see* RJN, Ex. C), and that notice of appeal triggered California's automatic stay pending appeal doctrine.  Unless and until the appeal is resolved, there is no enforceable Ground Lease in effect, and the City cannot be held liable in tort (among all the many other reasons) for interference with a Sublease that was terminated along with that Ground Lease (and has yet to be resurrected by enforceable court order).

66.    In California, unlike in federal court, "an injunction requiring the defendant to take affirmative action (a so-called mandatory injunction) is automatically stayed during the pendency

of the appeal." *Daly v. San Bernardino Cnty. Bd. of Supervisors*, 11 Cal. 5th 1030, 1041 (2021). Under very long-standing law summarized in *Daly*, any judicial order that "mandates the performance of an affirmative act," or "commands some change in the parties' positions" is considered a mandatory injunction subject to the automatic stay. *Id.* The doctrine is intended "to preserve the status quo while a court determines the merits of the appeal" on the theory that "before such [mandatory] orders are executed and the defendant must detrimentally alter its position, the defendant is entitled to know whether the order is correct." *Id.* at 1041, 1051. The Superior Court's judgment, which would require the City to reinstate the Ground Lease and extend the contract deadlines is precisely the kind of mandatory injunction that is automatically until the appeal is resolved. The City's appeal thus stayed that judgment and "preserve[d] the status quo while a court determines the merits of the appeal," *Daly*, 11 Cal.5th at 1051, and actions consistent with that doctrine cannot constitute this tort. Because the Ground Lease remains terminated (and is not resurrected until that order is enforceable), there is no valid and enforceable sublease under which ITS can state a claim for tortious interference.

### 4. ITS Has Not Stated a Claim for Prospective Interference Either

67. Finally, ITS alleges the City's post-judgment 2024 action (consistent with the above stay doctrine) interferes with unidentified future contracts. But ITS's claims all rest on the City's alleged breach of the Ground Lease with OBOT (that it claims has already been resolved by federal and state courts). It is black-letter law in California that "[t]o establish a claim for interference with prospective economic advantage … a plaintiff must plead that the defendant engaged in an independently wrongful act." *Korea Supply Co.*, 29 Cal. 4th at 1158 (citing *Della Penna*, 11 Cal. 4th at 392-93 (1995)). If "the sole conduct alleged to support the interference with an economic advantage [is] essentially allegations giving rise to a breach of contract claim," plaintiff cannot state a tort claim for that conduct. *Huviron Co., Ltd v. Cctvstar Inc.*, No. SACV 14-1009-DOC (ANx),

2014 WL 12689221, at *4 (C.D. Cal. Nov. 25, 2014); *see also Applied Equip. Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515; *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th 464, 478 (Cal. App. 1st Dist. 1996); *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612, 618 (Cal. App. 2d Dist. 1993) *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185–88 (Cal. App. 2d Dist. 1998).

68.     Second, ITS has not plausibly alleged the economic benefit that it speculates its relationship with OBOT would result in in the absence of the City's alleged disruption.  "Only plaintiffs that can demonstrate an economic relationship with a probable future economic benefit will be able to state a cause of action for this tort."  *Korea Supply Co.*, 29 Cal. 4th at 1164; *see also Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal.App.4th 507, 530–531 (1996).  Notably, ITS identifies only one economic relationship with which the City allegedly interfered: its "economic relationship with OBOT" (under which it would only *pay* money, not make it).  (Adv. Dkt. ¶ 1, 66; *see also id.* ¶ 68.)[5]

## V.     <u>CONCLUSION</u>

69.     For the foregoing reasons, the City respectfully requests that the Court dismiss with prejudice the Complaint in its entirety pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, or in the alternative pursuant to Rule 12(b)(6) for failure to state a claim, and grant any such other and further relief as the Court deems appropriate.

---

[5] The Complaint makes vague references to potential customers and financial commitments, but "a relationship with the general market is not enough by itself to demonstrate a reasonable probability of future economic advantage." *Westside Center Assocs. v. Safeway Stores 23, Inc.* 42 Cal.App.4th 507, 529-30 (1996).

Dated:  May 1, 2024

By:  /s/ April A. Wimberg
April A. Wimberg
Ryne E. Tipton
DENTONS BINGHAM GREENBAUM LLP
3500 PNC Tower, 101 South Fifth Street
Louisville, Kentucky 40202
Phone:  (502) 587-3719
Email:  april.wimberg@dentons.com
        ryne.tipton@dentons.com

Barbara Parker, City Attorney (SBN 69722)
Maria S. Bee, Chief Asst City Attorney
(SBN 167716)
Jamilah Jefferson, Supervising Deputy City
Attorney (SBN 219027)
THE CITY OF OAKLAND
One Frank Ogawa Plaza, 6th Floor
Oakland, California 94612
Phone:  (510) 238-3601
Email:  bparker@oaklandcityattorney.org
        mbee@oaklandcityattorney.org
        jjefferson@oaklandcityattorney.org

Monique D. Jewett-Brewster (SBN 217792)
HOPKINS & CARLEY, ALC
The Letitia Building
70 S First Street
San Jose, CA  95113-2406
Phone:        (408) 286-9800
Facsimile:    (408) 998-4790
Email:  mjb@hopkinscarley.com

Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Phone: (415) 421-7151
Email:  dleonard@altshulerberzon.com

Attorneys for Defendant,
CITY OF OAKLAND

4879-9304-4152.6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was served electronically upon all parties in the electronic filing system in this Adversary Proceeding.

Dated:  May 1, 2024

By: _/s/ April A. Wimberg_
April A. Wimberg
Ryne E. Tipton
DENTONS BINGHAM GREENBAUM LLP
3500 PNC Tower, 101 South Fifth Street
Louisville, Kentucky 40202
Phone:  (502) 587-3719
Email:  april.wimberg@dentons.com
            ryne.tipton@dentons.com

4879-9304-4152.6

# EXHIBIT A

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

| | |
|---|---|
| In re:<br><br>INSIGHT TERMINAL SOLUTIONS, LLC, *et al.*[1],<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 19-32231<br><br>(Jointly Administered)<br><br>Adv. Proc. No. 24-03007-jal |
| INSIGHT TERMINAL SOLUTIONS,<br>LLC, as the Reorganized Debtor,<br><br>　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>CITY OF OAKLAND,<br><br>　　　　　　　　　Defendant. | Judge Joan A. Lloyd |

### <u>REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF</u>
### <u>DEFENDANT CITY OF OAKLAND'S MOTION TO DISMISS</u>

Pursuant to Federal Rule of Evidence 201, made applicable in these cases by Federal Rule of Bankruptcy Procedure 9017, Defendant The City of Oakland (the "City" or "Defendant"), by and through its undersigned counsel, requests that this court take judicial notice of the following:

1.　　*Order Sustaining Defendant's Demurrer to Complaint* signed by Hon. Judge Jo-Lynne Q. Lee on May 16, 2019 in the Superior Court of California, County of Alameda in Case No. RG18930929, a true and correct copy of which is attached hereto as **Exhibit A** and incorporated herein by reference.

---

[1] The Debtors in these chapter 11 cases are Insight Terminal Solutions, LLC (Case No. 19-32231) and Insight Terminal Holdings, LLC (Case No. 19-32232). The Court has ordered the joint administration of theses chapter 11 cases. The docket in this Case No. 19-32231 should be consulted for all matters affecting the above listed cases.

2.    *Statement of Decision Re Damages* signed by Hon. Judge Noel Wise on December 22, 2023 in the Superior Court of California, County of Alameda in Case Nos.: RG18930929 and RG20062473, a true and correct copy of which is attached hereto as **Exhibit B** and incorporated herein by reference.

3.    *Notice of Appeal* filed by Plaintiff City of Oakland on January 23, 2024 in the Superior Court of California, County of Alameda in Consolidated Case Nos.: RG18930928 and RG20062473, a true and correct copy of which is attached hereto as **Exhibit C** and incorporated herein by reference.

Dated:  May 1, 2024          By: */s/ April A. Wimberg*
                              April A. Wimberg
                              Ryne E. Tipton
                              DENTONS BINGHAM GREENBAUM LLP
                              3500 PNC Tower, 101 South Fifth Street
                              Louisville, Kentucky 40202
                              Phone:  (502) 587-3719
                              Email:   april.wimberg@dentons.com
                                       ryne.tipton@dentons.com

                              Barbara Parker, City Attorney (SBN 69722)
                              Maria Bee, Chief Asst City Attorney (SBN 167716)
                              Jamilah Jefferson, Supervising Deputy City Attorney (SBN 219027)
                              THE CITY OF OAKLAND
                              One Frank Ogawa Plaza, 6th Floor
                              Oakland, California 94612
                              Phone:   (510) 238-3601
                              Email:   bparker@oaklandcityattorney.org
                                       mbee@oaklandcityattorney.org
                                       jjefferson@oaklandcityattorney.org

Monique D. Jewett-Brewster (SBN 217792)
HOPKINS & CARLEY, ALC
The Letitia Building
70 S First Street
San Jose, CA  95113-2406
Phone:   (408) 286-9800
Facsimile:        (408) 998-4790
Email:  mjb@hopkinscarley.com

Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Phone: (415) 421-7151
Email:  dleonard@altshulerberzon.com

*Attorneys for Defendant,*
*City of Oakland*

# EXHIBIT A

Mnatt, Phelps & Phillips, LLP
Attn:  Lee, Barry W.
One Embarcadero Center
30th Floor
San Francisco, CA    94111____

Altshuler Berzon LLp.
Attn:  Finberg, James
177 Post Street, Ste. 300
San Francisco, CA    94108

---

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

---

| | |
|---|---|
| Oakland Bulk And Oversized Terminal, LLC | No. <u>RG18930929</u> |
| Plaintiff/Petitioner(s) | |
| | Order |
| VS. | |
| | Demurrer to Complaint |
| City of Oakland | Sustained |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

The Demurrer to Complaint filed for City of Oakland was set for hearing on 04/25/2019 at 03:00 PM in Department 18 before the Honorable Jo-Lynne Q. Lee.  The Tentative Ruling was published and was contested.

The matter was argued and submitted, and good cause appearing therefore,

IT IS HEREBY ORDERED THAT:

Defendant City of Oakland's ("Defendant" or "City") Demurrer to Plaintiffs Oakland Bulk and Oversized Terminal, LLC ("OBOT") and Oakland Global Rail Enterprise, LLC's ("OGRE") (collectively, "Plaintiffs") Complaint is SUSTAINED WITH LEAVE TO AMEND IN PART AND OVERRULED IN PART.  Plaintiffs shall file an amended complaint no later than June 12, 2019.

STANDARD OF LAW

"A demurrer tests the legal sufficiency of the factual allegations in a complaint."  (Redfearn v. Trader Joe's Co. (2018) 20 Cal. App. 5th 989, 996.)  The Court must determine "whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense."  (Id.)  The Court assumes "the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken."  (Id.)  "As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however improbable they may be," unless the "complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed."  (Del E. Webb Corp. v. Structural Materials Co. (1981) 123 Cal. App. 3d 593, 604.)  "The court does not, however, assume the truth of contentions, deductions or conclusions of law."  (Aubry v. Tri-City Hosp. Dist. (1992) 2 Cal. 4th 962, 967.)  Courts "give the complaint a reasonable interpretation, reading it as a whole and its parts in their context."  (Goncharov v. Uber Techs., Inc. (2018) 19 Cal. App. 5th 1157, 1165.)  Courts "construe the complaint 'liberally ... with a view to substantial justice between the parties[.]'"  (Id.)

"[I]f a plaintiff pleads a claim that fails to state a cause of action, a demurrer is properly sustained[.]" (Boxer v. City of Beverly Hills (2016) 246 Cal. App. 4th 1212, 1225.)  "Where the complaint is defective, '[i]n the furtherance of justice great liberality should be exercised in permitting a plaintiff to amend his [or her] complaint.'" (Redfearn, 20 Cal. App. 5th at 996.)  "[L]eave to amend should not be granted where ... amendment would be futile."  (Id. at 997.)

FACTUAL AND PROCEDURAL BACKGROUND

---

Plaintiffs (or predecessors in interest) and the City entered into negotiations and agreements for the development of a rail-to-ship bulk commodity terminal ("Terminal") at the former Oakland Army Base beginning in or about 2010 through 2013. A Development Agreement was entered into in or about 2013. Apparently in response to community concerns about potential transport of coal through the Terminal, in 2016 the Oakland City Council adopted an ordinance banning coal operations at "bulk material facilities" in Oakland and passed a resolution applying this ordinance to the Terminal, finding that coal operations at the Terminal would pose a substantial danger to the health and safety of people in Oakland.

Plaintiff OBOT responded by filing a lawsuit in the United States District Court, Northern District of California captioned Oakland Bulk & Oversized Terminal, LLC v. City of Oakland, Case No. 16-cv-07014-VC (hereinafter, the "federal action.") challenging these acts and asserting the City breached the Development Agreement it had signed in July, 2013 by applying the coal ban to the Terminal. On May 15, 2018 Judge Chhabria issued Findings of Fact and Conclusion (hereinafter "Chhabria Order.") framing the question at issue in the federal action as "...whether the record before the City Council when it made its decision [adopting the Resolution] contained substantial evidence that the proposed coal operations would pose a substantial health or safety danger." Judge Chhabria held: "Even under the deferential standard of review in the development agreement, the record before the City Council does not contain enough evidence to support the City Council's conclusion that the proposed coal operations would pose a substantial danger to the people in Oakland. In fact, the record is riddled with inaccuracies, major evidentiary gaps, erroneous assumptions, and faulty analysis, to the point that no reliable conclusion about health or safety dangers could be drawn from it. Perhaps a more thorough investigation could result in a lawful determination that coal operations may be restricted at the facility, but in this case, the record was inadequate. Because the resolution adopted by the City Council applying the coal ordinance to this shipping facility constitutes a breach of the development agreement, it is invalid and the City may not rely upon it to restrict operations there." (Chhabria Order, pp. 2-3.). In light of this finding, Judge Chhabria concluded: "The City is therefore enjoined from relying on the resolution either to apply the ordinance to OBOT or to restrict future coal operations at the facility. As a practical matter, this renders the coal ordinance a nullity, because the only reason the City adopted it was to restrict OBOT's operations, and OBOT is the only facility in Oakland to which it could conceivably apply. But as a strictly technical matter, there's no reason to strike down the ordinance once it has been determined that Oakland may not presently apply it to OBOT. The City remains free, of course, to pursue future regulation of the project so long as it complies with its legal obligations, including any legitimate contractual obligations to the project developers. Because OBOT prevails on its breach of contract claim, the Court enters judgment for OBOT without reaching the constitutional and statutory claims raised at summary judgment. (Chhabria Order, p. 37.) Judgment was entered on May 23, 2018 in favor of Plaintiff OBOT.

The instant Complaint was filed on December 4, 2018. In its Complaint, Plaintiffs assert twelve (12) causes of action including claims involving alleged breaches of contract (First through Third Causes of Action), fraud (Fourth Cause of Action), and intentional and negligent interferences with contract and prospective economic relations (Fifth through Tenth Causes of Action) and they seek declaratory relief (Eleventh Cause of Action), specific performance (Twelfth Cause of Action), compensatory damages, preliminary and permanent injunction, and attorneys' fees and costs of suit.

In this litigation Plaintiffs reference the 2103 Development Agreement and a 2016 ground lease (the "Army Base Gateway Development Project Ground Lease for West Gateway, dated February 16, 2016) pursuant to which, they claim, they "set out to redevelop a significant portion of the former Oakland Army Base, which included reestablishing certain rail improvements (the "Shoreline Rail") and developing the Terminal." (Complaint, ¶4.) The Shoreline Rail and the Terminal are collectively referred to as the "Project." (Id.). Plaintiffs complain that over the last several years, "the City has engaged in an uninterrupted pattern of delay and interference, all with the objective of preventing OBOT from completing this project" including "the City's latest tactic - falsely asserting that its Lease with OBOT has automatically terminated as the result of a claimed default that did not occur." (Complaint, ¶1.).

The Complaint alleges various acts of delay and interference, apparently occurring from approximately 2014 forward. Specifically mentioned is the Ordinance and Resolution adopted in 2014 that was the subject of the federal action. Plaintiffs contend that the City's appeal and continued prosecution of the federal action "continues to interfere with OBOT's ability to perform timely under the Lease."

(Complaint, Section IV and par. 67.). Other acts of alleged delay and interference complained of in this action include (1) a memorandum issued in 2015 by Assistant Oakland City Administrator Claudia Cappio ("Cappio Memo") that has allegedly caused delay and confusion for the permitting of the Project (Complaint , ¶¶ 74-77); (2) the requirement in 2016 that OBOT Project permit applications are subject to discretionary approvals in violation of the Development Agreement (Id., ¶¶ 78-86); (3) the City's refusal to advance and interference with completing the Shoreline Rail project for over six years and as recently as 2018 (Id., ¶¶ 87-103); the City's active interference with OGRE's efforts to obtain approvals from the Surface Transportation Board ("STB" since 2015 and specifically in 2018(Id., ¶¶ 104-108); (4) the City's alleged failures to obtain easements needed by OBOT and its subtenants to enter upon Port of Oakland property to construct and use relevant segments of track per the Lease (, (Id., ¶¶ 109-111); (5) the City's alleged "illegitimate" claim of an unmatured Event of Default under the Lease in or about August, 2018 (Id., ¶¶ 112 - 128) and (6) various other alleged improper delaying tactics and interferences with the Project in 2018, including false statements to the press in November, 2018, insistence by the City that Plaintiffs agree to construct a "ban compliant" terminal and the service of a 3-Day Notice to Quit or Cure in December, (Id., ¶¶ 129 - 153).

## THE DEMURRER

Defendant demurs to the Complaint on the grounds that the claims are barred by res judicata, are barred by the applicable statute of limitations, are barred by the Government Claims Act, and/or fail to state facts sufficient to constitute a cause of action.  The Court will address each of these arguments in turn.

## RES JUDICATA

Defendant argues that this action arises between the same parties, same agreements, same development, same type of alleged wrongdoing, and same injury that was adjudicated in a prior federal action concerning this purported campaign.  Defendant points out that the campaign of delay and interference alleged in this action include many of the same activities alleged in the federal action including the adoption of the 2014 Resolution, Defendant's statements in opposition to coal from 2014 to 2016, the 2016 Ordinance and Resolution, and allegedly improper work done by Environmental Science Associates ("ESA") to support the 2016 Ordinance.  As in this action, the federal action included allegations that the campaign was a breach of contract and caused a diminution of value to Plaintiffs' investment of the Project, out-of-pocket costs, and loss of a sublease.  (Mot. at p. 9.)

Defendant contends that Plaintiffs have brought this action now because they voluntarily waived damages in the federal action.  Defendant points out that the federal court warned OBOT that "res judicata would bar [it] from seeking damages on the same claims or claims that could have been brought in th[e] [federal] case," OBOT conceded that the federal court was "100 percent right that there . . . will be res judicata impacts" but it was "not seeking damages in the trial . . and if [it] win[s], [it] do[es] not intend to seek further relief."  (RJN, Ex. E at 9:9-22.)

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action."  (Owens v. Kaiser Found. Health Plan, Inc. (9th Cir. 2001) 244 F.3d 708, 713.)  The doctrine is applicable whenever there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties."  (Id.)  The same principles apply under California law.  (Mycogen Corp. v. Monsanto Co. (2002) 28 Cal. 4th 888, 896 ["Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them."].)  "Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief."  (Id. at 897.)  "A predictable doctrine of res judicata benefits both the parties and the courts because it 'seeks to curtail multiple litigation causing vexation and expense to the parties and wasted effort and expense in judicial administration.'"  (Id.)  "Res judicata bars not only issues that were raised in the prior suit but related issues that could have been raised."  (Villacres v. ABM Indus. Inc. (2010) 189 Cal. App. 4th 562, 569.)

"The federal rule is that 'a judgment or order, once rendered, is final for purposes of res judicata until reversed on appeal or modified or set aside in the court of rendition.'"  (Calhoun v. Franchise Tax Bd. (1978) 20 Cal. 3d 881, 887.)  Defendant contends that the parties are the same as in the federal action, with OGRE being in privity with OBOT in the federal action.  Further, Defendant argues that there is an identity of claims as they involve the same primary right for OBOT to pursue development of a coal terminal at the Project and arise from the same transaction or series of transactions.  (Cal Sierra Dev.,

Inc. v. George Reed, Inc. (2017) 14 Cal. App. 5th 663, 675 ["[I]f two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery."]; W. Sys., Inc. v. Ulloa (9th Cir. 1992) 958 F.2d 864, 871 ["The test for whether a subsequent action is barred is whether it arises from the same 'transaction, or series of transactions' as the original action.].)  In this case, there has been a final judgment in the federal action holding that the Resolution passed in 2016 is not valid and cannot be relied upon by the City in connection with the Development Agreement and Project at issue herein and that the City breached, or would be in breach, of the Development Agreement by disallowing the transport of coal at the Terminal on the basis of that Resolution.  (RJN, Exs. F-G.)

Plaintiffs argue that res judicata should not apply here because this action does not involve the same agreement or claims as in the federal action.  This court agrees.  As noted above, the federal action was limited to enjoining Defendant from applying a coal ban ordinance to Plaintiffs' work at the site because it was a breach of the Development Agreement  Here, Plaintiffs contend that even after they succeeded in the federal action to enjoin Defendant's reliance on the ordinance, Defendant has continued to ignore its obligations under the Development Agreement and has otherwise engaged in conduct to intentionally delay and obstruct Plaintiffs' development efforts.  The discussion of the 2016 Ordinance and Resolution in the Complaint simply places in context the alleged injuries currently in contention.  Further, it appears that this action involves other contracts than the Development Agreement that was the subject of the federal action, and the tort claims were not at issue in the federal action.

"As a cause of action is framed by the facts in existence when the underlying complaint is filed, res judicata 'is not a bar to claims that arise after the initial complaint is filed.'"  (Planning & Conservation League v. Castaic Lake Water Agency (2009) 180 Cal. App. 4th 210, 227.) "For this reason, the doctrine may not apply when 'there are changed conditions and new facts which were not in existence at the time the action was filed upon which the prior judgment is based.'"  (Id.)  "This exception to the doctrine encompasses claims based on rights that arise after the filing of the complaint in the first action, but before judgment is entered."  (Id.)  In other words, "distinct episodes of purported noncompliance regarding 'the same general subject matter'" may give rise to separate suits, and the latter is not barred by res judicata.  (Id.)  Indeed, in the absence of "a continuing breach," it is permissible for there to be "successive causes of action arising out of the same general subject matter," even if based "on the same contract or transaction."  (Yates v. Kuhl (1955) 130 Cal. App. 2d 536, 540.)

While arguably correct that both the Development Agreement and the Lease address the right of Plaintiffs to develop the Project and the terms thereof, the Court does not agree that the claims in this lawsuit are simply different theories based on the same "primary right" addressed by the federal action which concerned the validity of 2016 Resolution and enjoined the City from relying upon it in connection with the Development Agreement.

As discussed in further detail below with respect to statutes of limitations, the Court finds that the allegations in this Complaint concern distinct wrongs that pre-dated the federal action, and therefore are not barred by res judicata.  Even if some part of the claims based on pre-federal action conduct may be barred by res judicata, this demurrer should not be sustained if there are post-federal action conduct that exist as a valid basis for the claims.  "A demurrer must dispose of an entire cause of action to be sustained."  (Fremont Indem. Co. v. Fremont Gen. Corp. (2007) 148 Cal. App. 4th 97, 119.)  Thus, the Court OVERRULES Defendant's demurrer to all causes of action on the ground of res judicata.

## STATUTES OF LIMITATIONS - GENERALLY

Alternatively, Defendants contend that the tort claims are barred by applicable statutes of limitations.  In opposition, Plaintiffs argue that due to the ongoing nature of Defendant's conduct, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease.  "Generally, a limitations period begins to run upon the occurrence of the last fact essential to the cause of action."  (Pugliese v. Superior Court (2007) 146 Cal. App. 4th 1444, 1452.)  "However, where a tort involves a continuing wrong, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease."  (Id.)  Here, Plaintiffs have not demonstrated that the continuing tort doctrine should apply to their claims for interference with contractual relations or prospective economic relations, or fraudulent inducement.  (See Boon Rawd Trading Int'l Co. v. Paleewong Trading Co. (N.D. Cal. 2010) 688 F. Supp. 2d 940, 952 [applying California law, and finding that there is no

authority in California cases applying the continuing tort doctrine to the tort of intentional interference with prospective economic advantage].)  Nevertheless, to the extent that discrete wrongs are alleged to have occurred within the statute of limitations for each claim, those claims may not be barred by the statute of limitations.

## STATUTE OF LIMITATIONS - FRAUDULENT INDUCEMENT (FOURTH CAUSE OF ACTION)

"The elements of fraud . . . are: a representation, usually of fact, which is false, knowledge of its falsity, intent to defraud, justifiable reliance upon the misrepresentation, and damage resulting from that justifiable reliance."  (Stansfield v. Starkey (1990) 220 Cal. App. 3d 59, 72-73.)  "An action for relief on the ground of fraud or mistake" is governed by a three-year statute of limitations, and "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."  (Cal. Civ. Proc. Code § 338(d).)

Plaintiffs argue that the fraud inducement claim accrued on August 20, 2018, when Defendant allegedly falsely asserted that OBOT committed an unmatured Event of Default under the Lease and it became apparent that Defendant did not intend to perform under the Lease.  (Opp. at p. 11.)  Plaintiffs argue that Defendant engaged in other fraudulent acts after the passing of the 2016 Ordinance through 2018, including interfering with Plaintiffs' permit applications to the present date, rejecting Plaintiffs' force majeure extension claims in 2018, and withholding estoppel certificates and NDA's in 2018, among other acts.  Thus, Plaintiffs contend that its fraud claim is within the statute of limitations.

Defendant counters that Plaintiffs already knew that Defendant was not going to comply with its promises under their agreements when Defendant adopted a resolution opposing the coal transportation on June 17, 2014.  In essence, Defendant is arguing that there could be no justifiable reliance on its representations in the agreements because it had already purportedly breached the agreements.  However, it is not clear that the fraudulent acts alleged in this action are based on the same representations in the parties' agreements that were at issue with respect to coal ban in the federal action.  Further, whether Plaintiffs' reliance on the agreements is justifiable is a question of fact that should not be decided on demurrer.

Accordingly, the Court OVERRULES Defendant's demurrer to the Fourth Cause of Action on this ground.

## STATUTE OF LIMITATIONS - INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC RELATIONS CLAIMS

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  (Pac. Gas & Elec. Co. v. Bear Stearns & Co. (1990) 50 Cal. 3d 1118, 1126.)  The elements of a claim for tortious interference with prospective economic relations are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  (Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal. 4th 1134, 1153.)  A two-year statute of limitations applies to claims for interference with contractual relations and prospective economic relations.  (CCP § 339 [governing "[a]n action upon a contract, obligation or liability not founded upon an instrument of writing"].)

Defendant contends that these claims are time-barred because under the Complaint.  Plaintiffs allege that since 2012 Defendant has interfered with their economic relationships with two potential subtenants, and Plaintiff OBOT previously stated in the federal action that the sublease option was diminished by the passing of the 2016 Ordinance.  Further, Defendant argues that OGRE's tortious interference claims are based on Defendant's purported interference with Plaintiffs' efforts to complete the Shoreline Rail portion of the Project over the course of six years.

Plaintiffs contend that their tortious interference claims are not time-barred, arguing simply that TLS, one of their subtenants, did not abandon its sublease option until 2018.  While the Complaint alleges

that Defendant's conduct at unspecified times "[s]nice 2012" has "interfered with Plaintiffs' prospective economic relationships," it fails to specify discrete wrongful conduct or resulting damage that occurred within the statute of limitations. (Compl. ¶¶ 185, 189, 196, 209, 213, 219.)  Accordingly, the Court SUSTAINS WITH LEAVE TO AMEND Defendants' demurrer to the Fifth through Tenth Causes of Action on this ground.

GOVERNMENT TORT CLAIMS ACT

Alternatively, Defendant contends that the seven tort claims (fraudulent inducement, intentional interference with contractual relations, and intentional/negligent interference with prospective economic relations) are barred by the Government Tort Claims Act.  "Except as otherwise provided by statute . . . [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  (Cal. Gov't Code § 815(a).)  To the extent Plaintiff's alleged facts support a claim for negligence or other tort, Plaintiff must provide a statutory basis for his claim. (Eastburn v. Reg'l Fire Prot. Auth. (2003) 31 Cal. 4th 1175, 1183 [holding that "direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care"].)   In addition, since "under the Tort Claims Act all governmental tort liability is based on statute, the general rule that statutory causes of action must be pleaded with particularity is applicable."  (Lopez v. S. Cal. Rapid Transit Dist. (1985) 40 Cal. 3d 780, 795.)  "[T]o state a cause of action against a public entity, every fact material to the existence of its statutory liability must be pleaded with particularity."  (Id.)

Plaintiffs argue that Defendant is not immune from tort liability arising out of the tortious acts and omissions of its employees.  Plaintiffs note that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative." (Cal. Gov't Code § 815.2(a).)  Courts have noted that it is "possible for a public entity and its employees to be held liable for intentional interference with prospective economic advantage and trade libel." (City of Costa Mesa v. D'Alessio Investments, LLC (2013) 214 Cal. App. 4th 358, 378.)

Defendant argues that Plaintiffs have failed to articulate a statutory basis for its tort claims.  Further, Defendant asserts immunity on any claims based on any purported misrepresentations by its employees since "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."  (Cal. Gov't Code § 818.8.)

Based on the foregoing, the Court finds that Plaintiffs have failed to allege sufficient facts to overcome Defendant's immunity under the Government Tort Claims Act.  Thus, the Court SUSTAINS WITH LEAVE TO AMEND Defendant's demurrer to the Fourth through Tenth Causes of Action on this additional ground.

FAILURE TO STATE A CLAIM - FRAUDULENT INDUCEMENT (FOURTH CAUSE OF ACTION)

Defendant then argues that the Fourth Cause of Action for fraudulent inducement fails to satisfy the particularity requirement for pleading a fraud claim.  "Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made." (Stansfield, 220 Cal. App. 3d at 73.)  This "'strict requirement" of pleading "necessitates pleading facts which 'show how, when, where, to whom, and by what means the representations were tendered.'"  (Id.)  "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written."  Tarmann v. State Farm Mut. Auto. Ins. Co. (1991) 2 Cal. App. 4th 153, 157.)  However, "the requirement of specificity is relaxed when the allegations indicate that 'the defendant must necessarily possess full information concerning the facts of the controversy' . . . or when the facts lie more in the knowledge of the opposite party."  (Id. at 158.)

Defendant contends that Plaintiffs fail to plead any intent by Defendant to defraud Plaintiffs.  Plaintiffs allege that Defendant "did not intend to perform its promises at the time it entered into the Lease to the extent Plaintiffs subleased the Terminal to a bulk commodity provider that shipped coal." (Compl. ¶ 174.)  Defendant argues that there is no allegation that Defendant made any promises with respect to

Plaintiffs subleasing to a provider that shipped coal, and in fact the immediate commodity focus was on iron ore and copper concentrate, not coal. (Compl. ¶ 37.) Plaintiffs argue that they have pled that the City was aware that OBOT intended to sublease the terminal to a bulk commodity provider, and that coal was a potential commodity that would be transported through the terminal. (Compl. ¶¶ 23, 174.) The Court finds that these allegations are sufficient to plead fraudulent intent.

Defendant also reiterates that there is no allegations supporting justifiable reliance by Plaintiffs on those promises in light of its public opposition to the shipment of coal. However, as stated previously, the Court is not persuaded that the fraudulent actions asserted that took place after the federal action are centered on the same promises that were broken when Defendant attempted to apply a coal ban to the Project. The question of justifiable reliance is thus a question of fact for the factfinder, not an issue for demurrer.

Based on the foregoing, the Court OVERRULES Defendant's demurrer to the Fourth Cause of Action on this ground.

## FAILURE TO STATE A CLAIM - INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (SIXTH, SEVENTH, NINTH, AND TENTH CAUSES OF ACTION)

"[W]hile intentionally interfering with an existing contract is 'a wrong in and of itself' . . . intentionally interfering with a plaintiff's prospective economic advantage is not." (Korea Supply Co., 29 Cal. 4th at 1158.) "To establish a claim for interference with prospective economic advantage, therefore, a plaintiff must plead that the defendant engaged in an independently wrongful act." (Id.) "An act is not independently wrongful merely because defendant acted with an improper motive." (Id.) "The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct." (Id. at 1158-59.) "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (Id. at 1159.)

Defendant argues that Plaintiffs have not alleged facts demonstrating that Defendant's conduct that purportedly interfered with their prospective economic relations were independently wrongful. Plaintiffs contend that the acts were independently wrongful as breaches of the duty of good faith and fair dealing. Defendant counters that a breach of contract cannot be the independently wrongful act because that would improperly transform a breach of contract claim into a tort claim. As one case points out, "[a] contracting party's unjustified failure or refusal to perform is a breach of contract, and cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business." (JRS Prod., Inc. v. Matsushita Elec. Corp. of Am. (2004) 115 Cal. App. 4th 168, 181-82.) Thus, as Plaintiffs does not identify any other independently wrongful act, the Court SUSTAINS WITH LEAVE TO AMEND Defendant's demurrer to the Sixth, Seventh, Ninth and Tenth Causes of Action on this additional ground.

## FAILURE TO STATE A CLAIM - NEGLIGENT INTERFERENCE WITH ECONOMIC RELATIONS (SEVENTH AND TENTH CAUSES OF ACTION)

With respect to the claims for negligent interference with economic relationships, Defendant argues that Plaintiffs have not established any duty owed by Defendant to Plaintiffs. "The tort of negligent interference with economic relationship arises only when the defendant owes the plaintiff a duty of care." (LiMandri v. Judkins (1997) 52 Cal. App. 4th 326, 348.) Notably, "a plaintiff who is not a party to a contract between a defendant and a third party generally may not recover for loss of expected economic advantage resulting from the defendant's negligent performance of the contract unless there is a special relationship between the parties." (Id. at 348-49.) "The key component in determining whether the relationship between plaintiff and defendant in such cases gives rise to a duty of care is the foreseeability of the harm suffered by the plaintiff." (Id. at 349.) "Foreseeability is generally measured by the closeness of the connection or nexus between the defendant's conduct and risk of injury to the plaintiff-that is, whether the defendant had 'entered into any relationship or undertaken any activity where negligence on his part was reasonably likely to affect plaintiff adversely.'" (Id.)

Plaintiffs argue that a duty arose based on the parties' lease agreement, and contend that Defendant was aware of its contractual relationships with OGRE, TLS and later ITS, so the harm was foreseeable. The Court finds that these allegations are sufficient to support a claim of duty for purposes of demurrer.

Thus, the Court OVERRULES Defendant's demurrer to the Seventh and Tenth Causes of Action on this ground.

## FAILURE TO STATE A CLAIM - INTENTIONAL AND NEGLIGENT INTERFERENCE WITH ECONOMIC RELATIONS (NINTH AND TENTH CAUSES OF ACTION)

Defendant argues that the Ninth and Tenth Causes of Action improperly allege intentional and negligent interference with prospective economic relations based on relationships with potential customers, and not current customers. Courts have held that "the interference tort applies to interference with existing noncontractual relations which hold the promise of future economic advantage," not to potential relations which are too speculative. (Westside Ctr. Assocs. v. Safeway Stores 23, Inc. (1996) 42 Cal. App. 4th 507, 524.) Such an "interference with the market" theory of liability "is insufficient as a matter of law to show [that a plaintiff] had an economic relationship with a prospective [client] which was reasonably likely to produce a future beneficial [relationship]." (Id. at 528.) As these causes of action allege interference of relationships with potential and not existing customers, the Court SUSTAINS WITH LEAVE TO AMEND Defendant's demurrer to the Ninth and Tenth Causes of Action on this additional ground.

## FAILURE TO STATE A CLAIM - NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS (TLS AND ITS) - (SEVENTH CAUSE OF ACTION)

Defendant argues that the Seventh Cause of Action, which alleges that Defendant interfered with OBOT's sublease with TLS and ITS, is actually a claim for negligent interference with contractual relationships since it concerns existing contracts and not potential contracts or economic relationships. Defendant contends that such a claim is invalid under California law. "In California there is no cause of action for negligent interference with contractual relations." (Davis v. Nadrich (2009) 174 Cal. App. 4th 1, 9.) "While there exists a cause of action for negligent interference with prospective economic advantage . . . the California Supreme Court . . . has rejected a cause of action for negligent interference with contract." (Id.)

However, the Complaint alleges interference with a "proposed sublease between OBOT and TLS," not an existing lease. Thus, the Court Defendant's demurrer to the Seventh Cause of Action on this ground.

## FAILURE TO STATE A CLAIM - SPECIFIC PERFORMANCE OF CONTRACT (TWELFTH CAUSE OF ACTION)

"An agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable," is not specifically enforceable under California law. (Cal. Civ. Code § 3390(e).) Defendant argues that Plaintiffs' claim for specific performance fails to specify the precise act to be done, as the request for relief simply asks for "[s]pecific performance of all of [the City's] contractual obligations set forth in the DA and Lease." (Compl. Prayer for Relief ¶ 3.) The Complaint simply states that "[t]he Lease and DA are sufficiently certain in their terms to be specifically enforced" (Compl. ¶ 232), but fails to identify which terms they seek to enforce.

Thus, the Court SUSTAINS WITH LEAVE TO AMEND Defendant's demurrer to the Twelfth Cause of Action on this additional ground.

## REQUEST FOR JUDICIAL NOTICE

The Court GRANTS Defendants' request for judicial notice of filings and orders in the federal action in the United States District Court for the Northern District of California captioned Oakland Bulk & Oversized Terminal, LLC v. City of Oakland, Case No. 3:16-CV-07014. (Request for Judicial Notice, Exs. A-J; Cal. Evid. Code § 452(d).) The Court OVERRULES Plaintiffs' objection to the request for judicial notice of the court transcript in Exhibit E, as a court may take judicial notice of a transcript without taking judicial notice of the truth of the testimony. (Kumaraperu v. Feldsted (2015) 237 Cal. App. 4th 60, 65 ["We also grant judicial notice of the preliminary hearing transcript, but only to the extent it sheds light on the various actors' claims, not for the truth of statements made during the hearing."].) The Court considers this evidence not for the truth of the statements made by the federal court or by OBOT that the claims in this action are in fact barred by res judicata, but for the limited ground that OBOT was made aware that certain future claims could be barred by res judicata.

Dated:  05/16/2019

Digital

_____
Judge Jo-Lynne Q. Lee

# EXHIBIT B

**FILED**
Superior Court of California
County of Alameda

12/22/2023

Chad Finke, Executive Officer/Clerk of the Court

By: _Melisa Callender_ Deputy
M. Callender

1
2
3
4
5
6        SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
7               HAYWARD HALL OF JUSTICE
8

| | |
|---|---|
| 9   Oakland Bulk & Oversized Terminal, LLC, et al., | Nos.: RG18930929, RG20062473 |
| 10  | **STATEMENT OF DECISION RE DAMAGES** |
| 11               Plaintiff, | |
| 12       v. | |
| 13  City of Oakland, | |
| 14               Defendant. | |
| 15  City of Oakland, | |
| 16               Counter-Plaintiff, | |
| 17       v. | |
| 18  Oakland Bulk & Oversized Terminal, LLC, et al., | |
| 19  | |
| 20               Counter-Defendant. | |

21
22
23
24
25
26
27
28

This is the Court's final Statement of Decision on damages.[1]  The Court issued its proposed Statement of Decision regarding damages on December 11, 2023.  (Cal. R. Ct. 3.1590(c)(1).)  On December 18, 2023, by stipulation and in accordance with Rule of Court 3.1590(g), each Party filed written objections and comments to the proposed Statement of Decision, which the Court considered.

## I. INTRODUCTION

This case involves a contract dispute regarding the redevelopment of an old army base located south of the Bay Bridge toll plaza, along the San Francisco Bay, in the City of Oakland (City).  After considering numerous potential projects, the City decided the land would be used for a bulk commodity marine terminal (Project).  The City entered into a series of agreements (including the December 4, 2012 Army Base Gateway Redevelopment Project Lease Disposition and Development Agreement (LDDA), the July 16, 2013 Development Agreement, and the February 16, 2016, Army Base Gateway Redevelopment Project Ground Lease for West Gateway (Ground Lease or Lease))[2] with Oakland Bulk and Oversized Terminal, LLC (OBOT)[3] to develop the Project.

"[W]ord spread that the developer was making plans to transport coal through the terminal. Many people in Oakland expressed concern about this." (*Oakland Bulk &*

---

[1] "A statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal. App. 4th 1106, 1124–25.) Accordingly, the trial court need not respond "point by point" to the issues posed by the Parties requesting the statement of decision." (*Pannu v. Land Rover N. Am., Inc.* (2011) 191 Cal. App. 4th 1298, 1314 n.12.)

[2] The Court periodically refers to these documents collectively as the contracts or the agreements.

[3] OBOT is a wholly owned subsidiary of California Capital Investment Group (CCIG).  Oakland Global Rail Enterprise LLC (OGRE) is owned by CCIG and is OBOT's subtenant.  CCIG and Prologis formed a joint venture (Prologis CCIG Oakland Global) and the City selected that entity as the master developer for the Project.  Because OBOT is the successor in interest to Prologis CCIG Oakland Global for the purposes of the Project, the Court refers to these entities collectively in this action as OBOT.  OBOT and the City are collectively referred to as the Parties.

*Oversized Terminal, LLC v. City of Oakland* (2018) 321 F. Supp. 3d 986, 988.)  "The Oakland City Council responded by adopting two measures [on June 27, 2016]: (i) an ordinance that bans coal operations at 'bulk material facilities' in Oakland; and (ii) a resolution that applies the ordinance to this terminal, through a finding by the City Council that coal operations at the terminal would pose a substantial danger to the health and safety of people in Oakland."  (*Id.*)

On December 7, 2016, OBOT filed an action in the U.S. District Court for the Northern District of California.  (*See* Docket, *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, No. 16-CV-07014-VC.)  As amended on June 14, 2017, OBOT's complaint in the federal case alleged the Oakland City Council's resolution applying the ordinance to the Project was a breach of the Development Agreement.  (*See Oakland Bulk*, 321 F. Supp. 3d at 988.)  On May 15, 2018, the federal court ruled for OBOT, concluding "the resolution adopted by the City Council applying the coal ordinance to this shipping facility constitutes a breach of the development agreement, it is invalid and the City may not rely on it to restrict operations there."  (*Id.* at 989; *see also* Statement of Decision re Liability § III.A, Nov. 22, 2023 (restating entirety of opinion).)[4]

The City terminated the Ground Lease on November 22, 2018.  OBOT then filed this action for breach of contract.  The City in turn filed an action for breach of contract against OBOT, and the two matters were consolidated.

The Court bifurcated the issue of liability and held a bench trial that began on July 10, 2023, and concluded on October 11, 2023.  The Court issued its proposed Statement of Decision on October 27, 2023, regarding the Parties' respective claims of liability for breach of contract.  On November 22, 2023, the Court issued its final Statement of Decision on liability in which the Court found in favor of OBOT.

---

[4] On May 26, 2020, the U.S. Court of Appeal for the Ninth Circuit affirmed the Northern District's order.  (*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* (9th Cir. 2020) 960 F.3d 603.)

The Court then held a bench trial on the issue of damages.  That trial began on November 28, 2023, and concluded on December 1, 2023.

## II. OBOT'S ALTERNATE CLAIMS FOR RELIEF

OBOT presented evidence in support of two claims for relief: a claim for an equitable remedy and a claim for a legal remedy.  Plaintiffs described these alternate claims for relief as follows:

As an equitable remedy, OBOT claimed it was entitled to:

- A declaratory judgment by the Court finding that OBOT is not in default of either the Development Agreement or the Ground Lease, and that both contracts remain in effect.

- An award of specific performance requiring the City to comply with all its obligations under the Development Agreement and the Ground Lease, and extending OBOT's deadline to perform its obligations under the Development Agreement and the Ground Lease by 30 months.

- An award of $19,300,000.00 in damages for the period between February 16, 2016, through December 31, 2023.

As a legal remedy, OBOT claimed it was entitled to:

- A declaratory judgment by the Court finding that OBOT is not in default of the Development Agreement or the Ground Lease and that both contracts remain in effect.

- An award of $159,600,00.00 in damages for the period between February 16, 2016, and the expiration of the Ground Lease.[5]

---

[5] For the legal remedy, OBOT claimed $115,000,000.00 in damages, and OGRE claimed $44,600,000.00 in damages.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.    Underlying Rulings and Stipulations**

The following rulings and stipulations predicate this proposed Statement of Decision regarding damages:

1. In 2018, the federal court determined that the City could not use the coal ordinance to restrict coal operations at the terminal.  While the Federal Decision recognized that perhaps the City could issue a valid ordinance restricting coal operations at the Project in the future, the City has not done so as of the date of this Statement of Decision.  The City has also not presented the Court with any evidence that there are any new federal or state laws that would currently restrict coal operations at the Project.  Nevertheless, the question of what commodities (including coal and soda ash) may eventually be handled at the future terminal is not before this Court, and the Court makes no findings as to that issue.

2. During the trial the City agreed that (subject to its right to appeal this Court's decision finding in favor of OBOT on its breach of contract claims against the City) OBOT is entitled to a declaratory judgment.  As a result, the Court does not analyze this matter further.[6]

3. The Parties stipulated that (subject to the City's right to appeal this Court's decision finding in favor of OBOT on its breach of contract claims against the City) OBOT is entitled to the remedy of specific performance.  For the purposes of the remedy phase of trial, the only remaining issue as to specific performance is the amount of additional time the Court may award OBOT to commence construction of

---

[6] In the City's post-trial briefing, the City asserted that the "Court already ruled on Plaintiff's declaratory relief claim" in the November 22, 2023 Statement of Decision and OBOT's request for "further declaratory relief is an improper request for reconsideration." (City's Trial Br. re Dec. Relief 1:4–6, Dec. 4, 2023.)  While the Court made findings of fact and conclusions of law in the Statement of Decision on liability, for clarity and completeness the Court incorporated a declaratory judgment in this Order.

the Project as set forth in section 6.1.1.1 of the Ground Lease (defined as "Initial Milestone Date").[7]

## B.    Additional Time

As noted above, OBOT requested an extension of the deadline under section 6.1.1.1 of the Ground Lease.  In its post-trial brief, the City correctly stated, "The scope of any such remedy is governed by the contract terms at issue.  The force majeure definition sets the parameters: 'such additional time thereafter as may reasonably be required to complete performance of the hindered act,' and all parties agreed the range is bounded at the upper end by the contract at two and a half years."  (City's Trial Br. re Remedies 1:3–8, Dec. 4, 2023 (citations omitted).)  After noting that the evidence was "mixed" regarding what amount of additional time is reasonably required, the City stated it "defer[red] to the Court's exercise of equitable discretion as to the length of the extension."  (*Id.* 1:12–13.)

During Mr. Tagami's testimony, he referenced a Project timeline (provided to the Court as a demonstrative aid) that detailed the tasks that would need to be completed to meet a new Initial Milestone Date of June 2, 2026, assuming a start date of January 5, 2024. (Tr. 4437:11–15, 4445:25–4446:8.)  This timeline works out to almost exactly two years and five months.

Mr. Tagami acknowledged he had previously testified during the liability phase of the trial that a period of less than two-and-a-half years might be sufficient.  However, he explained that when he estimated 12 to 14 months, he was referencing a construction

---

[7] OBOT also asked the Court to award it an extension of time to meet the deadline in Section 6.3.1 of the Ground Lease (Pursuit of Additional Funds).  The compliance date in Section 6.3.1 can be extended "pursuant to Force Majeure events" but only if that event occurs after February 16, 2016, and "only if notice is provided within thirty (30) days of the event triggering the claim of Force Majeure."  (Ex. 68 at 42 (§ 6.3.1).)  The Court received no evidence that OBOT provided timely notice to the City asserting a claim of force majeure under section 6.3.1. (*See* Ex. 191 at 7 (Letter from Mr. Tagami to William Gilchrist, Director, Planning and Building Department (Aug. 28, 2018) (discussing events that occurred in 2015).)  Accordingly, the Court finds OBOT is not entitled to additional time to perform its obligations under section 6.3.1, and the Court does not address this issue further.

schedule.  He added that OBOT would need additional time to advance the Project because several of the nonprofits and contractors with which OBOT worked in 2016 are no longer in business; and some OBOT employees, who had substantial Project knowledge, had since left the company.  (Tr. 4419:19–4422:22.)

Additionally, since his prior testimony, Mr. Tagami said several things made him conclude that OBOT would need more time to meet a new Initial Milestone Date, including the press release the City issued following the Court's proposed Statement of Decision concerning liability (*see* Ex. 1003 (Oakland City Attorney, Press Release re OBOT Shipping Lawsuit Results in Disappointing Outcome for City of Oakland (Oct. 30, 2023)), and the City's presentation at the Oakland Builders Alliance forum (Ex. 1002 (Oakland Presentation (Nov. 9, 2023)).  (Tr. 4419:19–4422:22, 4425:23–4426:4.)  Mr. Tagami suggested that the City's recent communications demonstrated the City's continued unwillingness to support the Project going forward.[8]

The Project is a large and complex development, and the Parties' pace of moving the Project forward was not swift—even at its inception.  The Court therefore views it as prudent, when considering among the range of time estimates to advance the Project that were proposed at trial, to conclude that the higher side of that range is reasonable and necessary for the Parties to meet their contract obligations.  The Court finds two years and six months is the amount of time that section 6.1.1.1 (Initial Milestone Date) of the Ground Lease should be extended due to events of Force Majeure.

---

[8] As to the last point, OBOT asked this Court to assume that past is prologue: Because the City breached the Development Agreement and the Ground Lease in the past, and because the City has consistently stated it would take measures to prevent the Project from moving forward if coal is an included commodity, the City will not act in good faith as a party to the Development Agreement and the Ground Lease going forward.  For those reasons, OBOT asked this Court not only for the maximum amount of time to extend the dates in the Ground Lease but also sought to have this Court include language in the declaratory judgment requiring the City to fulfill its legal obligations.

The Court declines to make those assumptions or issue such orders.  The Parties have the legal obligations set forth in the Development Agreement, the Ground Lease, and the related contracts.  The law requires the Parties to move forward with those agreements in good faith.  If either Party does not, perhaps that will be the subject of future litigation.  But that is not the subject of this litigation.

6

**C.    Monetary Damages**

    **1.    Scope of Monetary Damages Pursuant to the Parties' Contracts**

    The LDDA, Development Agreement, and the Ground Lease collectively frame the Parties' rights and obligations for the Project.[9] (*See* Civ. Code § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.").)  The Development Agreement and the Ground Lease delineate the Parties' respective equitable and legal remedies in the event of default.  In the Development Agreement, section 8.7, titled "Remedies," states in relevant part:

> Upon the occurrence of an Event of Default, <u>each Party shall have the right</u>, . . . <u>to (a) bring any proceeding in the nature of specific performance</u>, injunctive relief or mandamus, <u>and/or (b) bring any action at law or in equity as may be permitted by Laws or this Agreement</u>.  Notwithstanding the foregoing, <u>however, neither Party shall ever be liable to the other Party for any consequential or punitive damages on account of the occurrence of an Event of Default (including claims for lost profits, loss of opportunity, lost revenues, or similar consequential damage claims)</u>, and the Parties hereby waive and relinquish any claims for punitive damages on account of an Event of Default, which waiver and relinquishment the Parties acknowledge has been made after full and complete disclosure and advice regarding the consequences of such waiver and relinquishment by counsel to each Party.

(Ex. 7 at 40 (emphasis added).)

    Section 22.1 of the Ground Lease, titled "Default by Landlord; Tenant's Exclusive Remedies," states in relevant part:

> Upon the occurrence of default by Landlord . . . <u>Tenant shall have the exclusive right: (a) to</u> offset or deduct only from the Rent becoming due hereunder, the

---

[9] The Development Agreement and the various iterations of the LDDA are collectively referenced more than 100 times in the Ground Lease.  (*See generally* Ex. 68.)  For example, in section 5.2.1 of the Ground Lease, titled "City Approvals," the Parties agreed that "nothing herein shall be deemed to limit or amend the rights and obligations of [OBOT] or [the] City under the Master Plan, PUD or Development Agreement as they pertain to the Permitted Uses, the Scope of Development and the review and approval of planned Improvements, or any other provision thereunder."  (*Id.* at 29 (§ 5.2.1); *see also, e.g.*, *id.* at 34 (§ 6.2), 46 (§ 7.2), Art. 40.)

amount of <u>all actual damages incurred by Tenant as a direct result of Landlord's default</u> . . . ; <u>and (b) to seek equitable relief</u> . . . ; <u>provided, however,(i) in no event shall Tenant be entitled to</u> offset from all or any portion of the Rent becoming due hereunder or to otherwise recover or <u>obtain from Landlord or its Agents any damages (including, without limitation, any consequential, incidental, punitive or other damages proximately arising out of a default by Landlord hereunder) or Losses other than Tenant's actual damages as described in the foregoing clause (a);</u> (ii) Tenant agrees that, notwithstanding anything to the contrary herein or pursuant to any applicable Laws, Tenant's remedies hereunder shall constitute Tenant's sole and absolute right and remedy for a default by Landlord hereunder (including but not limited to any default by Landlord under Section 36.2) . . . .

(Ex. 68 at 91–92 (emphasis added).)

Given the amount of time and legal scrutiny that went into the negotiation and execution of these documents, it is not surprising that section 8.7 of the Development Agreement and section 22.1 of the Ground Lease are consistent and clear as to OBOT's exclusive remedies if the City defaults.  The Parties agreed that in the event of the City's breach, OBOT is entitled to equitable or legal relief, including actual damages only and not incidental or consequential damages, including "lost profits, loss of opportunity, lost revenues, or similar consequential damage claims[.]"  (Ex. 7 at 40 (§ 8.7).)

Although these provisions already demonstrated the Parties' unambiguous intentions as to the scope and limits of monetary damages, the Ground Lease also includes the proverbial belt and suspenders in section 24.1, titled "Waiver of Consequential Damages."  That provision states: "As a material part of the consideration for this Lease, and notwithstanding any provision herein to the contrary, neither Party shall be liable for, and each Party hereby waives any claims against the other for, any consequential damages incurred by either Party and arising out of any default by the other Party hereunder."[10]  (Ex. 68 at 92 (§ 24.1).)

---

[10] Although the Ground Lease does not repeat the language from section 8.7 of the Development Agreement that explicitly excludes "claims for lost profits, loss of opportunity, lost revenues, or similar consequential damages," nothing in sections 22.1 and 24.1 is contrary to section 8.7 of the Development Agreement, nor is there any language in the Ground Lease that indicates the Parties intended for

**2.    OBOT's Claims for Monetary Damages by Category**

OBOT used a series of eight tables (Damages Tables) to summarize its claimed monetary damages.  The tables were employed as demonstrative aids and were not introduced into evidence.  OBOT claimed it had three categories of "actual" damages, which it divided into categories defined by date:

- February 2016 through May 2018 ($4,600,000.00);
- June 2018 through December 2023 ($14,500,000.00); and
- January 2024 through February 2082 ($140,500,000.00).

OBOT used these categories for both its equitable and legal remedy.  The only distinction is that in OBOT's claim for an equitable remedy of specific performance, it limited its claim to the first two categories (ending December 2023) for a grand total of $19,100,000.00, and in its claim for a legal remedy it included all three categories (through February 2082) for a grand total of $159,600,000.00.  The Court addresses each category separately.

**a.    February 2016 through May 2018**

OBOT's claim for damages in this category are solely attributable to one item: the legal fees it incurred in the federal action.  Mr. Tagami testified that OBOT spent $4.6 million on legal fees between February 16, 2016, and May 15, 2018.  (Tr. 4484:21– 4485:12, 4487:16–23, 4487:25–4488:6.)

Assuming there was a contractual or statutory basis for doing so, OBOT could have sought attorneys' fees in the federal action.  But OBOT's time to request an award of

---

"consequential damages" to have different meanings in the related contracts.  (*Compare* Ex. 7 at 40 (§ 8.7), *with* Ex. 68 at 92 (§§ 22.1, 24.1).)  OBOT presented no evidence to the contrary.  As such, reading the Ground Lease against the backdrop of the Development Agreement, the Court reasonably concludes that the Parties understood the consequential damages waived in the Ground Lease included "lost profits, loss of opportunity, lost revenues, or similar consequential damages."  (*See* Civ. Code § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together.").)

reasonable attorneys' fees in the federal action has passed.  Under the Federal Rules of Civil Procedure, a prevailing party must file a motion for attorney's fees "no later than 14 days after the entry of judgment."  (Fed. R. Civ. P. 54(d)(2)(B)(i).)  Judge Vince Chhabria entered the district court court's judgment on May 23, 2018.  (*See* Judgment, *Oakland Bulk*, No. 3:16-cv-07014-VC (N.D. Cal. May 23, 2018).)  OBOT chose not to move for attorneys' fees and forfeited its right to claim those fees.[11]

OBOT also cannot seek attorneys' *fees* it expended in the federal action as *damages* in this state action.  As the California Supreme Court unequivocally noted: "In California, 'attorney's fees *qua* attorney's fees'—that is, the fees 'attributable to the bringing of the . . . action itself'—are not an element of damages.'"  (*Pulliam v. HNL Auto. Inc.* (2022) 13 Cal. 5th 127, 141 (quoting *Brandt v. Super. Ct.* (*Standard Ins. Co.*) (1985) 37 Cal. 3d 813, 818).)  "Instead, they are defined as 'costs.'"  (*Id.* (quoting Code Civ. Proc. § 1033.5(a)(10).)  OBOT presented no authority to this Court that unrequested costs from previous litigation can metamorphosize into actual damages in a current legal action.  On this separate basis, the Court finds that the legal fees OBOT incurred in prosecuting its 2016 case against the City are not actual damages in this matter, and OBOT is not entitled to recover them.[12]

If the Court is incorrect as to both points above, the Court must assess whether the attorneys' fees requested by OBOT from the federal litigation were reasonable.  (Ex. 68 at 127 (Art. 40, defining "Attorney's Fees and Costs" as "reasonable").)  OBOT argued (and

---

[11] Attorneys' fees may be recovered under the "tort of another" theory.  "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Elec. Elec. Control, Inc. v. L.A. Unified Sch. Dist.* (2005) 126 Cal. App. 4th 601, 616.)  OBOT did not make this argument.  Even if it had, the theory does not apply to this case: OBOT is not seeking attorneys' fees from the City because the City's tortious actions required OBOT to bring or defend an action against a third person; instead OBOT's dispute with the City stems from the Parties' disagreement regarding their contracts.

[12] The City separately argued that OBOT cannot now recover the previous fees both based on res judicata and because those fees, which occurred prior to May 15, 2018, cannot be damages that flow from the City's post-May 15, 2018 breaches of contract that this Court found in the liability phase of this action. (City's Obj. to Proposed Statement of Decision at 6:17–26, Dec. 18, 2023.)  The Court agrees.

Damages Table 2 stated), that "50% of OBOT's Legal and Professional Fees incurred related to the Federal trial" were $4,618,364.00, which OBOT "rounded" to $4.6 million. Based on the scope of the Federal Decision, the Court has little doubt that OBOT expended a significant amount of money litigating the federal case.  However, OBOT did not provide this Court with a single piece of supporting evidence describing the hours, hourly rates, or related costs, including expert hours and fees, that OBOT was billed in that litigation.  The Court has no information demonstrating why OBOT decreased its "claim" by 50 percent—whether because OBOT believed the fees were at least partially unreasonable or unrecoverable or because another entity paid them.

Further, even had OBOT provided the underlying documentation, because Judge Chhabria (and not this Court) presided over the federal action, and this Court neither received nor reviewed the full underlying record in that matter, this Court has no context to determine whether those fees were reasonable.  Therefore, as an additional, separate basis, the Court denies OBOT's claim for $4.6 million in historic legal fees because OBOT failed to demonstrate that its attorneys' fees and costs in the federal action were reasonable.

### b.    June 2018 through December 2023

OBOT's claim for damages in this category are broken into three segments that it summarized in Damages Table 1 as: "Actual Out-of-Pocket Damages" of $600,000.00, "OBOT Actual Damages" of $19,300,000.00, and "OGRE's Actual Damages" which OBOT expressed as a negative number of $5,400,000.00 and credited to the City, for a grand total of $14,500,000.00.  OBOT further described each of these categories in Damages Tables two through four.

### i.    Damages OBOT characterized as "Actual Out-of-Pocket Damages"

In its arguments (and as noted on Damages Table 2), OBOT asserted it spent $331,700.00 for "50% of Legal and professional Fees incurred related to Federal Trial," $274,7001.00 for "Payroll—Additional staff time and expenses incurred from the breach date through November 2021 due to the City's breaches," $5,000.00 for "Extra Costs due to Illegal Dumping—K-Rail Barriers," and $37,982.00 for "Extra Costs due to Illegal Dumping—Repair & Maintenance," for a total amount of $649,424.00, which OBOT "rounded" to $600,000.00.

Mr. Tagami testified that OBOT spent $331,740.00 between May 16, 2018, and December 31, 2023, in legal and professional fees associated with the federal litigation. (Tr. 4484:21–4485:12, 4487:16–23, 4487:25–4488:6.)  Although the Court received no evidence on this point, based on the dates, the Court assumes those fees and costs were associated with defending the City's appeal of the Federal Decision to the U.S. Court of Appeals for the Ninth Circuit.

The Court incorporates the above analysis regarding OBOT's claims for $4.6 million for 50 percent of its legal fees for the federal action between February 2016 and May 2018, and similarly concludes OBOT is not entitled to its legal fees for the period between June 2018 and December 2023 for three separate reasons.

First, OBOT chose not to seek attorneys' fees for the federal appeal.  The Ninth Circuit's local rules dictate that "a request for attorneys' fees shall be filed no later than 14 days after the expiration of the period within which a petition for rehearing may be filed."

1  (9th Cir. R. 39-1.6(a).)  The Ninth Circuit issued its opinion on May 26, 2020.[13]  Again,

2  OBOT did not move for attorneys' fees and forfeited its right to claim those fees.[14]

3         Second, the Court finds that the legal fees OBOT incurred in prosecuting the federal

4  appeal are costs and not actual damages in this matter, and OBOT is not entitled to

5  recover them.  (Code Civ. Proc. § 1033.5(a)(10).)

6         Third, even if the Court is incorrect as to either of its previous findings on this

7  point, the Court still needs to assess whether the attorneys' fees requested by OBOT in the

8  federal appeal were reasonable.  Based on the scope of the Ninth Circuit's decision

9  affirming the Federal Decision, the Court has little doubt that OBOT expended a

10 significant amount of money litigating the federal appeal.  However, OBOT did not

11 provide this Court with any evidence describing the hours, hourly rates, or related costs

12 that OBOT was billed in that appellate litigation.  The Court received no information that

13 explained why OBOT decreased its "claim" by 50 percent—whether because OBOT

14 believed the fees were at least partially unreasonable or unrecoverable, or because another

15 entity paid them.

16        Further, even had OBOT provided the underlying documentation, because justices

17 sitting on the Ninth Circuit (and not this Court) presided over the federal appeal, and

18 because this Court has neither received nor reviewed the full appellate record in that

19 matter, this Court has no context to determine whether those fees were reasonable.

20 Therefore, as an additional and separate basis, the Court denies OBOT's claim for

21 $331,740.00 in historic legal fees because OBOT failed to demonstrate that its attorneys'

22 fees and costs in the federal appeal were reasonable.

23

24 _____

25

26        [13] The Court took judicial notice of the records of the Ninth Circuit.  (*See* Evid. Code § 452(d).)

27        [14] OBOT filed an initial bill of costs on June 4, 2020, but for reasons not presented in this action,
OBOT elected not to take further action to recover those costs or its legal fees then.  (*See* OBOT's Bill of

28 Costs, *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, No. 18-16105 (9th Cir., June 4, 2020);
*see also generally* Docket, *Oakland Bulk*, No. 18-16105.)

* * *

Mr. Tagami testified that OBOT spent $274,701.00 in Project-related staff costs during this period.  (Tr. 4485:13–19, 4488:8–13.)  He also testified that OBOT spent $5,000.00 in 2022 for barriers to prevent ongoing illegal dumping in certain areas of the Project.  (Tr. 4485:20–4486:4, 4488:15–21.)  Finally, Mr. Tagami testified that OBOT spent $37,982.00 between October 2022 and April 2023 for clean-up caused by illegal dumping of hazardous materials.  (Tr. 4485:5–7, 4487:2–14, 4488:23–4489:3.)  During the City's cross-examination of Mr. Tagami, there were suggestions that Insight Terminal Solutions (ITS) had—or, perhaps, was supposed to—reimburse OBOT for staff costs and for the costs to secure and maintain the Project premises.  (*See* Tr. 4544:2–3, 4546:18–4547:5, 4577:2–18.)  However, the City ultimately elicited no testimony or provided other evidence that clearly controverted Mr. Tagami's testimony that OBOT had in fact paid those amounts between June 2018 and December 2023.  (*See id.*)

The Court therefore finds that OBOT is entitled to $317,683.00 for actual damages incurred during that time.[15]

### ii.    Damages OBOT characterized as "Actual Damages"

In its arguments (and as noted on Damages Table 3), OBOT claimed it had "actual damages" of $19,300,000.00 in lost profits from June 2018 through December 2023.  OBOT

---

[15] At trial, OBOT argued it should recover these damages even if it elects an equitable remedy.  The Court rejects that argument.  First, the Parties waived the right to recover "incidental damages."  (*See* Ex. 68 at 91–92 (§ 22.1).)  Second, even if not explicitly waived by the Ground Lease, OBOT did not present the Court with evidence that demonstrated these "actual damages" were lost because of the City's breach, that such expenses would have been unnecessary had OBOT been able to proceed with advancing the Project in 2018, or that the expenses are for materials or time that OBOT will need to be "replace" once the Project resumes (assuming OBOT elects an equitable remedy).  Accordingly, the Court does not award these damages in conjunction with an award of specific performance.

calculated that amount by adding its "But-for[16] Revenues (OBOT's Lost Rents from ITS and OGRE)" that it totaled at $35,723,447.00, and subtracting "Actual (Mitigating) Revenues" of $11,739,989.00 plus its "But-for Expenses" of $4,678,723.00, for a grand total of $19,304,735.00, which OBOT "rounded" to $19,300,000.00.  On Damages Table 4, OBOT totaled OGRE's financial impact during the same period.  OBOT concluded (presumably because the Project would not yet have been operational) that OGRE would have no revenue and would only have expenses (including rental payments to OBOT, taxes, rail improvements, etc.) totaling $5,401,042.00, which OBOT "rounded" to $5,400,000.00.  In Damages Table 5, OBOT subtracted "OGRE Actual Damages" from "OBOT Actual Damages" for a total of $13,900,000.00.[17]

As set forth above, the Development Agreement and Ground Lease clearly state the Parties' agreement regarding the scope of monetary damages in the event of default.  "[I]n no event shall [OBOT] be entitled" to recover incidental or consequential damages; this prohibition includes "claims for lost profits, loss of opportunity, lost revenues, or similar consequential damage[s]."  (Ex. 7 at 40 (§ 8.7); *see also* Ex. 68 at 91–92 (§ 22.1).)  If the City breached, OBOT's "exclusive" remedy was "actual damages incurred by [OBOT] as a direct result of [the City]'s default."  (*Id*. at 91.)

OBOT claimed $13,900,000.00 as damages from June 2018 through December 2023.  This amount reflects *profits* OBOT stated it would have earned, based on "*revenues*" it should have received (less expenses it assumed it would have incurred), all which flow from the terms contained within subleases it separately negotiated with ITS and OGRE.  The Parties' contracts do not permit OBOT to recover these amounts as "actual damages" resulting from the City's default.

---

[16] As used throughout OBOT's Damages Tables, the Court understood OBOT's use of "but-for" to mean what OBOT would have received if not for the City's breach of the Ground Lease.

[17] In Table 5, OBOT added the full $600,000.00 (*see supra* Section III.C.2.b) and listed a grand total of $14,500,000 in the June 2018 through December 2023 column.

15

If the Court is incorrect and the plain language of the Parties' contracts does not automatically preclude—as a monetary remedy for breach—damages for unreceived "revenues" and "profits," then the Court must analyze this issue further.  The Court must consider whether those "revenues" and "profits" are permissible under the contracts as "actual damages" or impermissible as "consequential damages."

Contractual damages are frequently divided into two broad categories, "general damages," which are sometimes called direct damages (and are what the Court finds most closely aligned to what the Parties refer to as "actual damages")[18] and "special damages (sometimes called consequential damages)."  (*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.* (2004) 34 Cal. 4th 960, 968.)  "General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach."  (*Id.*)  "Because general damages are a natural and necessary consequence of a contract breach, they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated them."  (*Id.* (quoting Calamari & Perillo, The Law of Contracts (2d ed. 1977) § 14–5, 525).)

"Unlike general damages, special damages are those losses that do not arise directly and inevitably from any similar breach of any similar agreement."  (*Id.*)  "Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties."  (*Id.*; *see also Ash v. N. Am. Title Co.* (2014) 223 Cal. App. 4th 1258, 1270; *FAA v. Cooper* (2012) 566 U.S. 284, 301 (stating "the converse of general

---

[18] The Parties' contracts do not refer to "general damages."  Instead, the Ground Lease references other forms of damages, most notably for the purposes of this analysis, "actual damages" and "consequential damages."  (*See* Ex. 68 at 91–92 (§ 22.1); *see also* Ex. 7 at 40 (§ 8.7, referring to "consequential damages")).)  "'[A]ctual damages' is a term synonymous with compensatory damages."  (*Saunders v. Taylor* (1996) 42 Cal. App. 4th 1538, 1544 (quoting *Weaver v. Bank of Am.* (1963) 59 Cal. 2d 428, 437); *see also DeLisi v. Lam* (2019) 39 Cal. App. 5th 663, 682 ("'[A]ctual damages' are simply compensatory damages, as opposed to nominal, exemplary or speculative.").)  Black's Law Dictionary defines "general damages" as "compensatory damages for harm that so frequently results from the tort for which a party has sued that the harm is reasonably expected and need not be alleged or proved."  (*Damages*, Black's Law Dictionary (11th ed. 2019).)

damages is special damages.").) "Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." (*Id.* at 968–69.) "Special damages 'will not be presumed from the mere breach' but represent loss that 'occurred by reason of injuries following from' the breach." (*Id.* at 969 (quoting *Mitchell v. Clarke* (1886) 71 Cal. 163, 168).) "Special damages are among the losses that are foreseeable and proximately caused by the breach of a contract." (*Id.*) "[F]oreseeability is to be determined as of the time of the making of the contract." (*Ash*, 223 Cal. App. 4th at 1270 (citing Farnsworth on Contracts).) "The loss must have been foreseeable as a probable result of the breach." (*Id.*) "[I]t is foreseeability only by the party in breach that is determinative." (*Id.*)

"Lost profits from collateral transactions as a measure of general damages for breach of contract typically arise when the contract involves crops, goods intended for resale, or an agreement creating an exclusive sales agency." (*Lewis Jorge*, 34 Cal. 4th at 971–72.) "The likelihood of lost profits from related or derivative transactions is *so obvious* in these situations that the breaching party must be deemed to have contemplated them at the inception of the contract." (*Id.* at 972 (emphasis added).) "Lost profits, if recoverable, are more commonly special rather than general damages." (*Id.* at 975 (quoting 3 Dobbs, Law of Remedies (2d ed. 1993) § 12.4(3), pp. 76–77).)

The Ground Lease includes various provisions that would apply if OBOT elected to sublease the property.[19]  For example, there is language regarding estoppel certificates

---

[19] In its objections to the Court's proposed Statement of Decision regarding damages, OBOT claimed that section 3.4 of the Ground Lease *mandated* OBOT to execute subleases. (OBOT & OGRE's Obj. to Proposed Statement of Decision 5:11–14, Dec. 18, 2023.)  OBOT overstated the language of the Ground Lease.  Section 3.4, titled "Premises Must Be Used," only requires that OBOT "use all portions of the Premises containing completed Initial Improvements continuously during the Term in accordance with the Scope of Development, the Regulatory Approvals, and the Permitted Uses and shall not allow any such

(*see* Ex. 68 at 93–94 (§§ 25.1, 26.1), as well as a provision that obligated OBOT to assign to the City "all rents and other payments of any kind, due or to become due from any or present or future Subtenant as security for Tenant's obligation to pay Rent hereunder." (*Id.* at 72 (§ 12.2, Assignment of Sublease Rents).)  In addition, section 19.4, titled "Continuation of Subleases and Other Agreements," provides that the City "shall have the right, at its sole and absolute option, to assume any and all Subleases and agreements by [OBOT] for the maintenance or operation of the Premises." (*Id.* at 90.)  These examples demonstrate the Parties' understanding that OBOT could, and likely would, enter into subleases with third parties.  It was therefore reasonably foreseeable that if the City breached, its default would have consequences on both OBOT and its subtenants.  Lost profits was among those potential consequences, which explains why the Parties agreed that "lost profits" would be excluded as a remedy in the event of default.

But even if lost profits were not specifically excluded in the contracts, OBOT presented insufficient evidence regarding the various components that contributed to its $13,900,000.00 damages calculation for the June 2018 through December 2023 time frame.  Specifically, OBOT did not distinguish between money it would have received in monthly sublease rental payments pursuant to its subleases (which perhaps could be characterized as actual or general damages akin to those that would have inevitably flowed from the breach of "any similar agreement") and money it may have received based on "secondary or derivative losses arising from circumstances . . . particular to the contract or to the parties."  Table 3 references approximately $25,000,000 for "Balloon Rent" and "Lease Take Down Payments," which are ostensibly tied to the unique, financial

---

portions of the Premises or any part thereof to remain unoccupied or unused . . . without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion."  (Ex. 68 at 25.)

obligations set forth in subleases that OBOT entered into with third parties.[20]  OBOT also subtracted $11,739,989 from what OBOT calls "But-for Revenues."  It is unclear whether that reduction is partially for money OBOT received from ITS between June 2018 and December 2023 for "Base Rent" (although that amount exceeds what OBOT claimed ITS owed for "Base Rent"), or for something else.  The bottom line is this: The evidence the Court received on this point was inscrutable.  The Court therefore finds, as a separate basis from the Court's finding above, that OBOT's claim for $13,900,000.00 for lost profits is impermissible because OBOT did not establish what, if any of that amount constituted "actual damages" resulting from the City's breach of contract.

Even if the Court is incorrect as to both points above, OBOT's claim for $13,900,000.00 as "actual damages" from June 2018 through December 2023 is not recoverable because OBOT failed to demonstrate with any reasonable probability that it would have received those amounts; instead, the evidence demonstrated those projections were uncertain, moving targets.  "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." (Civ. Code § 3301.)

As support for all the monetary damages alleged by OBOT in this phase of the trial, OBOT relied almost exclusively on the testimony of Mr. Tagami and one expert, Mr. Peter Brown.  Mr. Brown is a CPA who has a Bachelor of Science in managerial economics and an MBA.  (Tr. 4643:24–4644:22.)  He is accredited in business valuation and has a certified financial forensics designation.  (Tr. 2645:10–18.)  For much of his career, Mr. Brown worked at various accounting firms, including Arthur Anderson, until he joined GHL Advisors in 2020 primarily conducting forensic accounting investigations.

---

[20] The Court notes that OBOT did not enter into its sublease with OGRE until June 26, 2018 (Ex. 162 at 4) and did not enter into its sublease with ITS until September 24, 2018 (Ex. 801 at 1).  Both subleases were negotiated and executed years after the Parties entered into the Development Agreement and the Ground Lease; after the federal court issued the Federal Decision finding the City breached the Development Agreement; and even after a portion of the time OBOT claimed it was entitled to "actual damages" in this litigation (this category of damages begins on June 1, 2018).

(Tr. 4643:24–4645:9.)  Mr. Brown was designated as an expert in "quantifying economic damages in commercial disputes."  (Tr. 4653:1–9.)

Both Messrs. Tagami and Brown primarily, and at times exclusively, referenced the figures noted on OBOT's Damages Tables when testifying about specific monetary damages claimed by OBOT.  Mr. Brown testified that the figures contained in the Damages Tables for June 2018 through December 2023 were based on the data contained in OBOT's subleases with ITS and OGRE.  (Tr. 4661:14–22 (testifying he prepared the tables to reflect the amounts OBOT allegedly suffered between 2016 and 2023), 4664:3–11.)

The OBOT-ITS sublease obligated ITS to make various categories of payments to OBOT including Base Rent under the Ground Lease, Sublease Base Rent, Balloon Rent, and Sublease Bonus Rent.  (Ex. 801 at 19–30 (§§ 2.2, 2.3, 2.4, 2.5, 2.13).)  Although Mr. Brown relied on the monetary terms of the subleases as originally drafted, Mr. Tagami testified that since entering into the sublease, OBOT and ITS had renegotiated those sublease terms: Some payments ITS owed OBOT were deferred (not waived), and other payments were reduced.  Specifically, in their first memorandum of understanding (MOU), OBOT and ITS modified ITS's rental obligations by deferring the Ground Lease Base Rent and Balloon Rent payments, reducing the Sublease Base Rent payment, and resolving an outstanding issue about the Sublease Bonus Rent payments.  (*See* Ex. 962 (OBOT & ITS's 1st MOU (Dec. 21, 2020)); *see also* Tr. 4525:2025–4528:24 (Tagami).)  In their second MOU, OBOT and ITS again modified ITS's rental obligations by further deferring Balloon Rent payments, and a True Up Payment.  (*See* Ex. 344 (OBOT & ITS's 2d MOU (Mar. 9, 2022)); *see also* Tr. 4529:10–4531:6 (Tagami).)  As of the time of trial, Mr. Tagami indicated that OBOT and ITS were in discussions about executing a third MOU concerning ITS's rent payments under the sublease to account for several contingencies.  (Tr. 4532:11–4539:9.)

The testimony the Court received regarding the subleases, and OBOT's previous and ongoing negotiations with ITS in particular, was ambiguous and vague.  Mr. Tagami

testified that if OBOT elects the remedy of specific performance, ITS would be responsible (subject to the MOUs) to repay any amounts that were deferred.  Yet there was no testimony that clearly (or even equivocally) explained what amounts if any ITS would pay if OBOT proceeded with the remedy of specific performance versus a monetary remedy; when (if ever) ITS would pay those unknown amounts; or, how those unknown amounts would likely further change because, as Mr. Tagami stated, "[e]verything is on the table." (Tr. 4539:9.)

Even under the newly negotiated financial terms between OBOT and ITS—which to be clear, were never explained to the Court during trial, not included in the Damages Tables, not shared with OBOT's expert, and not incorporated into the very calculations OBOT relied upon to seek "actual damages" for this time period—the evidence did not show that but-for the City's breach it was reasonably certain that ITS would have paid, in full, whatever rental payments it may have owed OBOT from June 2018 through December 2023.  OBOT and ITS's past practices indicate a willingness and ability to modify sublease terms as circumstances evolve.  While that nimbleness and flexibility may be beneficial and perhaps necessary to advance this Project in the complicated political and legal environment OBOT finds itself, it yields a range of uncertain financial outcomes.  Considering that history and the realities faced by complex construction projects such as this one, the Court finds OBOT did not establish with any reasonable likelihood that it lost specific rental payments owed under the subleases it negotiated (and renegotiated) because of the City's default.  Therefore, the Court finds, as a separate basis from the Court's findings above, that OBOT is not entitled to its claim for $13,900,000 as "actual damages" from June 2018 through December 2023.

### c.    January 2024 through February 2082

In its arguments (and as described on Damages Tables 5-8), OBOT claimed that if it elects the legal remedy, it has "Actual Damages" of $140,500,000.00  in lost profits from

January 2024 through February 2082.[21]  As reflected on Damages Table 7, OBOT calculated that amount by adding its "But-for Revenues (OBOT's Lost Rents from ITS and OGRE)" that it totaled at $778,543,179.00 as "Net Lost Revenues," and subtracting its "Net But-for Expenses" of $167,712,022.00, for an "Actual Damages" subtotal of $610,831,157.00.  OBOT then further subtracted $520,344,152.00 as a "Discount for Present Value of Future Cash Flows" for a "Present Value" total of $90,487,005.00, which OBOT "rounded" to $90,500,000.00.

On Damages Table 8, OBOT totaled the "Actual Damages Sought by ORGE with Legal Award" for the same period.  OBOT claimed OGRE would have received $2,176,727,871.00 in "Last Mile Service paid by U.P." plus $380,320,407.00 in "Indexing paid by ITS" for a total "Net Lost Revenues" of $2,557,048,278.00.  OBOT then listed 13 "Anticipated Expenses," which it totaled at $1,671,468,017.00 for "Net But-for Expenses." The "net" expenses were subtracted from the "net" revenues for a "Subtotal: Actual Damages" of $885,580,261.00.  OBOT further subtracted a "Discount for Present Value" of $835,559,781.00 for a "Present Value" of $40,020,480.00, which OBOT "rounded" to $50,000,000.00.  In Damages Table 5, OBOT added "OGRE Actual Damages" from "OBOT Actual Damages" for a total of $140,500,000.00.

The Court incorporates the analysis from above regarding OBOT's claims for $13,900,000.00 in damages for lost profits between June 2018 and December 2023.  The Court similarly concludes OBOT is not entitled to the $140,500,000.00 damages it seeks in lost profits for the period from January 2024 through February 2082 for three separate reasons.

First, as noted above, the Development Agreement and Ground Lease do not allow OBOT to recover consequential damages, including those for "lost profits, loss of

---

[21] During trial, OBOT did not explain how or why it selected February 2082 (58 years and one month from the Judgment) as the final date for calculating actual damages under a legal remedy.

1    opportunity, lost revenues, or similar consequential damage[s]."  (Ex. 7 at 40 (§ 8.7); *see*

2    *also* Ex. 68 at 91–92 (§ 22.1).)  OBOT's "exclusive" remedy was "actual damages incurred

3    by [OBOT] as a direct result of [the City]'s default."  (Ex. 68 at 91 (§ 22.1).)

4        Second, as discussed above, even if lost profits were not specifically excluded as a

5    remedy in the contracts, the Court finds that the $140,000,000.00 OBOT claims as "Actual

6    Damages" from January 2024 through February 2082 are not, in fact, "actual" or "general"

7    damages but are instead properly characterized as "special" or "consequential" damages,

8    which are precluded under the Development Agreement and the Ground Lease.  Like

9    OBOT's previous calculations, these figures are based on revenues OBOT asserted it

10   would have received over the next 56 years, according to the original terms of subleases

11   that OBOT had with ITS and OGRE (even though those sublease terms were already

12   modified as embodied in two MOUs).  Those subleases do not arise "directly and inevitably

13   from any similar breach of any similar agreement" but instead are "secondary or

14   derivative losses arising from circumstances that are particular to" this Project and

15   OBOT's subleases with ITS and OGRE.  (*Lewis Jorge*, 34 Cal. 4th at 968.)  The Court

16   therefore finds as a separate basis from the Court's finding above, that OBOT is not

17   entitled to recover $140,500,000.00 as "actual damages" resulting from the City's breach of

18   contract.

19       If the Court is incorrect as to both points above, OBOT's claim for $140,500,000.00

20   as "actual damages" from January 2024 through February 2082 are not recoverable

21   because OBOT failed to demonstrate with any reasonable probability that it would have

22   received those amounts.  The minimal evidence the Court received was based on layers of

23   unsound assumptions, unsubstantiated and incorrect data, and unexplained conclusions.

24       Even if lost future profits are permissible damages that OBOT can recover under

25   the Development Agreement and the Ground Lease, as analyzed below, OBOT failed to

26   demonstrate that those lost profits were reasonably likely to occur.  (*See Sargon Enters.,*

27   *Inc. v. Univ. S. Cal.* (2012) 55 Cal. 4th 747, 773–74 (stating lost profits are only

28   "recoverable [as damages] where the evidence makes reasonably certain their occurrence

and extent.") (quoting *Grupe v. Glick* (1945) 26 Cal. 2d 680, 693).)  The Court looks to the analysis in *Sargon* and related cases for legal guidance on this point.

In *Sargon*, a small dental implant company with modest profits sued the University of Southern California for breach of contract for USC's failure to conduct clinical tests of a new implant the company had patented.  (*Id.* at 753.)  The company claimed, due to USC's breach, it was entitled to damages ranging from $220 million to over $1 billion for lost profits.  (*Id.*)  At an evidentiary hearing, the trial court heard from the company's primary witness, Mr. Skorheim, who was proffered as an expert.  Mr. Skorheim was a business and industry analyst, CPA, and forensic accountant.  (*Id.* at 755.)  Mr. Skorheim's opinion relied upon many materials including deposition transcripts, financial information from the company and its competitors, and market analyses of the dental implant market.  (*Id.* at 755–67.)  At an evidentiary hearing, Skorheim provided comparative data for those entities, and then made numerous assumptions about how the company would grow as an innovator over future years.  (*Id.*)  The trial court excluded Skorheim's testimony, finding among other things that he lacked qualifications and expertise in the dental implant industry to support his opinions, his opinions were "not based upon matters upon which a reasonable expert would rely," and his opinions regarding lost profit damages were "pure speculation" that relied upon "unreasonable assumptions."  (*Id.* at 766–67.)  The Court of Appeal reversed the trial court's decision.  The Supreme Court, in turn, reversed the Court of Appeal.  The Supreme Court noted that the calculation of lost profits does not require "mathematical precision;" what is required is "reasonable certainty."  (*Id.* at 774–75 (quoting *Lewis Jorge*, 34 Cal. 4th at 975); *see also* Civ. Code § 3301 ("No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin.").)

In *Sargon*, the court looked to *Greenwich S.F., LLC v. Wong* (190 Cal. App. 4th 739) in which lost profits were found to be "uncertain, hypothetical and entirely speculative." (*Sargon*, 55 Cal. 4th at 775.).  The court noted that in *Greenwich*, the "plaintiffs sought lost profits for breach of a real property sales agreement.  They 'presented evidence of lost

profits through the testimony of [a] real estate appraiser,' who testified about what the property would have been worth had it been developed according to the intended plans and specifications." (*Id.* at 775 (quoting *Greenwich*, 190 Cal. App. 4th at 749).)  The *Greenwich* court found the award of $600,000.00 in lost profits to be unsupported because the projections were "not proven with the requisite *reasonable certainty*." (*Id.* (quoting *Greenwich*, 190 Cal. App. 4th at 760).)  Further, the "existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits." (*Id.* (quoting *Greenwich*, 190 Cal. App. 4th at 763).)  "The lost profits claim was based on the assumption that [plaintiffs] would have constructed the residence according to the plans and specifications without changes and that the venture would have been profitable.  These assumptions were inherently uncertain, contingent, unforeseeable, and speculative.  The proposed real estate development project here involved numerous variables that made any calculation of lost profits inherently uncertain." (*Id.* (quoting *Greenwich*, 190 Cal. App. 4th at 766).)

Here, OBOT's claim of lost profits was substantially based on the testimony of Mr. Brown.  Mr. Brown has no experience or expertise in the development of bulk commodities terminals, the rail industry, or the commodity markets for coal and soda ash (Tr. 4758:13–4763:7), and OBOT did not call any other expert to provide foundational testimony about those topics.  And unlike Mr. Skorheim in *Sargon*, Mr. Brown did not conduct a comparative market analysis of any other bulk commodities terminals (including those in California that transport coal) and provided no information regarding the profitability or lack thereof for those entities.  (Tr. 48378:22–4838:23.)  He also provided no range of projected financial outcomes for OBOT over the ensuing decades. (Tr. 4839:7–4841:1.)

Mr. Brown stated that "the sufficiency of the facts and data used by the expert are critical to the creditability of the opinion" and that "one of the common areas of challenge to the sufficiency of the facts and data includes excessively relying on client-provided data with no independent analysis." (Tr. 4757:16–4757:1.)  Yet that very issue is one of the

flaws of Mr. Brown's opinion: Mr. Brown uncritically relied upon the Basis of Design, the Ground Lease, the original ITS Sublease, and the OGRE Sublease to calculate the estimated revenues of OBOT and OGRE.[22]

Mr. Brown testified that he estimated OBOT's future lost profits of $90 million based on "the lease payments that are being made by ITS and OGRE to OBOT, [minus] OBOT's costs related to those lease payments." (Tr. 4672:25–4673:18.) As to OGRE, Mr. Brown estimated future lost profits of $50 million, based on damages "related to the short line rail service that OGRE was going to be providing to the terminal." (Tr. 4673:19–4674:21.) Mr. Brown arrived at these figures by estimating OBOT's and OGRE's revenues using the Basis of Design, the Ground Lease, the ITS Sublease, and the OGRE Sublease, subtracting OBOT's and OGRE's expected costs, and applying a negative 12% discount rate, to account for "risk." (Tr. 4697:2–17, 4708:14–4702:9, 4712:22–4723:15, 4734:16–4749:18.)

Mr. Brown's calculations for OBOT's future lost profits were based on his assumption that the Project would be built exactly as described in the initial Basis of Design, even though the Basis of Design was a preliminary document that required an iterative, collaborative process with the City to advance the Project Design.[23]

---

[22] The City spent substantial time during the damages phase of trial and numerous pages in post-trial briefing arguing that portions of Mr. Brown's testimony should be excluded because he improperly relied on data that was case-specific hearsay, unauthenticated, and not admitted into evidence in violation of *People v. Sanchez* ((2016) 63 Cal. App. 2d 430). Mr. Brown's testimony was largely based on his interpretation of the Basis of Design, the Ground Lease, and OBOT's subleases with ITS and OGRE, all of which are in evidence. To the extent Mr. Brown mentioned he talked to other people, reviewed other case-specific documents (that were not in evidence), or testified without explaining the basis for his opinion, his testimony, while earnest, was so brief, vague, and speculative that the Court could not, and—importantly—did not rely on it. For example, Mr. Brown's testimony regarding the "General and Administration" expense in Table 7 was "General administration expenses are a percentage of recurring revenues. The total for that is $35,013,017." (Tr. 4716:18–20.) Mr. Brown then moved on to another topic. As a result, the Court does not further address the City's *Sanchez* arguments.

[23] The Court noted in the previous Statement of Decision regarding liability that when OBOT prepared the Basis of Design, it was unclear which of 15,000 bulk commodities would eventually be shipped through the terminal.

Nevertheless, Mr. Brown assumed (per the Basis of Design) that the Project would exclusively handle coal and soda ash at an annual rate of 5 million metric tons and 1.5 metric tons, respectively.[24]  (Tr. 4672-829:14–4830:4.)  When asked how he calculated OBOT's future revenues, he stated that he used a rate of $200 per car, and the number of rail cars per year "comes straight out of the basis of design." (Tr. 4735-4736.)  He stated that unit trains "for both coal and ash are 104 cars long each.  There are 437-unit trains for coal projected, and 160-unit trains for soda ash." (Tr. 4736:5–17.)  As the Court understood his testimony, Mr. Brown assumed, without any explanation, that these same 597 coal and soda ash filled trains would run every year, uninterrupted, until February 2082, which informed numerous of his calculations, including "Net Lost Revenues" to OGRE of approximately $2.5 billion.

Mr. Brown explicitly and implicitly made many additional assumptions about the Project and its future operations that made his conclusions regarding lost profits speculative and unreliable.  These include but are not limited to his assumptions that: the terminal will be commissioned on February 2025; the demand for coal will not decrease between now and 2082; no future federal, state or local regulations regarding fossil fuels will have any negative financial impact on the Project for 56 years; the Project will never handle any commodities other than coal or soda ash; transports by ship or rail will never be disrupted (meaning no acts of war, earthquakes, storms, labor disputes, pandemics, or political controversies will ever impact the constant flow of coal or soda ash); etc.  Mr. Brown's uncritical reliance on the preliminary data provided in the initial Basis of Design undermines any possible finding that his calculations regarding OBOT's future lost profits are reasonably certain.  Instead, his assumptions and his findings are

---

[24] Although OBOT informed the Court that Mr. Brown was "not testifying as an expert on the supply of coal," Mr. Brown testified that he had "looked at a number of statistics that are published by the United States government" and satisfied himself that "there is a sufficient supply of coal over the life of the lease." (Tr. 4685:15–4687:10.)

"inherently uncertain, contingent, unforeseeable and speculative." (*Greenwich*, 190 Cal. App. 4th at 743.)

Mr. Brown also assumed that the ITS and OGRE subleases would remain in place, unmodified, until February 2082. (Tr. 4763:18–4764:1, 4767:6–4770:12.) As discussed earlier, this assumption was not just potentially faulty, it was wrong. By the time Mr. Brown testified, OBOT had already twice changed the financial terms of its sublease with ITS (via two MOUs) and was in negotiations to modify the terms a third time. Because Mr. Brown was unaware of those changes, he did not consider them in his financial calculations for OBOT's lost profits. (Tr. 4773:3–9, 4784:11–4786:18, 4787:19–4789:13.)

There were many other issues that caused the Court to doubt the reliability of OBOT's claim for lost profits for the Project. For example (as noted above), Mr. Brown failed to analyze the profits and losses of other bulk commodity terminals, such as Long Beach, Vancouver, Pittsburg, Stockton, or Richmond. (Tr. 4837:13–4838:23.) This data could have better informed Mr. Brown's findings (and ultimately the Court) about OBOT's projected revenues and expenses over the duration of the lease. In addition, some of the financial information OBOT presented was simply inexplicable. For example, in Damages Table 8, OBOT called its $2.5 billion figure "Net Lost Revenues." It begs the question: If this figure is "net," what is the gross amount, and where is the data or analysis that

supports the gross figure?[25]  For these reasons, the Court separately finds that OBOT's claim for lost profits is speculative and not reasonably certain.[26]

## V. OBOT'S ALTERNATE REMEDIES

The Court finds the following alternative awards of relief are supported by the evidence:

## A.    Equitable Remedy

The Court will enter judgment in favor of OBOT as follows:

- OBOT is not in default of the Ground Lease for failure to meet the Initial Milestone deadline of August 14, 2018.

---

[25] In its objection to the proposed Statement of Decision concerning damages, the City requested that the Court make the following statement of law: "An expert opinion based on speculation and conjecture is *inadmissible* as a matter of law." (City's Obj. 7:11–12.)  The City also requested the factual finding that "Mr. Brown's opinions are inadmissible and excluded under this standard." (*Id.* at 7:12–13.)

The Court agrees with the City's statement of the law concerning the Court's gatekeeping role under section 801 of the Evidence Code.  However, unlike USC in *Sargon*, it does not appear that the City objected to Mr. Brown's testimony as speculative *before* the beginning of the damages phase of trial. (*See* Docket; *see also Sargon*, 55 Cal. 4th at 761–67.)  Thus, the City did not invoke the Court's gatekeeping function, and the Court will not rule on a motion to exclude that the City did not make.  The City also did not identify any authority that supports the contention that the Court can exclude an expert's testimony if the Court finds that the expert's testimony was unreliable and speculative *after* taking the expert's testimony as evidence.  Even if the Court is incorrect, the point is moot because, as set forth in this Statement of Decision, the Court did not rely on Mr. Brown's testimony.

[26] OBOT noted that the Court "appear[ed] to reject future lost profits altogether, omitting discussion of the relative higher certainty in calculating damages closer in time to the breach; the front-loaded nature of Mr. Brown's damages calculation . . . and the role of the discount rate to account for future uncertainty."  The Court disagrees with OBOT's premise that because most of its projected revenues were for years at the beginning of the lease term, those revenues are necessarily more certain.  As noted above, if there are many factors that made OBOT's revenue projections uncertain.  Further, the Court finds that the flat, 12-percent discount rate Mr. Brown used was insufficiently explained and inadequate to forecast multiple, compounding uncertainties. (*See* Tr. 5004:10–25, 5005:22–5007:11 (Mr. Borck) (explaining how even if each step in an eight-step project 90 percent is certain, the outcome of the project could still be as low as 43 percent).)

- The City's termination of the Ground Lease on November 22, 2018, was unlawful, invalid, and is rescinded. The City's corresponding termination of the Development Agreement with respect to the West Gateway property is also, therefore, rescinded.

- Section 6.1.1.1 (Initial Milestone Date) of the Ground Lease is extended, due to events of Force Majeure, by a period of two years and six months from the date of judgment.

**B.    Legal Remedy**

The Court will enter judgment in favor of OBOT as follows:

- OBOT is not in default of the Ground Lease for failure to meet the Initial Milestone deadline of August 14, 2018.

- The City's termination of the Ground Lease was unlawful, invalid, and is therefore rescinded.

- OBOT releases and relinquishes its rights to develop the Project pursuant to the Development Agreement, the Ground Lease, and the related contracts.

- The Court awards OBOT $317,683.00 for actual damages incurred from June 2018 through December 2023.

**C.    Election**

OBOT must (per the Parties' stipulation) file its proposed judgment (electing either the equitable or legal remedy in conformity with this Statement of Decision) within seven days of this decision, or January 5, 2024, whichever is later.

Dated: December 22, 2023

_____
Noël Wise
Judge of the Superior Court
**Noël Wise / Judge**

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

COURTHOUSE ADDRESS:
Hayward Hall of Justice
24405 Amador Street, Hayward, CA 94544

PLAINTIFF/PETITIONER:
Oakland Bulk And Oversized Terminal, LLC  et al

DEFENDANT/RESPONDENT:
City of Oakland et al

| **CERTIFICATE OF ELECTRONIC SERVICE CODE OF CIVIL PROCEDURE 1010.6** | CASE NUMBER: RG18930929 |

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Alameda

12/22/2023

Chad Finke, Executive Officer / Clerk of the Court

By: *Melisa Callender* Deputy
M. Callender

**I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served one copy of the Final Statement of Decision Re Damages entered herein upon each party or counsel of record in the above entitled action, by electronically serving the document(s) from my place of business, in accordance with standard court practices.**

Barry W. Lee
Manatt, Phelps & Phillips, LLP
BWLee@manatt.com

Danielle Evelyn Leonard
Altshuler Berzon LLP
dleonard@altshulerberzon.com

James Finberg
Altshuler Berzon LLp.
jfinberg@altshulerberzon.com

Julie Ann Shepard
Jenner & Block LLP
jshepard@jenner.com

Justin Jones Rodriguez
jjrodriguez@manatt.com

Chad Finke, Executive Officer / Clerk of the Court

Dated: 12/22/2023

By:

*Melisa Callender*

M. Callender, Deputy Clerk

# EXHIBIT C

APP-002

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:** STATE BAR NUMBER: 218201<br>NAME: Danielle Leonard<br>FIRM NAME: Altshuler Berzon LLP<br>STREET ADDRESS: 177 Post Street, Suite 300<br>CITY: San Francisco   STATE: CA   ZIP CODE: 00009-4108<br>TELEPHONE NO.: 415-421-7151   FAX NO.: 415-362-8064<br>EMAIL ADDRESS: dleonard@altshulerberzon.com<br>ATTORNEY FOR (name): City of Oakland | **FOR COURT USE ONLY**<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Alameda<br>01/23/2024 at 12:21:12 PM<br>By: Elsa Calderon,<br>Deputy Clerk |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS: Department 21
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

PLAINTIFF/PETITIONER: The City of Oakland
DEFENDANT/RESPONDENT: Oakland Bulk and Oversized Terminal, et al.

| | |
|---|---|
| ✔ **NOTICE OF APPEAL**   ☐ **CROSS-APPEAL**<br>**(UNLIMITED CIVIL CASE)** | CASE NUMBER:<br>RG18930928/RG20062473 (consolidated) |

**Notice: Please read *Information on Appeal Procedures for Unlimited Civil Cases* (Judicial Council form APP-001-INFO) before completing this form. This form must be filed in the superior court, not in the Court of Appeal. A copy of this form must also be served on the other party or parties to this appeal. You may use an applicable Judicial Council form (such as APP-009 or APP-009E) for the proof of service. When this document has been completed and a copy served, the original may then be filed with the court with proof of service.**

1. NOTICE IS HEREBY GIVEN that:

   a. *(Name):* The City of Oakland                      appeals from a judgment or order in this case.

   b. The judgment or order was entered on *(list the date or dates the judgment and each order being appealed were entered):*
      January 23, 2024

   c. The appeal is from the following order or judgment *(check all that apply):*

      ☐ Judgment after jury trial

      ✔ Judgment after court trial

      ☐ Default judgment

      ☐ Judgment after an order granting a summary judgment motion

      ☐ Judgment of dismissal under Code of Civil Procedure, §§ 581d, 583.250, 583.360, or 583.430

      ☐ Judgment of dismissal after an order sustaining a demurrer

      ☐ An order after judgment under Code of Civil Procedure, § 904.1(a)(2)

      ☐ An order or judgment under Code of Civil Procedure, § 904.1(a)(3)–(13)

      ☐ Other *(describe and specify the code section or other authority that authorizes this appeal):*

   d. ☐ The judgment or order being appealed directs payment of sanctions by an attorney for a party. The attorney *(name):*                      appeals.

2. For cross-appeals only:

   a. Date notice of appeal was filed in original appeal:

   b. Date superior court clerk mailed notice of original appeal:

   c. Court of Appeal case number *(if known):*

3. ☐ The judgment or order being appealed is attached *(optional).*

Date: January 23, 2024

Danielle Leonard
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
APP-002 [Rev. January 1, 2024]

**NOTICE OF APPEAL/CROSS-APPEAL—UNLIMITED CIVIL CASE**
**(Appellate)**

Cal. Rules of Court, rule 8.100
*www.courts.ca.gov*