# Exhibit A

```
                    UNITED STATES BANKRUPTCY COURT
                     WESTERN DISTRICT OF KENTUCKY


                                      .
IN RE:                                .  Case No. 19-32231-jal
                                      .  Chapter 11
INSIGHT TERMINAL SOLUTIONS,           .
LLC, et al.,                          .
                                      .
               Debtor.                .
                                      .
. . . . . . . . . . . . . . . . . .   .
                                      .  Adv. No. 24-03007-jal
INSIGHT TERMINAL SOLUTIONS,           .
LLC,                                  .
                                      .
               Plaintiff,             .
                                      .
v.                                    .  601 W. Broadway
                                      .  Louisville, KY 40202
CITY OF OAKLAND,                      .
                                      .  Thursday, July 11, 2024
               Defendant.             .  11:00 a.m.
. . . . . . . . . . . . . . . . .
```

                    TRANSCRIPT OF PRELIMINARY HEARING;
            MOTION FOR A RULE 2004 EXAMINATION OF THE CITY
                          OF OAKLAND [508];
                         PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE JOAN A. LLOYD
                 UNITED STATES BANKRUPTCY COURT JUDGE




APPEARANCES CONTINUED.

Audio Operator:          Crystal Buntain, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (Continued):

| For Insight Terminal | Gary Ice Higdon, PLLC |
|---|---|
| Solutions LLC: | By: ANDREW DAVID STOSBERG, ESQ. |

For Insight Terminal
Solutions LLC:              Gary Ice Higdon, PLLC
                           By:  ANDREW DAVID STOSBERG, ESQ.
                           3939 Shelbyville Road, Suite 201
                           Louisville, KY 40207
                           (502) 625-2734

                           Manatt, Phelps & Phillips
                           By:  BARRY W. LEE, ESQ.
                           One Embarcadero Center, 30th Floor
                           San Francisco, CA 94111
                           (415) 291-7450

                           Norton Rose Fulbright US LLP
                           By:  ROBERT M. HIRSH, ESQ.
                           1301 Avenue of the Americas
                           New York, NY 10019-6022
                           (212) 318-3000

For City of Oakland:       Dentons Bingham Greenebaum LLP
                           By:  APRIL A. WIMBERG, ESQ.
                           101 South 5th Street, 34th Floor
                           Louisville, KY 40202
                           (502) 587-3719

                           Hopkins & Carley, A Law Corporation
                           By:  MONIQUE D. JEWETT-BREWSTER,
                           ESQ.
                           70 South 1st Street
                           San Jose, CA 95113
                           (408) 299-1428

                           Altshuler Berzon LLP
                           By:  DANIELLE LEONARD, ESQ.
                           177 Post Street, Suite 300
                           San Francisco, CA 94108
                           (415) 421-7151

1          (Proceedings commence at 11:00 a.m.)

2               THE BAILIFF:  All rise.  The United States Bankruptcy

3   Court for the Western District of Kentucky is now in session,

4   the Honorable Joan A. Lloyd presiding.

5               THE COURT:  All right.  Good morning.  You can be

6   seated.

7               MS. WIMBERG:  Good morning.

8               THE COURT:  All right.  So Insight Terminal

9   Solutions.  Let's go ahead and have appearances.

10              MR. STOSBERG:  Good morning.  Andrew Stosberg on

11  behalf of the debtor, Insight Terminal Solutions.  I have

12  co-counsel with me in the courtroom, Barry Lee, Skyler Sanders,

13  and Rob Hirsch.

14              MR. HIRSCH:  Good morning, Your Honor.

15              MR. SANDERS:  And then also on speakerphone is the

16  principal for the debtor, Vikas Tandon listening.  Thank you.

17              THE COURT:  Okay.  All right.

18              MS. WIMBERG:  Good morning, Your Honor.

19  April Wimberg on behalf of the City of Oakland.  To my right,

20  Your Honor, is Monique Brewster.  Monique is the general

21  bankruptcy counsel for the City.  And on my left, I have

22  Danielle Leonard, and Danielle is the City's outside litigation

23  counsel.

24              THE COURT:  Okay.  All right.

25              MS. BIRD:  Good morning, Your Honor.  Charity Bird on

1    behalf of the Sierra Club.

2            THE COURT:  Okay.  All right.  So let's see here.  We

3    have an order presented to me.  We have 19-32231, which is the

4    reorganized debtor entity.

5            And, Ms. Bird, it looks like -- I'm assuming this is

6    first in time your motion to vacate on behalf of the Sierra

7    Club.

8            MS. BIRD:  And, Your Honor, we spoke before the

9    hearing, and if Your Honor would indulge, we'd like -- I'd like

10   to go after --

11           THE COURT:  Okay.

12           MS. BIRD:  -- the City of Oakland because a lot of

13   the arguments will be similar, and they've taken a deeper dive

14   into them than I have, Your Honor.

15           THE COURT:  All right.  I don't care.  Ms. Wimberg --

16           MS. WIMBERG:  And, Your Honor, I would agree with

17   Ms. Bird.  And if it's -- if it pleases the Court, I would ask

18   that Ms. Leonard first address the Court on the motion to

19   dismiss, and I think that'll, I think, help -- again, I know

20   we're just here for calendaring, but with regards to some of

21   our issues in the case, I think it then will help kind of

22   developed the -- our arguments in the motion for 2004.

23           THE COURT:  All right.  Mr. Stosberg, did you want to

24   say anything before --

25           MR. STOSBERG:  Well, just briefly, I guess, the

1   ground rules or what the Court envisions on the motion to

2   dismiss.  I mean, we're here today on a scheduling conference

3   for that, so I'm -- I just defer to the Court in terms of what

4   the -- Your Honor wants to hear from the respective parties on

5   the motion to dismiss since --

6           THE COURT:  Well, they've come --

7           MR. STOSBERG:  -- today's not --

8           THE COURT:  -- all the way from California.  We're

9   going to let them speak.

10          MR. STOSBERG:  Sure.  Of course.

11          THE COURT:  But, you know, you know the Court doesn't

12  go off the page.  I'm not making a decision today.  You can say

13  -- you can make arguments.  You can create a record, but it's

14  not a scheduled evidentiary hearing, and therefore, I will not

15  be ruling today.  But I -- you know, you're free to stand up

16  and make your argument or whatever you want to say.

17          MS. LEONARD:  Appreciate it, Your Honor, and

18  understood.  Danielle Leonard for the City of Oakland.  And

19  I'll address first the -- what we're here for on the motion to

20  dismiss, which is the next steps on this motion, which has

21  already been filed.

22          We've received the opposition from the debtor

23  plaintiff just a couple days ago, but we've digested that, and

24  we're ready to address what we think are the appropriate next

25  steps.  But -- and that will provide the context, I think, for

1   the Rule 2004 motion discussion, which can happen after that as

2   well.

3            So they have filed two Rule 2004 motions for

4   discovery on the main bankruptcy docket while this adversary

5   proceeding and motion for dismiss is pending.  That sets the

6   stage here, Your Honor.

7            But for some background and context on the motion to

8   dismiss and the claims so that we can appropriately talk about

9   the next steps, as Your Honor is aware from the papers that

10  have been filed, their claims are two California business torts

11  that they are bringing against the City of Oakland years after

12  the events allegedly at issue.

13           They claim that back in 2018, the City took some

14  action vis-a-vis the main lessee on the project, terminating

15  the contract.  That has caused them, ITS says, financial harm.

16  They want to sue now, years later, in this court to bring

17  interference with contract and interference with perspective

18  contractual relations, the perspective tort claim in

19  California.

20           The underlying disputes are being litigated in

21  California state court between the City and the primary lessee.

22  That litigation has been going on since December of 2018, well

23  before the bankruptcy was filed by ITS.  ITS chose to sit it

24  out, Your Honor, in the state court litigation in California.

25           They could have joined as a party.  They didn't.

1  They funded it, but they sat it out.  That sets the stage for

2  us being here six years after those events, four years after

3  plan confirmation, where they now bring an adversary proceeding

4  saying, We want to sue the City in Kentucky in bankruptcy court

5  for these torts, for the events that happened back in 2018.

6       They allege some more recent events following the

7  judgment from the trial court in the state court in California

8  that they say have caused them financial harm, but that

9  judgment, Your Honor, is on appeal.

10      They are very upset that the City has appealed from

11 that judgment, and they are trying to inflict financial harm by

12 bringing the City here as leverage to get the City to drop that

13 appeal.  That is what is going on, Your Honor.

14      So the City immediately filed a motion to dismiss

15 that is currently pending before Your Honor on two buckets of

16 issues:  Number one, this court does not have jurisdiction.

17 Post-plan confirmation.  This doesn't arise in, under, and is

18 not related to this bankruptcy, the estate, the plan.

19      There's a host of very precise bankruptcy law-related

20 reasons, and I will fully admit that I am not a bankruptcy

21 counsel, so I will defer to my very capable colleagues in

22 making those arguments and then appropriate time.

23      But we have moved to dismiss because this court lacks

24 jurisdiction over these very-late-in-the-day filed tort claims

25 that belong in California; should have been raised in

1   California in the first place; and, frankly, would have been

2   dismissed out of hand by California courts, just as their

3   business partners' torts were dismissed out of hand at the

4   outset of that litigation in California.

5          So that's our set of issues, Your Honor, in the

6   motion to dismiss the substantive state law reasons:

7   timeliness, statute of limitations, the failure to properly sue

8   the City in tort.  You can't sue a City directly in tort in

9   California.  You need a statutory predicate.  They never pled

10  one.

11         And a host of other substantive reasons why those

12  claims failed.  That's the motion that's pending before Your

13  Honor.  It doesn't require evidence.  It will never require

14  evidence.  This is straight-up motion to dismiss, 12(b)(1) and

15  12(b)(6).  So why are we here is the question that I am asking

16  myself.

17         THE COURT:  You know, everybody asks that at

18  bankruptcy court.  Did you know that?  Everybody.

19         MS. LEONARD:  Why am I here, Your Honor?

20         THE COURT:  Well, I want a time when somebody is not

21  -- is so fully expecting to be in bankruptcy court.  They never

22  are.

23         MS. LEONARD:  Understood and appreciated, but if

24  you'll indulge me, I think the reason is political leverage in

25  the fight in California, Your Honor.  And how do you know?  You

1    don't have to just take my word for it.

2         The Rule 2004 motion, they showed their hand.  That

3    Rule 2004 motion for discovery into the City's finances is

4    blatantly political.  It is blatantly seeking leverage to use

5    against my client.  This is all about causing the City to drop

6    that appeal.

7         And I will say on the record we're going to have a

8    transcript that's going to be provided to the client.  The

9    client is on the phone.  The City is not going to drop that

10   appeal.  The City is going to see that through.

11        This is a fight that is in California.  It belongs in

12   California.  It should not be here and not now, Your Honor.

13   And it's our job to convince you that that is the case, and we

14   will do that in the motion that we've already filed and the

15   reply brief that we would like to talk about scheduling and at

16   the hearing on the merits of this motion.

17        So that's what I would like to turn to next.  I'm

18   happy to answer any questions Your Honor may have about the

19   background.

20        THE COURT:  The Court's not -- the Court is not going

21   to make a decision today.

22        MS. LEONARD:  Got it.

23        THE COURT:  At a deference to you that you all had to

24   make this very long trip, you can go ahead and create the

25   record, but --

1              MS. LEONARD:  Thank you.

2              THE COURT:  -- the Court's not making a decision

3   today.

4              MS. LEONARD:  I appreciate your indulgence, Your

5   Honor.  But to turn to scheduling, then, what we would like to

6   do is file a reply brief.  We've just gotten the opposition.

7   We've digested it.  We don't think there's much there, but

8   we're happy to file a reply.

9              We would file it very quickly but for one scheduling

10  issue on our end among counsel.  Unfortunately, my co-counsel,

11  Ms. Brewster, has a medical procedure that is coming up very

12  shortly, and we're going to need a little bit more time, but we

13  would like a month until August 9th to file that reply brief in

14  light of her unfortunate absence for some part of that time.

15             So we would like to file the reply on August 9th and

16  then have a hearing as soon as Your Honor can schedule one and

17  be ready to hear back from us and see us again.  So I don't

18  know if there's -- I don't know the procedure in this court to

19  talk dates for the hearing and how we do that.

20             THE COURT:  We'll deal with that at the end if the

21  Court even gets involved in it.  Because I don't maintain my

22  own schedule.  This lady does.

23             MS. LEONARD:  Okay.

24             THE COURT:  But -- so we'll get to that after

25  everybody gets a could have can.

1          MS. LEONARD:  Okay.  Terrific.  So that's our

2     request.  Our action item for the Court is to file that reply

3     brief and schedule that hearing so that we can come back once

4     again, and only once again, and say, Thank you very much, Your

5     Honor.  It's been a pleasure to be here, but goodbye.  Thank

6     you.

7          THE COURT:  Who's next?

8          MR. STOSBERG:  Your Honor, I'll be brief, and I want

9     to give an opportunity for Mr. Lee to address a couple of

10    Ms. Leonard's comments since he also made the long trip from

11    California.  But I would say on why we're here and the

12    jurisdictional matters, this is all about an attack on the

13    sublease.

14         Sublease was the primary asset of the debtors.  We

15    talked about it throughout the history of the case, and

16    California is relentlessly attacking the sublease through its

17    actions.  So we need this Court's assistance to adjudicate the

18    issues associated with the City of Oakland's attack on the

19    sublease, period.

20         That's all I have to say.  I can argue this on the

21    appropriate time before the Court, but I wanted to put that

22    context out there very clearly.  As to why ITS wasn't in the

23    litigation and the matters in California, I'd like to give

24    Mr. Lee an opportunity just to briefly address those for the

25    Court.  Thank you.

```
 1                THE COURT:  Did you all fly on the same airplanes?

 2                MR. LEE:  No.

 3                THE COURT:  No?

 4                MS. WIMBERG:  I don't think so.

 5                MS. LEONARD:  I don't think so.

 6                THE COURT:  So you came with different schedules?

 7  All right.

 8                MS. LEONARD:  We know each other well.  We would have

 9  recognized each other.

10                MR. LEE:  Right.

11                THE COURT:  Perfect.

12                MR. LEE:  Thank you for the opportunity to -- and I

13  will be very brief.  We filed --

14                THE COURT:  You can take your time.  What was it,

15  like a five-hour flight out here, a night in Louisville?

16                MR. LEE:  Well, it's -- you got to change.  Two

17  flights, but yes.

18                THE COURT:  Two flights.  Yeah.  It's a long way.

19                MR. LEE:  Yeah.

20                THE COURT:  Okay.

21                MR. LEE:  But will be brief, and the reason is our --

22  the arguments against the motion to dismiss are, you know,

23  adequately and -- set forth in our opposition brief or

24  objection brief.  Mr. Stosberg will deal with the bankruptcy

25  issues.
```

1            As far as the state law issues are concerned, we've

2    laid out why our claims -- ITS's claims here are appropriate

3    and are appropriate under California law, period, full stop.

4    And I don't need to argue those now, but I do want to just

5    comment that ITS was not a party in the California litigation.

6            The California litigation was a breach-of-contract

7    case.  ITS is not in privity -- doesn't have a lease with the

8    City of Oakland.  My client -- we refer to it as OBOT, O-B-O-T,

9    Oakland Bulk and Oversize Terminal.  It had a contract with the

10   City, a 66-year lease that the City terminated improperly.

11           OBOT sued and got a judgment that the City acted in

12   bad faith and that the termination of the lease was

13   inappropriate and improper.  That was the basis of the City's

14   refusal to do the things that it should have done with respect

15   to ITS.  ITS was not a party to any contract with the City, and

16   that's why it was not a party.

17           Last thing I'll say, Your Honor, is that there's been

18   this constant refrain about the appeal.  We don't care about

19   the appeal.  ITS doesn't care about the appeal.  My client in

20   California, OBOT, is a party to that appeal and it, of course,

21   cares about it, but it's not doing anything other than dealing

22   with the appellate process.

23           And in California, we have a contempt hearing next

24   week -- I believe it's next week -- on Tuesday to address the

25   City's actions post-judgment in basically interfering, in our

1    view, with the lease premises as well as not complying with the

2    terms of the judgment.

3          But that's for the California courts, not for Your

4    Honor, so we'll address -- as far as scheduling is concerned,

5    whatever the Court sets forth in that I'm sure will be fine

6    with us.  Thank you.

7          THE COURT:  Okay.  All right.

8          MR. STOSBERG:  And just briefly on the scheduling, I

9    know we'll do that at the end, but my initial comment is

10   everything is relative, so if 30 days is needed for a medical

11   procedure, that's not -- that doesn't sound unreasonable,

12   provided -- you know, depending on what happens with Rule 2004

13   matters and then when the Court ultimately sets the oral

14   argument on the motion to dismiss and the objection, provided

15   that there's enough time between, say an August 9th -- pardon

16   me -- August 9 date and then the hearing date.  That's my

17   comment on the schedule.  Thank you.

18         THE COURT:  All right.  Mr. Hirsch, are you just

19   going to -- are you just watching, or are you going to make

20   argument?  Mr. Hirsch.  Sorry.

21         THE CLERK:  That was yesterday.

22         THE COURT:  Did I say Hirsch?

23         MR. HIRSCH:  Your Honor, I --

24         THE COURT:  What's his name?

25         THE CLERK:  We had Paul Hershberg here.

```
 1              THE COURT:  Yeah.  Yeah.

 2              THE CLERK:  Paul.

 3              THE COURT:  Paul was here yesterday.

 4              THE CLERK:  Paul was here.

 5              THE COURT:  Mr. Hirsh, I'm sorry.

 6              MR. HIRSCH:  No, no, that --

 7              THE COURT:  Mr. Hershberg was here yesterday, and I

 8   see him about as frequently as I see you.

 9              MR. HIRSCH:  Yeah.  Well --

10              THE COURT:  So go ahead.  Sorry.  I apologize.

11              MR. HIRSCH:  No, thank you, Your Honor.  I'm not

12   going to make any further argument today.

13              THE COURT:  Okay.

14              MR. HIRSCH:  Appreciate the Court's time, and I'm

15   sure you'll hear from me in the future.

16              THE COURT:  All right.  Yeah.  You came from a

17   different direction, and I just -- I don't want to -- I don't

18   want anybody that got on an airplane to feel like they're not

19   getting their day.

20              MR. HIRSCH:  Yeah.  No, thank you.  I had a much

21   quicker time to get down here than from California, so that's

22   okay.

23              THE COURT:  Okay.

24              MR. HIRSCH:  Thank you.

25              THE COURT:  It's just -- I was stuck in New York
```

1    once.  I was coming from Europe, and I arrived at La Guardia.

2    And I had a flight to Louisville that night, and they canceled

3    it.  And, I mean, you remember these things, right?

4            MR. HIRSCH:  Oh, yeah.

5            THE COURT:  You know, I'm coming back from Europe.

6    I'm coming, you know, home.  And when I went to try and

7    reschedule it, they're like -- you know, it's like Sunday

8    night.  Well, it'll be Tuesday.  I'm like, Tuesday?  And

9    they're -- they were serious.  It was like, Yeah.  That's the

10   next flight.  And I couldn't believe it.  It was Delta.

11           MR. HIRSCH:  Yeah.  That's -- I just flew Delta, so

12   hopefully --

13           THE COURT:  And then I'm like, Well, just get me

14   close, they're like, Well -- I mean, my friends are going to

15   Cincinnati, and they're like, Well, that's not close.  I'm

16   like, Oh, yes, it is.  It's a lot closer than 48 hours in New

17   York City.  I mean, give me a break.

18           MR. HIRSCH:  Yeah.  No, I understand, Judge.

19           THE COURT:  Anyway, so I feel for you.  It's probably

20   very difficult.

21           MR. HIRSCH:  Yeah.  It's all good.  Thank you so

22   much.

23           THE COURT:  All right.  Thanks.

24           MR. HIRSCH:  All right.

25           THE COURT:  All right.  Does the Sierra Club want to

1  be heard?

2          MS. BIRD:  I think -- not to interrupt, but I think,

3  Your Honor, we were going to discuss the 2004 against the City,

4  and my colleague, Ms. Brewster --

5          THE COURT:  Okay.  I'm sorry.

6          MS. BIRD:  -- was going to address that --

7          THE COURT:  I'm sorry.

8          MS. BREWSTER:  Yes.

9          MS. BIRD:  -- next in order if that's okay with --

10          MS. LEONARD:  Yeah.  That's fine.  That's all I was

11  going to say.

12          THE COURT:  All right.

13          MS. BREWSTER:  Your Honor, if you don't mind, I'll

14  sit.

15          THE COURT:  Of course.

16          MS. BREWSTER:  I can stand -- okay.

17          THE COURT:  No, that -- you all don't know me, but

18  counsel is always permitted to sit as long as our sound system

19  will pick you up.  So just make sure the mic is close to you.

20          MS. BREWSTER:  Okay.  Thank you very much, Your

21  Honor.  And to the extent the Court requires it, I'm happy to

22  find a -- file a declaration with general substantiation of my

23  medical procedure just to --

24          THE COURT:  No, we believe you.

25          MS. BREWSTER:  Okay.

18

1           THE COURT:  We believe you.

2           MS. BREWSTER:  Well, I wanted to make sure that I

3    addressed any concerns --

4           THE COURT:  No.

5           MS. BREWSTER:  -- about that.  Your Honor, I

6    appreciate the opportunity to address the Court.  As the Court

7    is aware, the City of Oakland didn't appear at the plan

8    confirmation hearing to address the placeholder objection it

9    had filed because the City filed that objection as its only

10   appearance in the case and only activity in that case to advise

11   the Court that the sublease that formed the basis of the

12   competing plans was under litigation.

13          And so that was the purpose of the objection.  The

14   City was not scheduled as a creditor, is not a creditor.  The

15   City was not a noticed party, despite the fact that now,

16   suddenly, there's the argument that it is a contingent debtor.

17          I say these things to lay the context for the Rule

18   2004 application that the debtor recently filed.  I mean, first

19   things first:  It's clear we're here on the pending adversary

20   proceeding.  The debtor has filed a Rule 2004 examination

21   application with respect to the City but has also sued the City

22   in the pending AP.

23          So for that reason alone, we would argue that the

24   Rule 2004 examination, close to four years post-confirmation,

25   is inappropriate, in addition to information, the discovery,

1  that's being sought by that application, which I'll turn to in

2  a moment.

3         But leaving the pending proceeding rule doctrine

4  argument, Your Honor, as Ms. Leonard has made clear -- she's

5  becoming a bankruptcy lawyer.  As I'm sure you learned, when

6  other litigators come into bankruptcy court, they have to kind

7  of learn the ropes, so she understands the jurisdiction issue

8  pretty clearly.

9         And so I won't waste anybody's time by making any

10  arguments, but we do respectfully submit that the Court's

11  related-to post-confirmation jurisdiction would be pretty

12  narrow in this case, given the confines of the plan, a plan

13  that is a reorganizing plan.  It's one that does not rely in

14  any way for funding from litigation recoveries against the

15  City.

16         I spent some time going through the schedules just to

17  make sure I was clear.  I did not see in the original or any

18  amended schedules any contingent claim of any kind listed

19  against the City.

20         And while the Rule 2004 application, I think, states

21  that there was a language in a motion to dismiss or an

22  objection to Autumn Wind's motion to dismiss, I was looking at

23  the disclosure statement.  I was looking at the plan and the

24  limited time that the City had once it learned about the

25  pending confirmation hearing and two competing plans to just

1  make sure the Court was aware of where the City of Oakland

2  stood.

3         All of those things would support the Court's finding

4  that it doesn't have jurisdiction over the adversary

5  proceeding, which makes even more clear the fact that they're

6  trying to seek this Rule 2004 discovery outside of the

7  adversary proceeding over which the City respectfully submits

8  the Court lacks related-to jurisdiction when it doesn't pertain

9  to the debtors' property, the debtors' financial condition,

10  everything.

11         All the discovery that's being sought in this Rule

12  2004 motion pertains to the City; the City's finances, the

13  City's decision to sell its interest in a stadium complex

14  center that's -- that has nothing to do with this case.  ITS

15  makes no claim of any sort in any interest in that stadium

16  complex, so it's -- the City's a little bit surprised and a

17  little bit incredulous.

18         Certainly, as we understand, people show up,

19  creditors show up, entities show up in bankruptcy against their

20  will.  We're just wondering why here, why now in light of the

21  third and final point I'll make, which is the Rule 2004 motion

22  makes clear that it's being filed as part of an effort to

23  ensure there were checks and balances with respect to the

24  City's future activities, you know, essentially trying to have

25  this Court assert its jurisdiction to somehow leash the City.

1         That is contradictory to the argument that we've

2  heard that, you know, ITS doesn't care about this appeal.  It

3  certainly sounds like ITS cares a lot about what's happening in

4  California and would like to argue its concerns with what's

5  happening in California in this court.

6         But certainly, we'll make the argument with respect

7  to the AP at the appropriate time, but with respect to the Rule

8  2004 application, Your Honor, again, the City would

9  respectfully submit that it's completely inappropriate for all

10 the reasons that I've said in addition to the fact that it's

11 much broader than the Federal Rules of Civil Procedure which

12 apply in the adversary proceeding that's already pending.

13        And any discovery that they would like to seek should

14 be done in the context at that proceeding if the Court does not

15 grant the motion to dismiss.  Thank you, Your Honor.

16        THE COURT:  All right.  So Ms. Bird?

17        Because it makes sense, Mr. Stosberg or Mr. Lee, you

18 all would follow, correct?  You'd like to follow her argument?

19        MR. STOSBERG:  I don't know if I have a position

20 either way, Your Honor.  I'll --

21        THE COURT:  Okay.  Go ahead --

22        MR. STOSBERG:  Ms. Bird, I --

23        THE COURT:  -- Ms. Bird.

24        MR. STOSBERG:  I don't have an issue with Ms. Bird

25 proceeding --

```
 1              THE COURT:  So you all are --

 2              MR. STOSBERG:  -- and listening.

 3              THE COURT:  You all are in alignment on the gist of

 4   your argument, and so that's the point.  I just want to make

 5   sure I'm organized.

 6              MS. BIRD:  I understand, Your Honor.  So is it my

 7   turn?

 8              MR. STOSBERG:  I have no --

 9              THE COURT:  Well, I don't know, but I think so.

10              MR. STOSBERG:  Yes.  Sure.

11              THE COURT:  Go ahead.  You're at the podium.  You've

12   got --

13              MR. STOSBERG:  No objection.

14              THE COURT:  -- the floor.

15              MS. BIRD:  Yeah.  I'm happy to be here, Your Honor,

16   in bankruptcy court.  I like it here, but my client doesn't

17   want to be here.  Your Honor, sort of echoing on what the City

18   of Oakland has said, we would submit that the post-confirmation

19   jurisdiction of this court is limited to the implementation of

20   the plan, execution of the plan.

21              And the plan has been substantially consummated, and

22   there's really nothing else left for this court to do with

23   respect to the implementation of the plan or the paying of

24   creditors.

25              There's the Cecelia Financial claim that is an
```

 1  insider's entity that's, I think, up on appeal at this point

 2  based on the objection from the reorganized debtor to its claim

 3  and that adversary proceeding.  I tried to read up on it

 4  quickly before I got here today, Your Honor, just to see the

 5  status of that.

 6          So there's that that's out there, but beyond that,

 7  you know, my client's a little bit different than the City of

 8  Oakland because, if Your Honor will recall, because in 2020, we

 9  were expressly banned from this court in the sense that we were

10  told to stop filing things as an interested party, that we had

11  no dog in the fight, no pecuniary interest.  Basically, you

12  shouldn't even be here.  Get out.

13          And so we'd like to stay in that position.  We were

14  told that we weren't involved at all.  We had nothing to do

15  with it.  We didn't have a say in the case.  And so I think if

16  at a point and time during the case -- at any point in time,

17  frankly, either on the petition, the schedules, amendments, the

18  plan -- if we had been placed on notice that we would later be

19  sued for state tort that we submit are likewise not subject to

20  your jurisdiction, Your Honor, where they would be in

21  California.

22          And I think the reason we're not in California,

23  frankly, is because they would be barred by the applicable

24  statutes of limitations, so here we are instead, playing some

25  games with this, I think.  It feels a little like some

1 | gamesmanship.

2 | But, Your Honor, had we known, I do think Your

3 | Honor's position on whether or not the Sierra Club could

4 | participate would have been different if we had ever had any

5 | notice that we had four years post-confirmation potential

6 | claims being made against us for aiding and abetting the City

7 | of Oakland on some state tort actions.

8 | So there's that issue.  The other issue, Your Honor,

9 | frankly, is that, although they haven't filed the adversary

10 | proceeding, they've drafted an identical adversary proceeding

11 | against Sierra Club and tendered it with the Rule 2004.

12 | To the -- so to the extent that there would be

13 | discovery, it should be done under the 7000s rules in an AP

14 | instead of as a, you know, fishing expedition here.  So I think

15 | it's wholly inappropriate.  I don't think the Sierra Club

16 | should be brought before this Court for the reasons that I put

17 | in my brief.

18 | And for the reasons that the City of Oakland stated,

19 | I don't think it has anything to do with the administration of

20 | assets, the implementation of the plan, execution.  The

21 | creditors were paid.

22 | The last operating report shows that the creditors

23 | have been paid on all allowed claims, so this is not something

24 | that's going to affect the administration of the estate or the

25 | execution of the plan.  And so we respectfully request that

1   this Court set aside the order that granted the 2004 exam of

2   the Sierra Club.

3              THE COURT:  All right.  Thank you.

4              Mr. Stosberg.

5              MR. STOSBERG:  Your Honor, I'm going to work

6   backwards and address the Sierra Club first and then shift to

7   the City of Oakland.  The Sierra Club feels like it's a bit of

8   a no good deed goes unpunished.  We keep hearing that, you

9   know, there's -- there have been some comments that these are

10  identical situations, and they're not.

11             In fact, my client elected and is currently taking a

12  measured approach.  We believe we have a claim against the

13  Sierra Club, but we want to get more information to confirm

14  that before prosecuting it.

15             As this Court understands, there's a difference

16  between filing a claim that passes Twombly and Rule 11 and

17  going all the way to trial and prevailing at trial.  So we

18  believe we have a claim, but what were the further investigate

19  it.

20             Turns out, we may ultimately elect, after doing some

21  standard 2004 investigation, that it's a claim not worth

22  pursuing.  So the fact that we're being measured and haven't

23  filed this claim feels like a little bit of a

24  no-good-deed-goes-unpunished type of situation.

25             And in getting into the arguments of, well, we have a

1    claim, you know, we should go ahead and file it and then

2    utilize the standard rules of discovery in -- that apply to

3    adversary proceedings, the Sierra Club's own argument in a

4    footnote in there reveals a concern for my client, which is,

5    you know, that they reference -- they -- the Sierra Club

6    references to allow the debtor to use 2004 when it already has

7    preliminary information -- not full information, but

8    preliminary information -- needed to file potential causes of

9    action would give the debtor an undue strategic advantage.

10          And then that's footnoted and says, "To be clear, the

11   claims in the draft complaint are baseless, and the Sierra Club

12   reserves all defenses against subsequently -- any subsequently

13   filed complaint, including opposition to any improper discovery

14   in pursuit of appropriate sanctions.

15          So let's say the Court is inclined to say, Deal with

16   this in an adversary proceeding and follow the rules of

17   discovery.  We'd go down that road, and then they're going to

18   do exactly what's intimated in the footnote.  They're going to

19   say, These claims are all baseless.  There's -- the S-word's in

20   there.  Sanctions are mentioned.

21          So it's a Catch-22 situation that's not fair to the

22   debtor, so we're trying to be measured and do our due diligence

23   before we move forward with a claim and file a complaint, which

24   we may never do.  So that's the context of why we're utilizing

25   2004, and I think that's important for this Court to

1  understand.

2          The other thing about confirmation and substantial

3  consummation of the plan:  Creditors have been paid, but again,

4  this is about the sublease being attacked.  That's why we're

5  here.  The actions out in California are a direct attack

6  against an assumed, unexpired lease.

7          That's in the confirmation order.  It was the key

8  theme throughout this bankruptcy, and everything in California

9  is an attack on the sublease.  When they say the development

10  agreement was terminated with OBOT and, therefore, it flows

11  down, the sublease is not valid, that's a direct attack on the

12  confirmation order and the order saying that this sublease, the

13  sub-ground lease was, in fact, assumed.

14          So there's a major substantive component on plan

15  implementation that's being attacked and is unaddressed, and it

16  goes toward 365 issues, goes toward plan confirmation issues,

17  and that's why it's appropriate to be here.  That context is

18  important as well.  I'm just reviewing my notes on -- and I

19  think that's it on -- as to the City.  Pardon me.  I think

20  that's it as to the Sierra Club's arguments.

21          Shifting to the City, at the beginning of

22  Ms. Brewster's presentation, she mentioned -- she sort of,

23  like, just set aside the City's objection like, oh, it was just

24  some placeholder.  That's in Document 276 of the main case, and

25  that was a very robust, substantive, meaty objection in 276

1    where not only did the City make substantive arguments against

2    both proposed, competing plans, but they included in there an

3    objection in opposition to assumption of the sublease.

4              And that is -- that document speaks to itself, and

5    that goes, frankly, more to the motion to dismiss arguments,

6    but since it was raised here, that's a preview of coming

7    attractions when we're arguing the motion to dismiss matters

8    one day.

9              The Document 276 is anything but a placeholder

10   objection.  It is a key substantive objection that not only

11   went to plan confirmation, but it went toward lease assumption,

12   the sublease assumption, which is why we're here.

13             And talk about tipping cards.  The City absolutely

14   tipped its card when they included the objection to the

15   assumption of the sub-ground lease.  That's what this is all

16   about.

17             The AP is pending.  Yes, there's an AP pending

18   against the City.  And, admittedly, you know, the general rule

19   is 2004 exams aren't typical.  Having said that, this is a very

20   narrow issue about the City's conduct relating to their

21   financial dealings and dissipation of assets.

22             That's all this is.  It is narrow in scope.  We can

23   tailor something that it starts with written discovery only,

24   but I want to make that clear.  It is a very narrow subset

25   topic of information that we're asking for that, if we try to

1   ask for it in the AP, they're going to revert back to the

2   footnote tactic that the Sierra Club mentioned, which is, Oh,

3   this is irrelevant, outside the scope of the AP.  You can't ask

4   for it.

5          So if Your Honor says we should pursue this in the

6   AP, fine, but we don't want to turn around and hear, Well, this

7   isn't relevant.  It's beyond the scope of the AP, so you can't

8   ask for it.

9          So I don't know that my client really has a

10  preference at the -- in the big picture.  We'd like to do 2004,

11  but if Your Honor says we need to ask for this stuff in the AP,

12  then that's not our first preference, but that would be an

13  understandable, digestible ruling from my client's perspective

14  on that.

15         I addressed the related-to jurisdiction comments

16  Ms. Brewster raised by again reiterating this is all about an

17  attack on the sub-ground lease.  And, you know, finally, I'll

18  just close it out.  We talked about the sublease, but talk

19  about the world being on notice.

20         I mean, from the onset, you know, back in '19, we

21  talked about the Oakland overburden.  And, in fact, that's a

22  phrase that Your Honor monikered very early in the case.  It

23  has permeated throughout a number of filings by multiple

24  parties, the effect of, quote, "the Oakland overburden."  So in

25  terms of notice of things, you know, Oakland was certainly on

 1  notice about that.

 2          And then, finally, the nuance of a description of

 3  claims.  Ms. Brewster referenced these things weren't in

 4  schedules.  Well, keep in mind, you know, it was Autumn Wind's

 5  competing plan that was ultimately confirmed.

 6          You know, Autumn Wind, you know, didn't have the

 7  advantage of seeing all of the debtors' books and records, but

 8  they have -- we -- in Autumn Wind's confirmed plan, there are

 9  robust retention of jurisdiction provisions that were approved.

10          The City could have objected to them, but they

11  didn't.  They objected to other things very substantively, but

12  not the jurisdiction provision, so that is in there as well.

13  So I believe I've addressed the arguments by both Ms. Bird and

14  Ms. Brewster.  Thank you.

15          THE COURT:  All right.  Mr. Lee?

16          MR. LEE:  If I could have just --

17          THE COURT:  Sure.

18          MR. LEE:  -- two words, Your Honor.  And I'm going to

19  disagree a bit with Mr. Stosberg.  The Rule 2004 motion is

20  important now, and the reason it's important now, as we've

21  detailed in our brief -- our motion, I should say, and events

22  have continued to unfold in the City of Oakland, the money's

23  going to be gone.

24          Oakland has a substantial deficit -- I only know what

25  I read, a 190 million to $290 million deficit -- selling off an

1  asset that is worth a substantial amount.  City councilmembers

2  in Oakland have said, We may be insolvent, and this asset is

3  going out the door.

4         And there have been instances in which city

5  councilmembers have even asked to see what's going on with this

6  sale of the coliseum, and they have not been provided with the

7  information.

8         The Rule 2004 subject matter is limited.  It's

9  limited to what is going on, what has happened with respect to

10  the sale of the 50 percent interest in the coliseum.  And it's

11  important that we get that information now because, again, all

12  I know is what I read in the paper and -- as well as some of

13  the city council transcripts.

14         On September 1, if there's a tranche of money that's

15  coming in, if it doesn't come in by then under the sale of the

16  coliseum, then another parade of horribles will occur in the

17  City of Oakland on the financial side.

18         So it's important for my client, for ITS, now to

19  understand what's going on because what we're seeking here

20  directly relates to our damages, and it's as if -- and I'm not

21  a bankruptcy lawyer either.  I've tried a case in bankruptcy

22  court, but I'm not a bankruptcy lawyer.

23         But what this sounds like to me is assets going out

24  while there's a claim pending, and we should be entitled in a

25  very limited basis to understand why and where and what the

1    basis of it is.  And that's why we would request the 2004

2    hearing -- the 2004 examination -- excuse me -- on a day to be

3    agreed to.  Thank you.

4            MR. STOSBERG:  Just to clean up, I appreciate

5    co-counsel's comments.  And we talk over each other, but if we

6    go through -- I don't downplay the urgency, but just from a

7    procedural standpoint, if we need to do -- we need to do these

8    things quickly, but if we need to do it through the adversary

9    proceeding, fine.  But we want to have the right to do that and

10   do it quickly, but we just talked over each other on that

11   procedural point.  Thank you.

12           THE COURT:  So did I just hear you say that the City

13   of Oakland is very likely -- could be insolvent, and it's

14   material to the outcome if you should prevail on an AP against

15   them?

16           MR. LEE:  That's what we are trying to figure out if

17   the comments that are being stated publicly by certain city

18   councilpersons --

19           THE COURT:  I see.

20           MR. LEE:  -- is accurate.

21           THE COURT:  So it's sort of hearsay, but it's --

22   okay.  I follow you.

23           MR. LEE:  There's an article a day, and they're even

24   becoming more after the -- as we put in, the mayor of Oakland

25   has had an FBI postal service raid, home and office, and --

1  having to do with financial dealings.  We don't know what they

2  are.

3           The most recent story that I read was that there's

4  been a federal subpoena to the City of Oakland asking for

5  various bits of information.  According to news article, one

6  bit of information was related to the Oakland Army basically,

7  which is, of course, with its terminal was to be built and

8  where OBOT has its lease and ITS has its sublease.

9           So it is urgent from ITS's perspective, and it would

10 specifically relate to the damages that ITS would recover in

11 the event, as we believe we will be successful in the AP

12 proceeding.

13          MS. LEONARD:  If I may.

14          THE COURT:  All right.

15          MS. LEONARD:  And I would like to get this back on

16 track, Your Honor, but if the ask is for discovery now in the

17 AP proceeding, I think we have a certain set of responses to

18 that.  If the ask is for a Rule 2004, my colleague will address

19 that, but it's completely inappropriate based on everything

20 that you just heard from counsel.  This is really about the AP

21 proceeding.

22          But to respond substantively, there is absolutely

23 nothing before this Court other than counsels' rhetoric that

24 substantiates a word of what counsel just said about the City

25 of Oakland's impending insolvency.  That is simply not true.

1          And on behalf of my client, I need to be clear in

2     saying that the City of Oakland, like many cities, has had

3     financial deficits, but that is a far cry from what counsel is

4     trying to portray here, that there is an imminent insolvency

5     that would lead the City of Oakland not to pay some

6     hypothetical damages award in this case if we ever got there,

7     Your Honor, the same damages award that the state courts in

8     California rejected out of hand when their business partners

9     tried to say that these entities together were going to make a

10    billion dollars from this project down the line.

11         This is a house of cards.  It's a speculation.

12    That's what the California courts said.  And the idea that they

13    could take discovery now into business dealings with the City

14    that have absolutely nothing to do -- nothing to do with the

15    Army base -- what Mr. Lee said about the reports, about

16    documents, and the federal government seeking information about

17    campaign finance contributions are about another part of the

18    Army base, Your Honor.

19         It has nothing to do with this piece of land, the

20    OBOT deal, ITS.  The coliseum is the stadium where the Raiders

21    and the As used to play.  They left because Las Vegas gave them

22    more money.  The City needs to do something with that sports

23    stadium.

24         These developers are interested in that for reasons

25    that we do not know, but they certainly are not appropriate

1 | subjects of discovery here in this court related to these

2 | claims, Your Honor.

3 |       It is outlandish for counsel to stand here and

4 | suggest that there is evidence that the City of Oakland is

5 | about to be insolvent, Your Honor.  That is simply not the

6 | case.  And I believe that I heard counsel admit that ITS is now

7 | carrying the weight for city councilmembers who want to probe

8 | that deal.

9 |       They said -- he said, City councilmembers can't get

10 | information, so we need to be here in this court and get that

11 | information so they can go back and give that to city

12 | councilmembers.  Your Honor, this is a California fight that

13 | should stay in California, and it will be adjudicated by the

14 | California courts and resolved there.

15 |       The City is not -- to respond to the other main point

16 | that counsel was making, the City's not attacking the sublease.

17 | The law will decide in California whether that sublease is

18 | valid or not.  The City's not attacking anything.  The City is

19 | pursuing its rights to terminate the main lease.

20 |       It believes that the trial court got it wrong, there

21 | shouldn't have been an extension of time, their business

22 | partner blew the deadlines and the contract, and that we will

23 | prevail on appeal.  If we prevail on appeal, the law will take

24 | care of the ITS sublease.  That's not an attack by the City;

25 | that's California law, Your Honor.

1          MS. BREWSTER:  Your Honor, may I just respond to the

2    arguments made on the Rule 2004 motion briefly?

3          THE COURT:  Let me -- Ms. Brewster --

4          MR. LEE:  Certainly.

5          THE COURT:  -- go ahead and do that.

6          MS. BREWSTER:  Your Honor, I believe it's helpful

7    just to focus on the information, the discovery that's being

8    sought in the Rule 2004, which would seem to be all appraisals,

9    market value estimates, broker opinions, among other items that

10   support the City's agreed-upon purchase price for its portion,

11   its interest in the coliseum-stadium complex.

12         This 2004 motion is based on ITS's belief that the

13   City is making questionable financial decisions that might

14   impact some judgment that has not been established as of yet.

15         Given the fact that this discovery sought in the Rule

16   2004 has absolutely nothing to do with the primary asset in

17   this case, which is the sublease for different property, I

18   believe the papers itself and the argument by the debtor

19   support the Court's ruling that the 2004 goes far beyond this

20   bankruptcy case, especially when most of this information could

21   be had through an open records request, which is the most

22   appropriate form for doing this in California rather than

23   coming to the Kentucky court and seeking discovery that doesn't

24   have to do with the plan itself.  I will pause there, Your

25   Honor.  Thank you.

1          THE COURT:  Okay.

2          MR. LEE:  Your Honor, I just want to be very brief

3    again.  This constant refrain that the damages that ITS is

4    seeking in the adversary proceeding are the same damages that

5    OBOT sought in the California action is not true.

6          In the California action, OBOT had a damage claim not

7    of over a billion dollars, but it was approximately $150

8    million based upon rent it would have received from ITS had --

9    over the 66-year term of the lease had the City not improperly

10   and in bad faith terminated the lease.

11         The damages that ITS seeks in this adversary

12   proceeding is the diminution in the value of the estate from a

13   little over a billion dollars to approximately $20 million, two

14   different components of damage.

15         And in the California case, as the judgment makes

16   clear and the statements of decision make clear, it was always

17   -- OBOT's preferred remedy was specific performance.  That is

18   to say the lease is -- and declaratory relief.

19         The termination was improper.  The lease goes on, and

20   you have to elect your remedies.  And, yes, the Court ruled

21   against us on the damage claim, but as the record is clear on

22   that case, at all times, OBOT's preferred remedy was specific

23   performance.  So these are two different -- completely

24   different damages.  Thank you.

25         THE COURT:  All right.  Anything else?

1             MS. BIRD:  Your Honor, Charity Bird for the Sierra

2    Club.  I feel a little bit like the spouse that has nothing to

3    do with anything being brought into bankruptcy court to apply

4    pressure to another side.

5             I just wanted to say, Your Honor, to the extent that

6    you are not inclined to grant the motion to set aside, the

7    requests are overly broad to the Sierra Club, so we would ask

8    that they be limited to the actual Oakland sublease, the things

9    that they are talking about.

10             But I would like to also point out that in prior

11   documents filed with this court, the same parties before Your

12   Honor suggested that the Oakland overburden, as it's been

13   called, is separate and apart from the plan process.  The

14   Chapter 11 should be complete without dealing with that.  It

15   should be set aside.  The resolution is unnecessary.  And I

16   quote some of that in my brief to Your Honor.

17             So it seems glaringly apparent, at least to the

18   Sierra Club, that this is not something that's properly before

19   the Court on post-confirmation and post-plan jurisdiction.

20   I've already said it before.  I won't repeat it.

21             I just wanted to -- I'd be remiss in suggesting that

22   if Your Honor weren't to grant the motion to set aside, that we

23   are okay with the requests as posed.  They would need to be

24   narrowly tailored, Your Honor.

25             THE COURT:  Okay.  All right.  So that the City of

1  Oakland understands, way back when, the word -- or the phrase

2  "Oakland overburden" was not a slur against the City.  What it

3  was, was a way to describe what was about two paragraphs of a

4  regulatory process by which ITS, the original filing debtor,

5  could not -- this is when John Segel was around.

6         And it was -- the idea was -- it was we had to come

7  up with some way for the lawyers not to keep repeating

8  themselves on the stages of a regulatory process.  At that

9  point in time, it was just a way to describe a process that the

10 debtor was trying to work its way through, just so you

11 understand.

12        The Court's never been to Oakland, California.  I

13 don't know the first thing about Oakland, California.  So just

14 -- let's make sure you understand that was not a slur.  It was

15 a way to describe the process by which the debtor even filed

16 this case in 2019.

17        Would you agree or disagree, Mr. Hirsch?

18 Mr. Stosberg?  Mr. King?  Anybody who was here then?

19        MR. HIRSCH:  Your Honor, I think that's accurate.

20 And I know -- Your Honor, if I may just --

21        THE COURT:  Sure.  Go ahead.

22        MR. HIRSCH:  -- get a minute.  And I know I said I

23 wasn't going to argue, but I just want to clarify maybe

24 something for the Court that could be of help to Your Honor.

25 Mr. Lee's comments about the current fiscal situation with the

1  City of Oakland is not comments that he's just made up or out

2  of thin air.

3          And this is something that's been in the news and

4  Oakland for a long time.  Even as of June 25th, there were

5  public articles in the paper.  For example, Oakland City

6  Councilmember Noel Gallo specifically said if we don't balance

7  this budget, we will go bankrupt.  That's his quote in the

8  paper.

9          And I bring that up because, relating to the 2004

10  motion, vis-a-vis the City -- put aside Sierra -- I just want

11  to impress on the Court the timing issue here because I don't

12  want it to be lost.

13          At the end of the day, the complaint that we filed in

14  the adversary proceeding against the City, that will play

15  itself.  We completely understand that.  Your Honor is going to

16  rule on the dismissal motion, and whatever comes of that comes

17  of that.  We hope, obviously, the motion is denied and we move

18  forward with the case.

19          But in the immediate term, this coliseum sale deal is

20  really something that I want the Court to focus on.  It's not

21  that ITS really has any dog in the fight about the sale itself

22  other than the most important part of this:  the value that the

23  City's getting.

24          And the reason we care about that is based on exactly

25  what I was just talking about:  the public comments from the

1   city councilmember.  It's not -- we're not making this up,

2   right?  They're -- the City of Oakland is in dire financial

3   crisis.  It's known publicly.

4        And so if we prevail and this Court awards damages to

5   the debtor relating to its complaint in the adversary

6   proceeding, there very well may not be --

7        THE COURT:  It's a general unsecured claim --

8        MR. HIRSCH:  Correct.

9        THE COURT:  -- against what -- an entity that could

10  potentially, under the Bankruptcy Code, seek relief under

11  Chapter 11.

12       MR. HIRSCH:  Or Chapter 9.

13       THE COURT:  Well, Chapter 9.

14       MR. HIRSCH:  Right.

15       THE COURT:  Excuse me.  Yeah.

16       MR. HIRSCH:  And that's fine, and I 100 percent agree

17  with that, but in the immediate instance right now, the reason

18  we're seeking this discovery -- and you can argue about

19  procedure all day long, whether it's a 2004 or it's discovery

20  in the AP.

21       We need that discovery on a very pointed, limited

22  basis now because, come September 1, if the sale goes forward

23  on the coliseum, that money is gone.  It's going to be used for

24  general obligation.  It's going to be used for whatever the

25  City needs to use it for to keep the fire department running,

42

 1 | the police, et cetera, et cetera, civil services.

 2 |          So -- but -- and I don't want to -- I don't want the

 3 | city council to jump up, what I'm about to say, but we do have

 4 | a claim against the City, pending, obviously, a dismissal

 5 | motion and going forward with our case.

 6 |          If the money's gone, the money's gone.  We don't know

 7 | if there would ever be money to pay our claim, right, against

 8 | the City if we ever get to that point.  And so we really do

 9 | need that discovery now concluded before September 1.

10 |          And this is the point where I don't want the City to

11 | jump up and down, and I respectfully say this.  Depending on

12 | what we find through that discovery, we may be back on an

13 | emergency basis before Your Honor on an injunction, right,

14 | seeking that money to be stayed and not used subject to our

15 | lawsuit here.

16 |          So that's the context, and I hope that doesn't get

17 | there, but that's the context of why -- the imperativeness of

18 | the immediate need.

19 |          THE COURT:  All right.

20 |          MR. HIRSCH:  Thank you, Judge.

21 |          MR. STOSBERG:  On the -- just on the Oakland

22 | overburden -- and it dovetails with Ms. Bird's final comment

23 | about what was said, and again, that permeated the case from

24 | the onset -- I want to read a nine-line excerpt about the

25 | Oakland overburden that was filed in the debtors' objection to

1   Autumn Wind's motion to dismiss way back at the beginning of

2   the case.

3           That excerpt is as follows:  "The debtors believe

4   that, with sufficient time in these Chapter 11 cases, they can

5   negotiate resolutions"--

6           THE COURT:  Who was saying this?

7           MR. STOSBERG:  This is in the pleading.  This is

8   in --

9           THE COURT:  Oh, it's a pleading.

10          MR. STOSBERG:  It's a pleading --

11          THE COURT:  Okay.  Go ahead.  Sorry.

12          MR. STOSBERG:  -- so there are -- so "The debtors

13  believe that, with sufficient time in these Chapter 11 cases,

14  they can negotiate resolutions concerning the Oakland

15  overburden with the City of Oakland that will allow the project

16  to move forward and enhance the value of the sublease for the

17  benefit of debtors' creditors.

18          "However, if the debtors cannot consensually

19  remediate the Oakland overburden by collaborating and

20  partnering with the City of Oakland, then the debtors further

21  assert that this Court is and can be empowered to adjudicate or

22  otherwise address the West Gateway Master Development Agreement

23  dispute, which directly affects the sub-ground lease that stems

24  from the agreement along with any other Oakland overburden

25  issues."

1          And that is excerpts from -- Document 61 was our --

2   our being the debtors -- objection to Autumn Wind's motion to

3   dismiss, Paragraphs 28 and 35.  So that was a position taken

4   very early on in the case by the debtors.

5          THE COURT:  All right.

6          MR. STOSBERG:  Thank you.

7          THE COURT:  Anything else?  Well, I know you object,

8   but you know the Court is not going to rule from the bench on

9   this.

10         MS. LEONARD:  We understand, Your Honor.

11         THE COURT:  Do you feel like there's some other thing

12  that you would -- point you would like to make?  Because it's

13  clear that this cast of characters knows each other, and this

14  is an ongoing thing, ongoing set of disputes that are back in

15  this court for -- at least for right now.

16         MS. LEONARD:  And, Your Honor, we appreciate that,

17  and I won't go point by point.  I think just the high-level

18  response to Mr. Hirsch -- I thought his comments were quite

19  telling in revealing that the strategy here is to seek

20  discovery into the City's finances of a deal that's completely

21  unrelated to anything to do with the estate, the plan, ITS,

22  OBOT in order to come back to this court and seek an injunction

23  further interfering with the City's finances, all because of a

24  hypothetical future idea that somehow the City might run out of

25  money to pay the judgment here.

1          They cannot stop the City from dealing with its

2    finances, and they should not be hijacking the jurisdiction of

3    this court to try.

4          THE COURT:  All right.  Let's talk dates.  You all

5    need until August 9th --

6          MS. LEONARD:  Correct.

7          THE COURT:  -- is that correct? -- to do a reply.

8    And, of course, this is pretty much black-letter law, right?

9    We're not talking about -- Mr. Stosberg, are you thinking that

10   you need extra time?

11         MR. STOSBERG:  Extra time?

12         THE COURT:  To respond to the reply.

13         MR. STOSBERG:  Yes.

14         THE COURT:  A sur-reply, you know.

15         MR. STOSBERG:  A sur-reply.  Absolutely.

16         THE COURT:  You know, normally, the Court doesn't

17   allow these because it is what it is.  Court doesn't need legal

18   expertise as a general rule, although you're entitled to make

19   your legal arguments.  So the reply is unusual, just so you

20   know, here.

21         As a matter of course, we don't even -- on summary

22   judgment, we don't allow replies.  You have to ask.  You have

23   to seek relief because you either got it or you don't.  And

24   then -- otherwise, we'll have a trial.  It's as simple as that.

25   If it's not obvious, that's where we go.

 1          So I need to know -- because she -- I'm asking you to

 2    think about what you don't know about.  I mean, whatever they

 3    may produce.

 4          MR. STOSBERG:  Your Honor, do you mind if we just

 5    take a five-minute recess?

 6          THE COURT:  Of course.  No.  Go ahead.  Yeah.

 7          MR. STOSBERG:  Thank you.

 8          THE COURT:  Take your five-minute -- y'all come back.

 9    If you -- honestly, I don't even -- we'll come back, but I

10    don't even need to be a part of this because, Kristin, this is

11    kind of one of the central jobs that she has, and that is to

12    deal with lawyers on getting the schedule right.  But, yes, we

13    will take -- we'll take five.

14          MR. STOSBERG:  Thank you, Your Honor.

15          MR. HIRSCH:  Thank you, Your Honor.

16      (Recess taken at 11:58 a.m.)

17      (Proceedings resumed at 12:08 p.m.)

18          THE BAILIFF:  All rise.

19          THE COURT:  All right.  Okay.  Be seated.  All right.

20    So something I should know about?

21          MR. STOSBERG:  Yes, Your Honor.  So our proposal the

22    -- with the City's request for a reply day for the 9th, that's

23    agreeable to the debtors.  We would ask for a sur-reply

24    deadline for a week later on August the 16th.

25          THE COURT:  Okay.

1          MR. STOSBERG:  At that time, concurrent with that

2    deadline, we would like to have the opportunity to propose

3    whether we believe an evidentiary hearing is needed or not

4    based on what is set forth in their reply.  To Your Honor's

5    comment, we don't know what we don't know until we read that

6    reply.

7          And then, finally, we would like to have a hearing

8    date, you know, by August 30th if the Court has docket

9    availability to do so.

10          MS. LEONARD:  Your Honor, if I may, this is a motion

11    to dismiss on the face of the complaint.  There is no

12    circumstance under which the standard is such that this Court

13    would hear evidence.

14          So this idea that they would reserve the right to

15    request -- we understand that, and we are addressing our legal

16    arguments to the allegations in the complaint and the documents

17    in the record that are incorporated.  The idea that they would

18    reserve and hold over the City's head the opportunity to have

19    an evidentiary hearing is completely inappropriate.

20          MR. STOSBERG:  Again, it's just a --

21          THE COURT:  Well --

22          MR. STOSBERG:  It's just a reservation.  We want to

23    see what their reply states, so I --

24          THE COURT:  So Kristin --

25          THE CLERK:  Yes?

```
1                   THE COURT:  -- do you -- so the 15th, and then --

2                   THE CLERK:  The response delays work, but as far as a

3    hearing in August --

4                   THE COURT:  Now, that's not going to --

5                   THE CLERK:  That's not going to fly.

6                   THE COURT:  It would be --

7                   THE CLERK:  It would have to be the first week in

8    September --

9                   THE COURT:  Mm-hmm.  Well --

10                  THE CLERK:  -- which I have open.

11                  THE COURT:  So getting hearing dates from this Court

12   is not hard.  It's not hard.  I'm inclined to go ahead and take

13   it under submission, but I don't know that taking -- I'll just

14   tell you this:  If I feel like evidence needs to be taken, then

15   the motion to dismiss is denied, okay?  That's just -- I mean,

16   it seems almost too elementary to me.  It's almost like a

17   trick.

18          If evidence needs to be taken, then there is a

19   dispute that requires something more, and the motion to dismiss

20   would be denied.  So I don't know that it in any way would

21   prejudice Insight Terminal Solutions -- the reorganized entity

22   is ITS.

23          So I don't know that there's any prejudice by not

24   immediately scheduling that because it is or it isn't.  And

25   there is the basis for this case to lie here, in which case the
```

1   motion to dismiss would be overruled or denied, or there -- you

2   follow me?  I feel like it's an either-or, and we're -- I'm

3   prepared on that.

4           So the 15th will be your sur-reply, 15th of August.

5   And the Court understands where the parties are coming from,

6   okay?  I understand ITS's position that time is of the essence,

7   so I'm also going to take the motion to vacate the 2004 exam,

8   and I'm going to take the motion for a Rule 2004 of Oakland

9   under submission but will rule promptly.

10          Going to -- you know, those are so perfunctory and

11  simple that the Court feels like that's almost hardly worth

12  arguing.  On the other hand, I'm going to -- I'll -- I will

13  look at it very closely, okay, in light of the motion to

14  dismiss, okay?  Anything else?

15          MS. LEONARD:  Are we -- sorry.

16          MR. HIRSCH:  Sorry.  Your Honor, just a clarification

17  point.  So I just want to make sure I understood.  So the

18  motion to dismiss, would that be on submission at the end of

19  the day or --

20          THE COURT:  Yeah, under submission.

21          MR. HIRSCH:  It is.  So no argument on that.

22          THE COURT:  Right.  Right.  No.  And just FYI, to

23  those of you who -- some of you know me very well.  And,

24  Mr. Hirsch, honestly, you probably could clearly represent to

25  others.  You've been in front of me a lot.  This is the Court's

1  bailiwick.  The Court's not deciding on something that is, I

2  think, really foreign to it in terms of its jurisdictional

3  basis in the planned construction.

4        This is -- I don't envision this being one that is

5  going to take an extended part of the.  I think it's going to

6  be -- it's going to be pretty clear to the Court one way or the

7  other and pretty quickly.

8        So I don't think you have to sit and think, Wow, you

9  know, gosh, it's October 15th.  What happened?  If it's August

10  22nd at 5 p.m. and you don't have a decision, it's time to call

11  the clerk's office and find out what happened.

12        MR. HIRSCH:  Understood.

13        THE COURT:  I actually had a case once where we ruled

14  about a deposition in Australia.  I think we had it -- and we

15  ruled right away.  And, like, three or four months later, we

16  get a call from one of the lawyers who's like, What -- is she

17  ever going to do anything about this?  And it's like, We did it

18  right away.  They all missed it.

19        It was the strangest thing because it had to do with

20  Australia, and we had to have a -- you know, because they all

21  had to get up in the middle of the night -- I've forgotten.  I

22  think that it was, like, Schuyler Olt or somebody.  Whover it

23  was, it was -- y'all don't know it, but the lawyers how

24  probably remember Schuyler was like, What the heck?

25        If you don't know by August 22nd, you need to

1  inquire, and that is simply because it's possible that the

2  system will go down, all right?

3           MR. HIRSCH:  Understood.  Thank you.

4           THE COURT:  Don't wait, but I think you'll know.

5           MR. HIRSCH:  Thank you.

6           MS. LEONARD:  Maybe I'm being a little thick here,

7  but, Your Honor, so we're not setting a hearing on the motion

8  to dismiss.  It's going to be submitted.

9           THE COURT:  No.

10          MS. LEONARD:  Got it.

11          THE COURT:  No.  There won't be evidence on that.  If

12 there needs to be evidence on that, then the motion to dismiss

13 is going to be denied.  That's just a fact.

14          MS. LEONARD:  Got it.

15          THE COURT:  I mean, it means there's a dispute of

16 fact that is -- requires decision.  Do you understand?

17          MS. BIRD:  So we're filing on the 9th.  And they said

18 the 16th, and then you said the 15th.

19          THE COURT:  Well -- oh, I'm sorry.  I thought it was

20 exactly seven days later.

21          MR. STOSBERG:  16th would be seven days.

22          THE COURT:  16th.  Okay.  Whatever.  Same thing from

23 our standpoint.  All right.  Anything else today?

24          MR. LEE:  I think that's it.

25          MR. STOSBERG:  That's all, Your Honor.

```
 1              THE COURT:  All right.  Well, you all who --

 2              MS. BIRD:  No, Your Honor.

 3              MS. LEONARD:  Not on behalf of the City.  Thank you,

 4   Your Honor.

 5              THE COURT:  Huh?

 6              MS. LEONARD:  Not on behalf of the City.

 7              THE COURT:  Oh, you're welcome.  Oh, wait.  Can I say

 8   one more thing?  For the City, you may not -- back to the

 9   Oakland overburden because it's -- you know, I'm a little

10   chagrined to keep hearing that, but it -- for those of you who

11   don't deal in strip mining, if you don't know anything about

12   coal extraction, in engineering -- actually, we had this in

13   that City of Clarksville case too, which was a big case.

14              But when you have an odd -- a valuable mineral or you

15   have a valuable object that needs to be extracted and it has

16   materials over top of it, it's technically called an

17   overburden, and it's an engineering term, okay?

18              And it's a cost that is -- accountants and other

19   engineers work on formulas to find out what that overburden

20   will cost for removal in order to extract whatever that -- and

21   the strip mining would be one thing, and there's other things.

22              So just so you know, the overburden -- again, I want

23   to make sure -- that wasn't a slur.  It has to do with the cost

24   associated with removing an obstruction to getting the desired

25   result, okay?
```

```
 1              MS. LEONARD:  Understood, Your Honor.

 2              THE COURT:  Okay?

 3              MS. LEONARD:  Thank you for that explanation.

 4              THE COURT:  All right.  So it's actually an

 5  engineering term, I think is what you'll find.  All right.

 6  Y'all have a great day.  Have a safe trip back.

 7              MR. STOSBERG:  Thank you, Your Honor.

 8              MS. LEONARD:  Thank you.

 9        (Proceedings concluded at 12:17 p.m.)

10                         *  *  *  *  *

11

12

13

14                  C E R T I F I C A T I O N

15

16              I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428    DATE: July 15, 2024

25  ACCESS TRANSCRIPTS, LLC
```