UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>INSIGHT TERMINAL SOLUTIONS, LLC, *et al.*<br><br>　　　　　　　　　　Debtors | CASE NO. 19-32231(1)(11)<br>(Jointly Administered) |
| INSIGHT TERMINAL SOLUTIONS, LLC,<br>as the Reorganized Debtor,<br><br>　　　　　　　　　Plaintiff(s)<br><br>v.<br><br>CITY OF OAKLAND,<br><br>　　　　　　　　　Defendant(s) | Adv. Proc. No. 24-03007 |

**MEMORANDUM-OPINION**

This matter is before the Court on the Motion to Dismiss filed by the Defendant City of Oakland. For the following reasons, the Court will enter the attached Order **DENYING** the City of Oakland's Motion to Dismiss.

**FACTUAL BACKGROUND**

1. In the Complaint filed on March 11, 2024, which initiated the above styled adversary proceeding, Plaintiff asserts two causes of action arising from the City's alleged obstruction of the development of a rail-to-ship bulk commodity terminal ("Terminal") located at a portion of the former Oakland Army Base known as the West Gateway ("West Gateway"). (Compl. ¶ 1.) These causes of action are based upon the following allegations asserted by the Debtor in its Complaint.

### The Bulk Commodity Marine Terminal

2. Plaintiff's sublandlord, Oakland Bulk and Oversized Terminal, LLC ("OBOT"), and the City executed a series of contracts, including a Development Agreement dated July 16, 2013 ("DA"), and the Army Base Gateway Development Project Ground Lease for West Gateway, dated February 16, 2016 (as amended, "Ground Lease") that vested in OBOT the right to develop and operate the Terminal. (Compl. ¶ 2.) The City and its outside counsel acknowledged early on that coal was a likely bulk commodity to be handled by the Terminal. (Compl. ¶ 6.)

3. Arguably due to political pressures and after the execution of the Ground Lease, the City passed an ordinance that prohibited the handling, storage and transportation of coal within the City ("Ordinance"), and applied the Ordinance only to the Terminal through a resolution ("Resolution"). (Compl. ¶¶ 6, 28.) Thereafter, OBOT filed a federal civil action against the City challenging the validity of the Ordinance and Resolution. (Compl. ¶¶ 7, 29.)

### The Federal Lawsuit (*OBOT I*)

4. *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 321 F. Supp. 3d 986 (N.D. Cal. 2018), *aff'd*, 960 F.3d 603 (9th Cir. 2020) ("*OBOT I*") clarified two material issues arising under the DA. First, the court held that OBOT had a vested contractual right to develop and operate a Terminal through which coal could be transferred. *See Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, No. 16-cv-07014-VC, 2017 WL 11528287, at *1 (N.D. Cal. 2017). Second, the City was enjoined from applying the Ordinance to the Terminal, and the Resolution was found void. *OBOT I*, 321 F. Supp. 3d at 1010. The City unsuccessfully appealed the *OBOT I* ruling. (Compl. ¶ 32.)

### The Sub-Ground Lease

5. Following *OBOT I*, on September 24, 2018, OBOT and Plaintiff entered into the Army Base Gateway Redevelopment Project Sub-Ground Lease for West Gateway ("Sub-Ground

2

Lease"), which granted Plaintiff the right (and obligation) to develop and operate the Terminal. (Compl. ¶¶ 4, 44.) After *OBOT I*, however, the City abandoned all pretense of complying with the federal courts and refused to perform its contractual obligations under the DA or Ground Lease, which, according to the Debtor, was an effort to achieve the goals of the Resolution that was struck down by the federal courts. (Compl. ¶ 34.)

6.     On or about November 22, 2018, the City attempted to terminate its Ground Lease with OBOT and subsequently refused to process Plaintiff's design permit applications and schedule meetings. (Compl. ¶ 35.) The City also refused to issue Plaintiff the valid estoppel certificate and non-disturbance agreement ("NDA") that the City was obligated to provide under the Ground Lease. (Compl. ¶¶ 46, 48, 51-53.)

7.     Because the City refused to honor its obligations, Plaintiff was unable to access additional capital and pay back its loan to Autumn Wind Lending ("AWL"), and Plaintiff was forced to file a petition for Chapter 11 bankruptcy protection with this Court ("Proceeding"). (Compl. ¶¶ 44, 54-55).

### State Lawsuit and the City's Post-State Lawsuit Conduct

8.     On December 4, 2018, OBOT filed a lawsuit against the City in the Superior Court of California, County of Alameda ("State Lawsuit" or "*OBOT II*") seeking relief for the City's improper Ground Lease termination. (Compl. ¶ 39.) Following a bench trial, the court (i) entered a November 22, 2023 Statement of Decision ("Statement of Decision") detailing the City's bad faith acts and omissions; and (ii) on January 23, 2024, entered Judgment in favor of OBOT—and against the City—finding, in pertinent part, that: (a) OBOT is not in default of the Ground Lease; (b) the City's November 22, 2018 termination of the Ground Lease was unlawful and invalid, and, therefore, void; and (c) the City's termination of the Development Agreement, with respect to the Premises, is also void. (Compl. ¶ 40-42, Ex. A.)

3

9. Following entry of the Statement of Decision, on or about November 29, 2023, OBOT and ITS submitted to the City a renewed notice of the Sub-Ground Lease and renewed requests for an estoppel and NDA. (Compl. ¶ 58.) On or about December 1, 2023, Plaintiff's architect submitted a permit application and drawings to the City. (Compl. ¶ 60.) On or about January 3, 2024, the City's Director of the Planning and Building Department responded, stating that "all matters concerning this project are being referred to and managed by counsel." (Compl. ¶¶ 60-61.)

10. After this five-year legal battle between OBOT and the City, the Superior Court of the State of California, County of Alameda, on January 23, 2024, entered judgment ("California Judgment") that the City acted in bad faith and improperly attempted to terminate, and therefore, breached its contracts with OBOT.

11. Shortly after the entry of the California Judgment, the City Attorney and outside counsel sent notice to Plaintiff, through its counsel, stating that the City would continue its refusal to process permit applications for the Terminal because the City still maintained that the Ground Lease was terminated and Sub-Ground Lease void, notwithstanding the entry of the California Judgment. (Compl. ¶ 60.) The City subsequently continued its refusal to issue the estoppel certificate or NDA. (Compl. ¶ 59).

12. In its Complaint initiating this adversary proceeding, the Debtor asserts that the preceding events and conduct by the City constitute continuing interference with the Debtor's ability to monetize the Sub-Ground Lease, and finance, develop and operate the Terminal, causing the Debtor substantial monetary damages. (Compl. ¶ 62)

### ITS's Pending Bankruptcy Case

13. On or about November 3, 2020, this Court entered an order ("Confirmation Order") [Doc. 245-1], which confirmed Autumn Wind Lending, LLC's Chapter 11 Plan of Reorganization for the Bankruptcy Estate of Debtor Insight Terminal Solutions, LLC Pursuant to Bankruptcy Code Section 1121(c)(2) (the "Plan"). The Plan and Confirmation Order allowed AWL to assume all rights and obligations of ITS under the Sub-Ground Lease for a total consideration of approximately $20 million. (Compl. ¶ 56; *see also* Confirmation Order [Doc. 379] ¶¶ 6.b., 15.) Paragraph 14 of the Confirmation Order expressly preserved Plaintiff's right to bring any "Litigation Claims" before this Court, and Paragraph 27 of the Confirmation Order included broad jurisdictional retention language. (Confirmation Order ¶¶ 14, 27; *see also* Plan [Doc. 245-1] at Article IX.)

14. Before the Confirmation Order was approved, the City appeared in this case and filed the City's Confirmation Objection on August 4, 2020 [Doc. 276].

15. In the City's Confirmation Objection, the City raised two targeted points of opposition to the proposed Debtors' Plan of Reorganization and AWL's Plan. First, the City argued that the Plans did not appear to meet the feasibility requirements of § 1129(a)(11). (*See* City's Obj. at 7-9.) Second, the City argued that the Debtors' Plan was not proposed in good faith as required by § 1129(a)(3) (City's Obj. at 9-11.)

16. In addition, the City's Confirmation Objection included an objection to AWL's assumption of the Sub-Ground Lease representing that the Ground Lease was terminated and the Sub-Ground Lease was void. (City's Obj. at 11-12.). In support of its explicit opposition to AWL's assumption of the Sub-Ground Lease, the City argued as follows:

> To be clear, ITS and the City are not in privity of contract with one another. ITS' rights under the aptly titled Sub-Ground Lease are

5

> entirely dependent on OBOT's rights under the Ground Lease—issues which are squarely before the California courts for adjudication . . . .
>
> As explained above, the City takes the position that the Sub-Ground Lease is not subject to assumption in connection with confirmation of the competing Plans . . . .
>
> In the instant cases, neither the Debtors nor AWL may resurrect and assume the Sub Ground Lease if the Ground Lease terminated prepetition. There can be no dispute that the termination of the Ground Lease is the subject of active litigation. If the California court determines that the Ground Lease was, in fact, terminated in 2018, there is nothing left for the plan proponents to assume.

(City's Obj. at 3, 11-12; *see also* Compl. ¶ 57.)

17. The City's Confirmation Objection contains no reference to or objection of the Plan's Retention of Jurisdiction provisions in Article IX.[1]

## The Adversary Proceeding's Causes of Action

18. On March 11, 2024, Plaintiff filed the Complaint seeking to hold the City accountable for its interference with Plaintiff's third-party contract and prospective economic advantage and the damages directly resulting therefrom, which Plaintiff believes to be at least one billion dollars. The Complaint seeks to hold the City accountable for its improper acts and omissions with respect to the Debtor's utilization and monetization of the Sub-Ground Lease to

---

[1] Article IX provides: Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan, including jurisdiction to: . . . [1] resolve any matters related to . . . Unexpired Leases . . . [5] issue and implement orders in aid of execution, implementation, or consummation of the Plan . . . [8] hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Person or entity's obligations incurred in connection with the Plan . . . [12] hear any other matter not inconsistent with the Bankruptcy Code . . . . [15] enforce all orders previously entered by the Bankruptcy Court.

**After the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date . . . .**

(AWL Plan [Doc. 245-1] at Article IX; *see also* Conf. Order [Doc. 379] ¶ 27.)

develop a rail-to-ship bulk commodity terminal at the former Oakland Army Base, the damages from which directly led to the Debtor filing its bankruptcy petition with this Court.

## PROCEDURAL BACKGROUND

On March 11, 2024, the Plaintiff, Debtor Insight Terminal Solutions, LLC (the "Plaintiff" or "Debtor") filed its Complaint for Damages.

On May 1, 2024, the Defendant, City of Oakland (the "City"), filed a Motion to Dismiss this Adversary Proceeding [Doc. 25] (the "Motion to Dismiss").

On July 9, 2024, the Debtor filed its Objection to the Motion to Dismiss [Doc. 42] (the "Debtor's Objection").

On July 11, 2024, the Court conducted a preliminary hearing on the Moton to Dismiss, which resulted in an Order directing the parties to file replies concerning the Motion to Dismiss. (*See* Order [Doc. 43].)

On August 9, 2024, the City filed its Reply to the Objection to the Motion to Dismiss [Doc. 47] (the "City's Reply").

On August 16, 2024, the Debtor filed its Surreply to the Reply to the Objection to the Motion to Dismiss [Doc. 48] (the "Debtor's Surreply").

On October 16, 2024, the Court conducted a telephonic hearing for oral arguments by the parties concerning the Motion to Dismiss. (*See generally* Notice of Telephonic Hearing [Doc. 50].)

On November 6, 2024, the parties contemporaneously filed competing proposed orders addressing the Motion to Dismiss for consideration by the Court.

After November 6, 2024 the Court reviewed and considered the Motion to Dismiss, the Debtor's Objection, the City's Reply, the Debtor's Surreply, the comments made by the parties'

attorneys during the July 11, 2024 preliminary hearing, the oral arguments made by the parties' attorneys presented during the October 16, 2024 telephonic hearing in this adversary proceeding, and the parties competing proposed orders before rendering this Memorandum Opinion.

## LEGAL ANALYSIS

### I. Legal Standard for Evaluating the Proposed Grounds for Dismissal

The City seeks dismissal of the Complaint under Federal Rule of Civil Procedure 12(b), incorporated into this proceeding under Bankruptcy Rule 7012(b), on two grounds: first, dismissal for lack of subject-matter jurisdiction pursuant to Federal Rule 12(b)(1), and second, dismissal for failure to state a claim upon which relief can be granted pursuant to Federal Rule 12(b)(6).

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, made applicable through Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, Plaintiff has the burden to show, by a preponderance of the evidence, that the Court has jurisdiction. *See Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Industries, Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).[2] The applicable legal standard "varies depending on the type of jurisdictional 'attack' raised." *Grand Rapids E Cigarette, LLC v. Mitten Pizza, LLC (In re Ahlan Indus., Inc.)*, No. AP 20-80136, 2021 WL 2134654, at 5 (Bankr. W.D. Mich. May 25, 2021). "A 'facial attack' on the court's jurisdiction . . . challenges 'the complaint on its face without contesting its alleged facts, is like a [Rule] 12(b)(6) motion in requiring the court to consider the allegations of the complaint as true'" but when the dismissal motion "presents a 'factual attack' on the court's jurisdiction, no presumption applies to the truthfulness of the factual allegations in the complaint and the court must 'weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist.'" *Id.* (citing *Ohio Nat'l Life Ins. Co. v.*

---

[2] "[F]ederal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*." *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009); *Pratt v. Ventas, Inc.*, 365 F.3d 514, 521 (6th Cir. 2004).

*United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Thus, the Complaint's jurisdictional allegations should be considered as true. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Kravitz v. Summersett (In re Great Lakes Comnet, Inc.)*, 588 B.R. 1, 10 (Bankr. W.D. Mich. 2018) (citing *Gavitt v. Born*, 835 F.3d 623, 639-40 (6th Cir. 2016)). Dismissal is proper only where no cognizable legal theory exists or an absence of sufficient facts alleged to support a cognizable legal theory. *Singleton v. Thompson*, No. CV G-02-713, 2005 WL 8165009, at *1 (S.D. Tex. July 19, 2005) (citing *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990)).

As discussed below, the City's Motion is a facial attack on this Court's jurisdiction, and an analysis of this attack turns on the recognition and interpretation of certain items rooted in and inextricably linked to this bankruptcy case, including: (i) the City's filing of an objection to confirmation, (ii) the terms of the Plan and other documents filed in the chapter 11 case, and (iii) the City's ongoing attacks on the Sub-Ground Lease, which was the bankruptcy estate's primary asset.

## II. Dismissal is not warranted pursuant to Rule 12(b)(1), because this Court maintains "related to" subject-matter jurisdiction under 28 U.S.C. § 1334(b).

The City argues that this adversary proceeding falls outside the broad ambit of the district court's bankruptcy jurisdiction under 28 U.S.C. § 1334(b). The City is mistaken.

It is well established that a bankruptcy court's subject matter jurisdiction derives from 28 U.S.C. § 1334. *In re Resorts Int'l., Inc.*, 372 F.3d 154, 161 (3d Cir. 2004). Section 1334(b) provides, in relevant part, that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *See* 28 U.S.C. § 1334(b). Although this proceeding neither arises under the Bankruptcy Code nor arises in a bankruptcy case, it is "related to" this chapter 11 case.

9

The Sixth Circuit adopts the Third Circuit's test in *Pacor, Inv. v. Higgins (In re Pacor)*, 743 F.2d 984 (3d Cir. 1984) for evaluating "related to" jurisdiction over an adversary proceeding. Under *Pacor*, an adversary proceeding is related to bankruptcy where "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Mich. Employment Security Comm. v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1142 (6th Cir. 1991) (quoting *Pacor*, 743 F.2d at 994) (emphasis in the original). In order to determine whether a matter is within a bankruptcy court's jurisdiction, "it is necessary only to determine a matter is at least "related to" the bankruptcy. *Wolverine Radio Co.*, 930 F.2d at 1141.

Relying on the factor-driven analysis from a bankruptcy court opinion from the Eastern District of Kentucky in *Tew v. ED&F Man Capital Markets, Ltd. (In re Tew)*, No. 20-51078, 2023 WL 7981684, at *7 (Bankr. E.D. Ky. Nov. 16, 2023), the City argues in its Motion to Dismiss that the Court lacks jurisdiction because (a) the City did not actively participate in the chapter 11 case, (b) the subject claims are not rooted in bankruptcy and lack a close nexus with the chapter 11 case, (c) the Debtor reorganized rather than liquidated, and (d) the Plan does not adequately preserve jurisdiction over the subject claims. The City is wrong on all counts.

Based on the analysis below, the Court determines that the matters asserted in the Complaint are related to this bankruptcy case and are relevant to the execution of the confirmed Plan. The Complaint's allegations are inextricably intertwined with the Debtor's chapter 11 case and the restructuring contemplated in the Plan. That is to say, "the outcome of [this adversary] proceeding could conceivably have an effect on the estate being administered in bankruptcy . . . "

10

as required under *Wolverine Radio's* measurement for related to jurisdiction. *Wolverine Radio Co.*, 930 F.2d at 1142.

### A. The City Actively Participated in the Bankruptcy Case When It Objected to the Assumption of the Sub-Ground Lease and Confirmation of the Plan.

The City's suggestion that it did not actively participate in the Debtor's chapter 11 case (*see* Motion to Dismiss ¶ 46) is belied by the facts here. When AWL pursued confirmation of a chapter 11 plan in order to—in the City's own words—"preserve their value in a Sub-Ground Lease," the City actively intervened to prevent the confirmation of both AWL's and the Debtor's proposed Plans by filing a robust and well-briefed twelve-page objection for the most important stage of the bankruptcy case.[3] That action reflects that the City was an active participating party-in-interest in the case, and proves that the Debtor's and AWL's preservation of the "value in [the] Sub-Ground Lease" was critical.

### B. The Complaint is "Rooted" in the City's Actions that Lead to ITS's Bankruptcy and Continue Unabated.

By relying on *Tew*, the City argues that the Complaint does not "pertain to activity in or **leading to the bankruptcy case**" or that there is not a "close nexus between [the Plan] or [this] bankruptcy case and the [Complaint]. . . ." *Tew*, 2023 WL 7981684, *9 (emphasis added). Yet ITS's purpose—both before bankruptcy and after confirmation—was always to maximize the value of the Sub-Ground Lease. Aptly, in its Complaint, the Debtor alleges that the City thwarted ITS's prepetition efforts to raise financing and subsequently monetize the Sub-Ground Lease, and continues to thwart ITS's post-confirmation efforts to monetize the Sub-Ground Lease as well.

The City, like other stakeholders in this bankruptcy case, was aware that the City's alleged wrongful termination of OBOT's Ground Lease helped force ITS into chapter 11, and that the

---

[3] *See* the City's Confirmation Objection (arguing, among other things, that both AWL's and the Debtor's proposed plans were "unfeasible" and that the Debtors' plan was proposed in bad faith); *see also Declaration of Bijal Patel* [Doc. 277] and a *Request for Judicial Notice* [Doc. 278].

evolution of this dispute would ultimately determine ITS's fate and whether it could confirm and implement a chapter 11 plan. Unlike the *Tew* debtor, the Complaint here concerns a pattern of alleged behavior that not only pre-dated ITS's bankruptcy filing, but caused the filing and continued unabated post-confirmation to today.[4]

Finally, the City itself highlights its own strong connections not only to ITS and its financial health, but to the bankruptcy case and the success of the proposed reorganization under the Plan. (*See* City Confirmation Objection § I (stating that the City is an "[i]nterested [p]arty" and the "owner of the land . . . that is the subject of competing plans filed by the Debtors and AWL").)

### C. ITS is a Single-Purpose Entity and Reorganized to Preserve the Value of its Critical Material Asset: the Sub-Ground Lease.

ITS was not a typical chapter 11 debtor and is not a typical reorganized debtor. ITS was a single-purpose entity created to develop the Terminal pursuant to the Sub-Ground Lease. As stated in the City's Confirmation Objection, the Disclosure Statement, and other chapter 11 filings, ITS's primary asset was the Sub-Ground Lease. (*See, e.g.,* Disclosure Statement Art. III. A; City Confirmation Objection § I.) So ITS's "reorganization" was subject to a number of interrelated contingencies, including various pending and potential litigations, that could take years to finally determine, as the Debtor's Complaint is now alleging. (*See* City Confirmation Obj. § I, II.D-E, III.A.) Unlike the debtor in *Tew*, ITS was not simply "reentering the market" as a clean new entity with an operating business. Rather, this chapter 11 case—through the confirmed Plan—created a path for ITS to potentially realize the value of the Sub-Ground Lease. (*See* Disclosure Statement § III.C.)

---

[4] The City also argues that any proceeds recovered in the adversary proceeding would not "impact the estate" or "be used to pay creditors under the Plan . . . ." As the *Tew* court notes, however, such factors are not dispositive. Moreover, funds recovered would reimburse the plan proponent entity that funded the payments made to creditors with allowed claims under the Plan.

The Complaint suggests this adversary proceeding is the Debtor's current best effort to travel that path to monetize the Sub-Ground Lease and implement the Plan's contemplated reorganization. ITS's chapter 11 case remains pending; it has not been closed and no final decree has been entered by this Court.

### D. The Plan Adequately Preserved Jurisdiction.

Although this chapter 11 proceeding was initiated in 2019 and the Plan confirmed in 2020, Debtor's case remains active before this Court and this Court has continuing jurisdiction over the matter. A review of the Plan and the Confirmation Order sets forth the terms of this Court's post-confirmation jurisdiction. Specifically, Article IX(A.) provides in relevant part that:

> Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan, including jurisdiction to: . . . [1] resolve any matters related to . . . Unexpired Leases . . . [5] issue and implement orders in aid of execution, implementation, or consummation of the Plan . . . [8] hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Person or entity's obligations incurred in connection with the Plan . . . [12] hear any other matter not inconsistent with the Bankruptcy Code . . . . [15] enforce all orders previously entered by the Bankruptcy Court.
>
> After the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date . . . .

(*See* Plan [Doc. 245-1] at Article IX(A.); *see also* Conf. Order [Doc. 379] ¶ 27.) Notably, the City's Objection failed to object to these confirmed post-confirmation jurisdiction provisions. (See Factual Background, *supra* at ¶ 17.)

While the Plan does not specify each potential claim and potential litigation target, that lack of minute detail is not problematic. *See, e.g., Gordon Sel-Way, Inv. v. U.S. (In re Gordon Sel-Way, Inc.)*, 270 F.3d 280, 288-89 (6th Cir. 2001). Prepetition and preconfirmation, ITS was a

13

largely under-funded single-purpose entity with few employees and no operations. When AWL and new management assumed control over ITS, it is not surprising that AWL's Disclosure Statement and the Plan did not identify claims with granular detail, but instead reasonably and adequately identified (i) the kinds of claims that would be preserved (*i.e.*, the "Litigation Claims" that were retained and reserved for prosecution by ITS, as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B) pursuant to Article VII.K of the Plan) and (ii) the kinds of disputes over which this Court would retain jurisdiction, including disputes within the categories identified in Article IX.A of the Plan. To expect a non-debtor competing plan proponent such as AWL to know and possess the ability to articulate all claims and disputes with absolute precision is neither practical nor required under the law.

Moreover, the Plan's description of claims and disputes is a far cry from an ambush on an unsuspecting party in interest. The City's own filings evidence that the City knew that its conduct was central to ITS's bankruptcy filing and implementation of the Plan.[5] From the onset, the Debtor espoused the problems created by the City's conduct, which was aptly acknowledged and monikered by the Court as the "Oakland Overburden". (*See, e.g.*, Debtor's Obj. to AWL's Motion to Dismiss [Doc. 61] at ¶¶ 28-35.) In this regard, the Debtor specifically asserted early on to the Court that:

> The Debtors believe that, with sufficient time in these Chapter 11 Cases, they can negotiate resolutions [concerning the Oakland Overburden] with the City of Oakland that will allow the Project to move forward and enhance the value of the Sublease for the benefit of the Debtors' creditors. **However, if the Debtors cannot consensually remediate the Oakland Overburden by collaborating and partnering with the City of Oakland, then the Debtors further assert that this Court is or can be empowered [to] adjudicate or otherwise address the West Gateway Master Development Agreement dispute, which directly affects the**

---

[5] *See* City Confirmation Obj. ¶ E (stating that "[a]ccording to AWL's Plan, '[t]he Sublease is the Debtor's primary asset and, upon information and belief, the Debtor has yet to commence development of the Premises nor is such development expected to commence in the near term.' AWL believes that, under new management, the Reorganized Debtor 'can successfully develop or actively market and sell the Sublease.'") (internal citations omitted).

14

> [Sub-Ground Lease] that stems from the Agreement, along with any other Oakland Overburden issues.

(*Id.* at ¶¶ 28, 35 (emphasis added).)

The City chose not to challenge the Plan's broad retention of claims and jurisdiction, despite the fact that the City capably (albeit unsuccessfully) analyzed and attacked other specific areas of the AWL's Plan in the City's Confirmation Objection [Doc. 276].

### III. Dismissal is not warranted pursuant to Rule 12(b)(6) because the Debtor properly pleads all elements of its two tortious interference claims.

Because the Complaint properly pleads all the elements of tortious interference with prospective economic advantage, and because the City has ***not*** moved to dismiss Plaintiff's claim for tortious interference with contract, the Motion should be denied.

Again, Plaintiff asserts two causes of action against the City: tortious interference with prospective economic advantage and tortious interference with contract. The City argues that the tortious interference with prospective economic advantage claim is barred by the California Tort Claims Act (Gov. Code, § 810 et seq.) (the "Act"), the statute of limitations, the City's pending appeal of the California judgment and because a breach of contract is not an independent act sufficient to support tort claims. None of these positions are with merit.

As discussed below, Plaintiff's claims are permitted by statute, are not time barred as the City admitted in prior statements to this Court and because the City's misconduct continues, the automatic stay under California law only stays enforcement of the California Judgment, and Plaintiff has not asserted a cause of action for breach of contract. Plaintiff meets the pleading requirements to state claims against the City for tortious interference with prospective economic advantage and tortious interference with contract.

California's Tort Claims Act authorizes governmental liability for tortious injuries suffered because of the acts or omissions of public entities or their employees. *Gong v. City of Rosemead*

15

(2014) 226 Cal.App.4th 363, 373. California Government Code ("Gov. Code") section 815.2 imposes vicarious liability upon public entities for the tortious acts and omissions of their employees, including elected officials. Gov. Code § 815.6 "makes a public entity liable for its failure to discharge a mandatory duty imposed by an enactment, be it a constitutional or charter provision, statute, ordinance, or regulation having the force of law, that is designed to protect against the risk of a particular against the risk of a particular kind of injury." *Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 720.

More specifically, California law mandates that a "public entity and its employees [may] be held liable for intentional interference with prospective economic advantage and trade libel." *City of Costa Mesa v. D'Alessio Invs., LLC* (2013) 214 Cal. App. 4th 358, 378. That conclusion is grounded in Gov. Code § 820 (allowing public employees to be liable for acts or omissions to the same extent as private persons) and Gov. Code § 815.2 (allowing public entities to be liable for the acts or omissions of its employees acting within the scope of their employment). *See H & M Assocs. v. City of El Centro* (1980) 109 Cal.App.3d 399, 406–07.

The City argues Plaintiff's claims are barred by a two-year statute of limitations applicable to tort claims against government entities as set forth in Gov. Code § 945.6. Not so. Gov. Code § 945.6 provides that, for purposes of computing the time in Gov. Code § 945.6, "the date of accrual of a cause of action . . . is the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitation which would be applicable thereto if there were no requirement that a claim be presented . . . ." Gov. Code, § 901; *see also City of Pasadena v. Superior Court* (2017) 12 Cal.App.5th 1340, 1349. Thus, the issue is when did Plaintiff's claims against the City become actionable? The City provides the answer in its previous filings with this Court: not until conclusion of the State Lawsuit.

The City represented to this Court that ITS had no rights or claims related to the Sub-Ground Lease until the State Lawsuit with OBOT was resolved: "There can be no dispute that the termination of the Ground Lease is the subject of active litigation. If the California court determines that the Ground Lease was, in fact, terminated in 2018, there is nothing left for the plan proponents to assume." (*See* City Confirmation Objection at 12.) Put differently, if the outcome of the State Lawsuit was a ruling that the Ground Lease was unlawfully terminated by the City in 2018—which is what happened—then the City could be held liable for refusing to acknowledge the assumed Sub-Ground Lease, issue the estoppel and NDA, and process ITS's permits.

Plaintiff detrimentally relied upon the City's statement and forestalled bringing its claims here. Consequently, the City is judicially estopped from now reversing field and contradicting its prior representations to this Court. *New Hampshire v. Maine* (2001) 532 U.S. 742, 749; *Dot ConnectAfrica Trust v. Internet Corp. for Assigned Names & Numbers* (2021) 68 Cal.App.5th 1141, 1158.

Because Plaintiff could not have known that the City acted in bad faith and breached the contracts with Plaintiff's Sub-Lessor until the California Court ruled in November 2023, Plaintiff did not have sufficient knowledge until that ruling as to whether it possessed any legal claims against the City. *See April Enter., Inc. v. KTTV* (1983) 147 Cal. App. 3d 805, 832 (holding that the discovery rule applies where breaches "can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time"). When the California Court issued its decision in the State Lawsuit, Plaintiff timely brought this action.

The City's argument that this action is time-barred fails for the additional reason that Plaintiff sufficiently alleges a continuing violation. The Complaint makes clear that as soon as the

California Court issued its November 2023 Statement of Decision finding the City acted in bad faith and breached the contract, the City resumed its course of conduct in refusing to issue an estoppel certificate and NDA and refused to issue permits—the exact improper actions it had taken in 2018. (Compl. ¶¶ 58-60.) This action was filed well within the applicable two-year statute of limitations.

The City's appeal of the California judgment provides no basis for dismissal of Plaintiff's claims. Under California law, perfecting an appeal only stays proceedings in the trial court regarding the order or judgment appealed, including enforcement of the same. California Code of Civil Procedure sections 916 *et seq.*

Finally, the City's argument that Plaintiff's claims fail because a breach of contract is not an adequate independent act to support tort claims is misplaced. No contract between the City and ITS exists and ITS has not asserted a breach of contract claim against the City. Rather, ITS alleges that the City has interfered with ITS' contract with a third-party—OBOT. California courts recognize the viability of tortious interference claims against a third-party's interference with a plaintiff's existing contract with another party. *Ixchel Pharma v. Biogen* (2020) 9 Cal. 5th 1130. As the City admits, "[t]he City has never had any contractual or business relationship with ITS." (Mot. ¶ 46.) Plaintiff has not, and cannot, allege a breach of contract claim against the City because no contract between these parties exists. Thus, the interference claims are not duplicative.

Because the Complaint properly pleads all of the elements of tortious interference with prospective economic advantage, and because the City has not moved to dismiss Plaintiff's claim for tortious interference with contract, the Motion should be denied.

## CONCLUSION

The jurisdiction of this Court is clearly established based on the City's voluntary participation in the bankruptcy case, the related-to nature of the claims, and the broad jurisdiction

retained under the Confirmation Plan. Moreover, ITS's claims are timely and well-pled, as they are not barred by the California Tort Claims Act, statute of limitations, or any automatic stay pending appeal. Therefore, the City's Motion to Dismiss is DENIED.

                                                    /s/ Joan A. Lloyd
                                                    Joan A. Lloyd
                                                    United States Bankruptcy Judge
                                                    Dated: November 20, 2024

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| INSIGHT TERMINAL SOLUTIONS, LLC, *et al.* | ) | CASE NO. 19-32231(1)(11) |
| | ) | (Jointly Administered) |
| Debtors | ) | |
| | ) | |
| INSIGHT TERMINAL SOLUTIONS, LLC, as the Reorganized Debtor, | ) | Adv. Proc. No. 24-03007 |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF OAKLAND, | ) | |
| | ) | |
| Defendant(s) | ) | |

**ORDER**

This matter having come before the Court on the Motion to Dismiss filed by the Defendant City of Oakland, and the Court having reviewed the Motion to Dismiss, the Debtor's Objection, the City's Reply, the Debtor's Surreply, the comments made by the parties' attorneys during the July 11, 2024 preliminary hearing, the oral arguments made by the parties' attorneys presented during the October 16, 2024 telephonic hearing, and the competing proposed orders filed with the Court on November 6, 2024 and the Court being duly advised in the premises,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the Motion to Dismiss filed by the City of Oakland, be and hereby is, **DENIED**.

So Ordered this 20th day of November, 2024.

Joan A. Lloyd
United States Bankruptcy Judge
Dated: November 20, 2024